**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

ROBERT G. SWOFFORD, JR.,
an individual, and his wife,
SHARON L. SWOFFORD, an
individual,

        Plaintiffs,

vs.                        Case No.: 6:08-cv-00066-PCF-DAB

DONALD ESLINGER,
in his official capacity
as the SHERIFF OF SEMINOLE
COUNTY, STATE OF FLORIDA;
WILLIAM MORRIS, JR.,
in his individual capacity, and
RONALD REMUS, in his
individual capacity,

        Defendants.

_____/

### AMENDED CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

The Plaintiffs Mr. Robert G. Swofford, Jr. ("Mr.

Swofford") and Ms. Sharon L. Swofford ("Ms. Swofford") (both

collectively "the Swoffords"), by and through their

undersigned counsel, sue the Defendants Mr. Donald Eslinger,

in his official capacity as the Sheriff of Seminole County,

Florida ("Eslinger"), Mr. William Morris, Jr., in his

individual capacity ("Morris"), and Mr. Ronald Remus, in his

individual capacity ("Remus") (all three collectively, the

"Defendants").

1

## I. <u>JURISDICTION AND VENUE</u>

In addition to several State civil causes of action, the Swoffords[1] are asserting a Federal civil rights action for damages brought pursuant to 42 U.S.C. §1983, 42 U.S.C. §1988 and the Fourth Amendment to the United States Constitution.

1.    Pursuant to §768.28(6)(a), *Fla. Stat.* (2007), the Swoffords notified Eslinger and the Florida Department of Financial Services of their claims six (6) months or more prior to the filing of this action.  No response was ever received.  The Swoffords have complied with §768.28(6)(a), *Fla. Stat.* (2007).

2.    This is a civil complaint for various causes of action in which the damages exceed the amount of $75,000.00, exclusive of interest, attorneys' fees and costs.

3.    Venue is proper in this County because the causes of action arose in Seminole County, Florida.

4.    All conditions precedent to the filing of this action have occurred, accrued, or have been waived as a matter of law.

5.    Unless otherwise indicated or implied by the text,

---

[1]    In particular, Mr. Swofford is the party asserting a Federal civil rights action for damages brought pursuant to 42 U.S.C. §1983, 42 U.S.C. §1988 and the Fourth Amendment to the United States Constitution.

2

all the acts detailed in this civil complaint in Parts III.
2., III. 3. and III. 4. took place between Midnight and 4:00
a.m. on April 20, 2006.

## II. THE PARTIES

6.     Mr. Swofford is a citizen of the United States and
at all times material hereto was and is a resident of Seminole
County, Florida.  Mr. Swofford has been married to Ms.
Swofford from February 20, 2005, to the present.  The
Swoffords were married to each other at the time of the
Shooting described below.

7.     Ms. Swofford is a citizen of the United States and
at all times material hereto was and is a resident of Seminole
County, Florida.  Ms. Swofford has been married to Mr.
Swofford from February 20, 2005, to the present.  The
Swoffords were married to each other at the time of the
Shooting described below.

8.     Eslinger is and was at all times material hereto
the Sheriff of Seminole County, serving in his official
capacity as such, and acting under the color of state law.
Eslinger is the director of and presides over the Seminole
County Sherriff's Office ("SCSO").  SCSO is the law
enforcement agency for Seminole County.  Eslinger and SCSO are
used interchangeably in this complaint for Eslinger.

3

9.    Morris is and was at all times material hereto a deputy sheriff appointed and employed by Eslinger, working within and without the course and/or scope of his employment as such, and acting under the color of state law.  Morris is being sued in his individual capacity.

10.    Remus was a former deputy sheriff and was at all times material hereto appointed and employed by Eslinger, working within and without the course and/or scope of his employment as such, and acting under the color of state law. Remus is being sued in his individual capacity.  Remus is no longer employed by Eslinger.

### III. FACTUAL ALLEGATIONS

#### 1. The Setting

11.    Ms. Swofford owns approximately seven (7) acres of land at 400, 410 and 420 North Forest Lake Drive (all contiguous parcels), Altamonte Springs, Seminole County, Florida ("Property").  At the time of the shooting, a six-foot high privacy wood fence ("Wood Fence"), chain link and brick and steel bar fences and a thick tree line surrounded most of the Property.

12.    The Property is approximately 225 yards long as measured from its Eastern boundary next to North Forest Lake Drive to the Western boundary represented by the Wood Fence

between the Property and The Barrington at Mirror Lake Apartments ("Barrington Apartments").

13. Mr. Swofford repairs and remodels vintage or "muscle" cars on the Property. Restored and pre restoration vintage, antique or "muscle" cars kept or stored on the Property are hereinafter referred to as the "Cars" collectively. The restored Cars are stored in garages on the Property. Prior to April 20, 2006, Cars that had not been restored were parked outside the garages on the Property.

14. Previous to the Shooting, the Swoffords had trouble with trespassers entering the Property and vandalizing the Cars.

15. Prior to the Shooting, the Swoffords had called the SCSO on several occasions to report trespassing and vandalism on the Property and to request its assistance.

16. Prior to the Shooting, the Swoffords were in the process of installing a security system to protect them, the employees, the Property and the Cars. The security system was to eventually consist of twenty (20) surveillance cameras and three (3) motion sensors placed at various locations inside the Property. Because the system was being installed, only two (2) cameras were working on the night of the Shooting. The system was designed to capture only live feed; it did not

5

record.   The Swoffords and Donald H. Buchholz ("Buchholz")[2]
monitor the system.   Buchholz was not on the Property when the
Shooting occurred.

### 2. The Encounter

17.   At approximately 2:30 a.m. on April 20, 2006, Remus
was on the Barrington Apartments.   The Barrington Apartments
are West of the Property and between the Property and Mirror
Lake in Seminole County, Florida.

18.   At all times relevant to this complaint, Remus was
riding a police-issued bicycle, and was wearing a white polo
shirt and black cycling shorts.   Remus was not wearing the
green shirt, trousers, and chest gold badge or star.   Based on
information and belief, the aforementioned green shirt,
trousers, and chest gold badge or star is the regular or
standard uniform worn by deputies of the SCSO.

19.   The white polo shirt and black cycling shorts Remus
was wearing did not have on it printed words visibly
identifying Remus at the time and day of the Shooting as a
member of the SCSO or as a law enforcement officer.

20.   At the time of the Shooting, Remus carried a
SigSauer semi-automatic pistol (with a chambered round and

---

[2]   At the time of the Shooting, Mr. Buchholz was the full-
time caretaker of the Property.

cocked), model P-226, caliber 9 mm (Luger), serial number
UU611582, a Taser (model number X26 or M26), two additional
loaded magazines for the P-226, a "Stinger" flashlight,
restraints and a two-way police radio (VOX enabled and with
the Vox activated).

21.    While on patrol on Post Lake Place (a street within
Barrington Apartments), Remus observed two males whom he
described as Hispanics (the two males are hereinafter referred
to as "Hispanics"), wearing black clothing inside a silver
colored passenger vehicle.

22.    After one of the Hispanics said "oh shit," both
Hispanics exited the vehicle and proceeded North on foot along
the West side of the Wood Fence separating Barrington
Apartments from the Property.

23.    The Hispanics were not armed.

24.    Remus pursued the Hispanics.  He lost them.

25.    In an attempt to locate the Hispanics, Remus
pedaled his bicycle along Blackland Terrace (a street within
Barrington Apartments) and Post Lake Place (another street
within Barrington Apartments) which runs along the East side
of the West Wood Fence separating Barrington Apartments from
the Property.  He did not find them.

26.    Still looking for the Hispanics, Remus pedaled his

bicycle along Post Lake Place West (another street within Barrington Apartments) which runs along the North side of the North Wooden Fence separating Barrington Apartments from the Property. He did not find them.

27. Remus pedaled back to Post Lake Place to the point where he first encountered the Hispanics. When he got there, Remus proceeded South on Blackland Terrace.

28. While on Blackland Terrace, he saw a dark colored Honda vehicle ("Honda").

29. The Honda started leaving Blackland Terrace.

30. While underway, the Honda was not speeding or driving erratically.

31. Remus chased the Honda on his bicycle North on Blackland Terrace continuing onto Post Lake Place and out of Barrington Apartments.

32. Once out of Barrington Apartments, Remus continued chasing the Honda East on Semoran Boulevard or State Road ("S.R.") 436. Remus requested assistance. Sergeant Jeanette E. Kloth ("Kloth") of the SCSO responded.

33. Kloth stopped the Honda by Jewel Drive. Remus met her and the Honda at this location. She arrested the Honda's driver and only occupant, Mr. Bienvenido Oscar Lendebol, for loitering and prowling, a misdemeanor under Florida law.

Jewel Drive is approximately 0.7 miles from where Remus started chasing the Honda.

34.    Subsequently, Mr. Lendebol entered a plea of "nolo contendere"[3] for loitering and prowling, and received pretrial diversion.  Mr. Lendebol was never connected with the Hispanics or charged with any other crimes.

35.    After Kloth arrested Mr. Lendebol, Remus left the location where Kloth and the Honda were and proceeded West on S.R. 436.  He made a left turn onto North Forest Lake Drive and proceeded South.

36.    North Forest Lake Drive is the East boundary of the Property.

37.    The Property is located within Remus' regular patrol area.

38.    Remus is familiar with his regular patrol area.

39.    While proceeding South on North Forest Lake Drive, Remus went past Lyndscape Terrace and up to Jean Court.

40.    The total distance traveled by Remus on his bicycle from the point where the Honda was parked inside Barrington Apartments before he started chasing it to where it was stopped by Kloth by Jewel Drive and S.R. 436 back to Blackland

---

[3]    This is a no contest plea to criminal charges under Fla. R. Crim. P. 3.170(a).

Terrace in Barrington Apartments, including the distance traveled on North Forest Lake Drive, is 1 3/4 miles.

41.    Between S.R. 436 and Lyndscape Terrace on the West side of North Forest Lake Drive is the Swoffords' residence.

42.    The Swoffords' home is next to and visible from North Forest Lake Drive.

43.    The Swoffords' home is located twenty (20) yards off North Forest Lake Drive.

44.    At the time of the Shooting, Lyndscape Terrace was a private dirt road that proceeded West into the Property past the area where the Shooting took place.

45.    On the date of the Shooting, law enforcement officers and crime scene technicians were able to drive standard patrol cars and trucks to the scene of the Shooting using Lyndscape Terrace.

46.    Before the shooting, while Remus was on North Forest Lake Drive looking for the Hispanics, he was able to observe and did observe Lyndscape Terrace.

47.    Before the shooting, while Remus was on North Forest Lake Drive looking for the Hispanics, he was able to observe and did observe the Swoffords' home.

48.    Before the shooting, Remus knew that the Property extended East up to North Forest Lake Drive.

10

49.   Before the shooting, Remus was able to observe and did observe that there was no fence blocking pedestrian or vehicular traffic between North Forest Lake Drive and Lyndscape Terrace.

50.   Before the shooting, Remus was able to observe and did observe that there was no fence blocking pedestrian or vehicular traffic between North Forest Lake Drive and the Swoffords' home.

51.   After Remus left North Forest Lake Drive, he proceeded West on S.R. 436 to Barrington Apartments.  He turned left into Post Lake Place and continued South until intersecting Blackland Terrace.  He continued South on Blackland Terrace until he reached the spot within Barrington Apartments where the Honda was parked originally (before Remus started chasing it).  There he waited for Morris, the K-9 officer, to arrive.

### 3. The Break-In

52.   Eventually, Morris, a K-9 deputy sheriff with the SCSO, arrived with his dog ("Strike") and parked his SCSO's cruiser on Blackland Terrace.

53.   Strike is a Belgian Malinois.  His identification number is BHFLBO.

54.   Strike is not trained as a tracking dog.

11

55.     Based on information and belief, Strike's SCSO
records claim that it is capable of apprehending persons both
under and not under gunfire and protecting its handler against
assault.

56.     Strike has a certificate of completion for "Street
Work" from the K-9 Dog Training Center ("Center") on January
26, 2006.  It also has a certificate of completion for
Narcotics Detection from the Center, also on January 26, 2006.

57.     Tracking dogs are excluded from the certification
process of §11B-27.013, Florida Administrative Code.

58.     The SCSO claims that it kept none of Strike's
training records, the training syllabus, protocols, notes,
tests, memoranda and other documents regarding Strike and
Strike's training at the Center.

59.     According to the Center, it lost all of Strike's
training records, the training syllabus, protocols, notes,
tests, memoranda and other documents regarding Strike and
Strike's training.

60.     Although the Swoffords dispute Strike's training,
according to the SCSO, Strike was trained only to detect the
odors of cocaine, marijuana, heroin and methamphetamines.
None of the above substances were the cause of the Shooting,
were carried by Mr. Swofford at the time of the Shooting or

found on the Property at the time of the Shooting or thereafter by law enforcement personnel.

61.    The South portion of the West Wood Fence runs along Blackland Terrace.  The North portion of the West Wood Fence runs along Post Lake Place.  Both streets are within Barrington Apartments.

62.    At the time of the Shooting, Morris carried a SigSauer semi-automatic pistol (with a chambered round and cocked), model P-226, caliber 9 mm (Luger), serial number U545127, a Taser (model number X26 or M26), two additional loaded magazines for the P-226, a "Stinger" flashlight, restraints and a two-way police radio (VOX enabled and with the Vox activated).

63.    At all times relevant to this complaint, Strike was on a twenty (20) foot dog leash or lead.

64.    After taking Strike from his SCSO's cruiser, Morris did not take Strike to the silver-colored passenger vehicle in which the two Hispanics were sitting prior to Remus coming across them.

65.    Morris, Strike and Remus walked off Blackland Terrace and approached the South portion of the Wood Fence that runs along the boundary between Barrington Apartments and the Property.

13

66.     After Morris, Strike and Remus reached the Wood
Fence, they proceeded North along its West side (the
Barrington Apartments' side) for approximately thirty (30)
yards.

67.     At the thirty (30) yard mark approximately, there
was space between the bottom of the Wood Fence and the dirt.
Strike went through this space and under the Wood Fence.
Remus and Morris did not.  Morris pulled Strike back through
the space under the Wood Fence and onto the Barrington
Apartments' side.

68.     While Remus stayed by the place where Strike had
gone under the Wood Fence, Morris and Strike walked South
along the Barrington Apartments' side of the Property's West
Wood Fence for approximately fifteen (15) yards to a point on
the Wood Fence where Morris felt that he could kick down,
break through or tear down the Wood Fence and enter the
Swoffords' private Property.

69.     Without announcing himself and without any
authorization whatsoever, Morris proceeded to unlawfully and
illegally break into the Swoffords' private Property by
kicking, tearing, shoving and/or pushing down a section of the
Property's Wood Fence facing Barrington Apartments and off
Blackland Terrace.

14

70.  At all times relevant to this complaint, Morris was wearing dark clothing.  Morris was not wearing the green shirt, trousers, and chest gold badge or star regularly worn by deputies of the SCSO.

71.  The dark clothing worn by Morris did not have on it printed words visibly identifying Morris at the time and day of the Shooting as a member of the SCSO or as a law enforcement officer.

72.  From the time Remus first came across the Hispanics up to the time of the Shooting, no perimeter was established by law enforcement officers around the Property.

73.  Prior to going into the Swoffords' private Property, neither Remus nor Morris requested permission from the Swoffords to enter.

74.  Prior to going into the Swoffords' private Property, neither Remus nor Morris informed the Swoffords that they were going to enter the Property.

75.  Prior to going into the Swoffords' private Property, neither Remus nor Morris made any effort to announce themselves as law enforcement officers or members of the SCSO. Morris' police cruiser's law enforcement lights were not on..

76.  Prior to going into the Swoffords' private Property, neither Remus nor Morris announce to persons on the

Property that there was a K-9, for said persons to show themselves and surrender and that otherwise the K-9 would be released.

77.    Prior to going into the Swoffords' private Property, neither Remus nor Morris requested other law enforcement officers or other third parties to contact the Property's owners or tenants-in-possession to request permission to enter the Property or to inform them what the SCSO was about to do.

78.    Prior to going into the Swoffords' private Property, neither Remus nor Morris requested other law enforcement officers or other third parties to contact neighbors to determine who were the owners or tenants-in-possession of the Property.

79.    Prior to going into the Swoffords' private Property, Morris loudly shouted to Remus that he had found a good place to go through the Wood Fence and go into the Swoffords' private Property.  While they were shouting at each other, neither Morris nor Remus identified themselves as law enforcement officers or members of the SCSO.

80.    At the time Morris and Remus got into the Swoffords' private Property, they were not in "hot pursuit" of the two Hispanic males.

16

81.    At the time Morris and Remus got into the
Swoffords' private Property, they did not have a search
warrant or other court order authorizing them to enter the
Swoffords' private Property.

82.    At the time Morris and Remus got into the
Swoffords' private Property, there were no exigent
circumstances present allowing Remus or Morris to legally go
into or otherwise enter the Property without a search warrant
or other court order authorizing them to enter the Swoffords'
private Property.

83.    At the time Morris and Remus got into the
Swoffords' private Property, they did not have probable cause
to believe that the two Hispanics were still on the Property.

84.    At the time Morris and Remus got into the
Swoffords' private Property, they were armed.

85.    At the time Morris and Remus got into the
Swoffords' private Property, they were not acting as law
enforcement officers entitled to legal protection or qualified
immunity.

86.    At the time Morris and Remus got into the
Swoffords' private Property, they knew that the Property they
were about to enter was privately owned.

87.    Morris and Remus' act of entering the Swoffords'

17

private Property constitutes trespassing, a warrantless and/or illegal entry, and/or a search and seizure of said Property.

88.    The Swoffords' private Property was one contiguous parcel of land containing within it the Swoffords' home and several other structures all belonging to the Swoffords.

89.    The Swoffords had a reasonable and legally protected right to and expectation of privacy over and in their Property.  The Swoffords actively enforced and protected said right to privacy by erecting a Wood Fence, erecting other fences and planting large trees along the Western, Southern and Northern perimeters of the Property, and by installing security system and by ejecting trespassers.

## 4. The Shooting

90.    Shortly after Midnight, in the early morning hours of April 20, 2006, Mr. Swofford was asleep on a recliner chair in his house on the Property.

91.    Mr. Swofford was awakened by his dog's bark. Thinking that the dog's barking was caused by the Swoffords' cats, he got up from the recliner, went to the back door, turned on the outside lights and looked out.  Because he did not see the cats, Mr. Swofford became concerned.

92.    One of the Swoffords' businesses is the restoration of Cars.  Prior to beginning the restoration process, the Cars

18

are kept outside on the Property.  Cars being restored or already restored are kept in large garages on the Property. Also within these large garages, the Swoffords keep automobile parts, tools, supplies, repair manuals, *etc*.  The restored and to-be-restored Cars, and the tools, parts, manuals, supplies, *etc*. are very valuable.

93.    Prior to April 20, 2006, the Swoffords had problems with persons coming onto the Property to among other things, vandalize the Cars or steal parts, accessories or the Cars themselves.  The Swoffords reported this illegal activity to the SCSO.

94.    On April 20, 2006, after being awaken by strange noises and thinking that vandals may be on the Property again, Mr. Swofford armed himself and went outside to investigate. He did not carry a flashlight.

95.    At the time of the Shooting, Mr. Swofford was armed with a SigSauer semi-automatic pistol, model P226, 9mm (Luger), serial number U724949.

96.    Mr. Swofford was a Captain in the U.S. Army Rangers.

97.    While initially serving as an enlisted man in the U.S. Army and even though he lacked a college education, Mr. Swofford was awarded a field commission as a Second

Lieutenant. Prior to his departure from the Army, Mr.
Swofford had reached the rank of Captain.

98.   Mr. Swofford is trained in the handling, use and
carrying of firearms. He is also trained in the discipline
required for the use of various firearms including but not
limited to rifles and pistols.

99.   Mr. Swofford is trained in self defense.

100.  At the time of the Shooting, Mr. Swofford's
military experience was not known to Morris or Remus.

101.  Presently and at the time of the Shooting, Mr.
Swofford is a tall, large-framed, white male.

102.  At the time of the Shooting, Mr. Swofford was bald
and suffered from injuries connected to his service in the
U.S. Army.

103.  At all times relevant to this complaint, Mr.
Swofford was dressed in dark sweat-type pants and a light
colored tee-shirt.

104.  At all times relevant to this complaint, Mr.
Swofford was wearing beach shoes and prescription eyeglasses.

105.  At all times relevant to this complaint, Mr.
Swofford did not look like or resemble any of the Hispanics
that Remus came upon at the Barrington Apartments.

106.  Mr. Swofford had no connection with anything Remus

20

observed or may have suspected was taking place or had occurred involving the Hispanics Remus observed while at the Barrington Apartments during the early morning hours of April 20, 2006.

107.   Mr. Swofford left his house to check his garages and Cars.  He did this by first checking the buildings behind and West of the Swoffords' home.

108.   Afterwards, Mr. Swofford proceeded to check on Cars that were parked South of the buildings behind and West of the Swoffords' home.

109.   Next to and West of the Cars lay a series of large black mats covering the ground.  The mats are of the type used by foliage companies to prevent weed and grass growth.  These mats start approximately 135 yards from North Forest Lake Drive and extend West almost forty (40) yards.  The mats end approximately fifty (50) yards from the West Wooden Fence.

110.   The mats are laid out in two rows.  The shortest row (the row nearest to North Forest Lake Drive) is approximately eleven (11) yards long (North to South) by fourteen (14) yards wide (East to West).  The second row (the row nearest to the Barrington Apartments) is approximately fifty (50) yards long (North to South) by fifteen (15) yards wide (East to West).

111. After checking the Cars and hearing noises coming from the direction of the West Wooden Fence, Mr. Swofford proceeded West and approached the mats.

112. As he neared the mats, Mr. Swofford heard loud voices along the West Wooden Fence running between the Property and Barrington Apartments.

113. Mr. Swofford kneeled down next to a water spigot along the South edge of the mats to listen and try to find out what was going on along the West end of the Property.

114. While Mr. Swofford was by the water spigot, he heard a loud voice coming from the Barrington Apartments' side of the West Wood Fence. The person was saying "this looks like a good place to go through" or words to that effect. Immediately afterwards, he heard the noise of breaking wood.

115. Next, Mr. Swofford saw flashlight beam(s) cross the West Wood Fence into his Property. The person or persons that just entered his Property did not announce or identify themselves.

116. Mr. Swofford was carrying his sidearm pointed down towards the ground in his left hand and cradled in his right hand.

117. West of the water spigot there is an outdoor light on a wooden pole. This light is on the Southwest edge of the

22

mats.

118.    The above outdoor light is approximately thirty (35) yards South and to the left of the place where Mr. Swofford was shot.

119.    There is a second outdoor light on an aluminum bracket or arm attached to the first building on the South side of Lyndscape Terrace just off North Forest Lake Drive. This second light is approximately 120 yards East of the place of the Shooting and to Mr. Swofford's back.

120.    Morris gained entry onto the Property by kicking down, breaking or forcefully prying apart from the Barrington Apartment's side the boards of the Property's West Wood Fence. After breaking down the Wood Fence, Morris, Remus and Strike went through the just-broken-down Wood Fence and onto the Swoffords' private Property.

121.    Morris or Remus did not identify or announce themselves before or after they entered into the Property.

122.    Mr. Swofford got up from his position next to the water spigot and with his sidearm pointed at the ground and in his left hand, moved North along the East edge of the mats. While walking North, Mr. Swofford kept the flashlight beam(s) in sight.

123.    While Mr. Swofford was walking North, Remus, Morris

23

and Strike were also walking North on the Property parallel to the West Wood Fence.

124.  Mr. Swofford was only able to observe the flashlight beam(s) moving North on the Property. He could not see how many persons were there or who they were.

125.  After Morris, Strike and Remus reached the Northwest corner of the Property where the West Wood Fence meets or joins the North Wood Fence, they proceeded East on the Property along and next to the North Wood Fence passing behind a forty (40) foot enclosed box-type trailer ("Large Trailer").

126.  The Large Trailer was parked in a North-South direction approximately ten (10) yards from the Property's North Wood Fence and fifteen (15) yards from the West Wood Fence.

127.  When Morris, Strike and Remus went behind and around the back of the Large Trailer, the flashlight beam(s) became invisible to Mr. Swofford.

128.  After Mr. Swofford saw the flashlight beam(s) reappear, he started moving West onto the mats.

129.  Once Remus, Morris and Strike came out from behind the Large Trailer, they began to move diagonally across the Property in a Southeasterly direction.

24

130.  While moving in the previously described direction, Morris, Remus and Strike passed in front of a parked sport utility vehicle ("SUV").  The SUV was approximately twenty (20) yards East of the Large Trailer and twenty (20) yards South of the North Wood Fence.

131.  On the day and time of the Shooting, next or close to the Northwest corner of the mats was an open gardening, two-wheeled pull-type rectangular trailer with low wooden sides ("Small Trailer").

132.  After they passed the SUV, and while Mr. Swofford was moving West across the mats, Morris, Strike and Remus approached the Small Trailer.

133.  At this time, the flashlight beams separated.  One moved ahead and to the South of the other.

134.  At the time of the Shooting, it was dark.  Other than the flashlight beam(s), Mr. Swofford was not able to see Morris, Remus or Strike.

135.  When the flashlight beam(s) were approximately twenty (20) to twenty-five (25) feet away, Mr. Swofford announced himself by yelling "halt" or words to that effect and immediately demanded that the intruder or intruders identify himself or themselves.

136.  When Mr. Swofford announced himself, he was

standing or crouching South or Southeast of the Small Trailer with his gun in his left hand cradled in his right.

137. At this time, Swofford firearm's muzzle was pointed down and into the ground immediately in front of him or to his left.

138. Just before, during or immediately after Mr. Swofford announced himself, Strike began to bark loudly.

139. Immediately after Mr. Swofford announced himself, a flash light beam(s) focused on him. At that time, Morris and Remus were standing next to or in the immediate proximity of the Small Trailer.

140. After illuminating Mr. Swofford, Remus drew and cocked his firearm and aimed it at Mr. Swofford. At this time, Remus' firearm had a live round in the chamber.

141. Mr. Swofford was blinded by the flash light(s) and was not able to see Morris, Remus or Strike.

142. While Remus illuminated Mr. Swofford, Morris changed Strike's leash to his left hand.

143. Strike began to drag and pull Morris towards Mr. Swofford.

144. While Strike was dragging Morris, its leash was fully extended.

145. After freeing his right hand, Morris drew and

26

cocked his firearm.  At that time, Morris' firearm had a live round in the chamber.

146.  As Morris was being dragged towards Mr. Swofford by Strike, his gun discharged once, either intentionally or due to improper maintenance.

147.  After hearing Morris' gun fire, Remus began to shoot at Mr. Swofford.

148.  Remus discharged his firearm twice.

149.  After hearing Remus' fire, Morris discharged his firearm four (4) more times.

150.  Morris and Remus did not identify themselves before firing on Mr. Swofford.

151.  During the Shooting, Mr. Swofford was hit several times by projectiles fired by Morris and Remus.

152.  Morris and Remus fired a combined total of seven shots at Mr. Swofford.

153.  As a result of several projectile hits, Mr. Swofford suffered wounds on his right leg, right wrist, left forearm and abdomen.

154.  At the time Mr. Swofford was shot by Morris and Remus, Mr. Swofford's firearm's muzzle was pointed down into the ground immediately in front of him or to his left.  He held the gun with his left hand while cradling it in his right

hand.

155. At no time before, during or after the Shooting did Mr. Swofford bring his firearm up to bear, level it at Morris or Remus or aim it at them.

156. At no time before, during or after the Shooting did Mr. Swofford discharge his weapon.

157. At the time of the Shooting, Morris had control and was in command of Strike.

158. At the time of the Shooting, Strike was approximately five (5) feet West of Mr. Swofford.

159. Although the SCSO's records claim that Strike was certified to pursue and apprehend a suspect under gunfire and to defend law enforcement officers from assault, Morris did not release Strike.

160. Strike was a non-lethal alternative available to Morris.

161. Morris and Remus were either carrying M26 or X26 Taser devices.

162. Neither Morris nor Remus deployed the Tasers.

163. Swofford was within the effective range of the Tasers carried by Morris and Remus.

164. Swofford was wearing a thin tee-shirt. Said shirt was within the penetration specifications of the barbs of the

28

Tasers carried by Morris and Remus on the night of the
Shooting.

165.   The Tasers carried by Morris and Remus on the night
of the Shooting were a non-lethal alternative available to
Morris and Remus.

166.   At the time of the Shooting, Mr. Swofford had not
committed any criminal acts.

167.   At the time of the Shooting, Mr. Swofford was
approximately fifty five (55) to fifty six (56) years old.

168.   At the time of the Shooting, Mr. Swofford was
overweight.

169.   At the time of the Shooting, Morris and Remus were
not aware of any history of violence regarding Mr. Swofford.

170.   At the time of the Shooting, nobody else was
present in the Shooting area other than Morris, Remus and Mr.
Swofford.

171.   At the time of the Shooting, Mr. Swofford was not a
fleeing felon or fleeing from law enforcement.

172.   At the time of the Shooting, Mr. Swofford was not
sought by law enforcement for arrest.

173.   At the time of the Shooting, neither Morris nor
Remus had any reason or cause to arrest Mr. Swofford.

174.   At the time of the Shooting, neither Morris nor

Remus had any reason to believe or cause to fear that evidence was likely to be destroyed or lost.

175. At the time of the Shooting, Mr. Swofford was legally in possession of his sidearm.

176. At the time of the Shooting, Mr. Swofford was legally carrying his sidearm.

177. At the time of the Shooting, Mr. Swofford had a valid Florida Concealed Weapons Permit.

### 5. The Aftermath.

178. While being shot, Mr. Swofford slumped to the ground close to where he was shot first.

179. After the Shooting and before the arrival of other law enforcement personnel, Morris and Remus, thinking that Mr. Swofford was dead, discussed the Shooting and stated that it had to be a "justifiable homicide."

180. Morris or Remus gave instructions to the Paramedics to come in Mr. Swofford's aid by going to the Barrington Apartments. This forced the Paramedics to take the equipment out of their truck, go through the broken down Wood Fence and walk approximately 100 yards instead of going South on North Forest Lake Drive, turning West onto Lyndscape Terrace and after driving a short distance on Lyndscape Terrace, park next to where Mr. Swofford was and walked no more than five

30

(5) yards.  The misdirection provided to the Paramedics increased the possibility that Mr. Swofford might die as a result of his wounds.  This delay increased the damage caused by the bullet wounds and increased Mr. Swofford's pain.

181.  The Lyndscape Terrace approach to the scene of the Shooting was used by members of the SCSO before the arrival of the Paramedics.  The Defendants were aware that there was a more direct and shorter route available to the Paramedics coming in Mr. Swofford's aid.  The Defendants' knowingly or negligently failed to pass this information to the Paramedics causing said Paramedics to take longer to reach Mr. Swofford.

182.  Eslinger failed to adequately train and/or supervise Remus and Morris regarding the use of non-deadly force in situations such as the Shooting.  By his failure to provide the aforementioned training and supervision, Eslinger caused the unnecessary and illegal use of deadly force by Morris and Remus in situations such as the Shooting.

183.  By his failure to provide the aforementioned training and supervision, Eslinger caused Morris and Remus to fail to use proper, non-deadly force in situations such as the Shooting.

184.  Eslinger caused the unnecessary and unreasonable use of deadly force in the Shooting by not conducting full,

31

in depth and impartial administrative reviews of search and seizure situations such as the Shooting, by failing to follow the Policies and Procedures of the Florida Department of Law Enforcement ("FDLE") and the SCSO, by not insisting that the investigation by the FDLE be full, in-depth and impartial, and by failing to impose disciplinary sanctions on employees guilty of improper conduct, by failing to provide adequate training and/or adequate supervision and/or enforcing his own or FDLE's policies and procedures, the laws of this State and/or the Constitutions of the United States and/or the State of Florida.

185. Eslinger failed to adequately train and/or supervise Remus and Morris regarding their entry onto private property in factual situations such as the one subject of this complaint.

186. Eslinger caused Morris and Remus' conduct regarding entering private property by not conducting full, in depth and impartial administrative reviews of search and seizure situations such as the one in the case at bar, by failing to follow the Policies and Procedures of the Florida Department of Law Enforcement ("FDLE") and the SCSO, by not insisting that the investigation by the FDLE be full, in-depth and impartial, by failing to impose disciplinary sanctions on

32

employees guilty of improper conduct, by failing to provide
adequate training and/or adequate supervision and/or
enforcing his own or FDLE's policies and procedures, the laws
of this State and/or the Constitutions of the United States
and/or the State of Florida.

187. The day after the Shooting, Eslinger determined
that Mr. Swofford's acts before, during and after the
Shooting did not constitute criminal conduct or violate any
of the criminal laws of the State of Florida.

188. The State of Florida never charged Mr. Swofford
with violating any of its laws because of his conduct before,
during or after the Shooting.

189. Mr. Swofford was never arrested because of his
conduct before, during or after the Shooting.

190. Mr. Swofford never discharged or raised his
sidearm.

191. Mr. Swofford sustained serious life-threatening
injuries from the gunshot wounds inflicted by Morris and
Remus.

192. After the Shooting and from the Property, Mr.
Swofford was taken to the Orlando Regional Medical Center
("ORMC").

193. Due to the injuries he sustained because of the

33

Shooting, Mr. Swofford stayed at ORMC for nearly six (6) weeks. His injuries required several surgeries. Mr. Swofford continues to see doctors on a regular basis for treatment of the injuries inflicted on him by Remus and Morris.

194. Two projectiles or fragments thereof remain inside Mr. Swofford's body causing further damage and more pain and suffering.

### 6. **The Consequences**

195. The Defendants' acts have caused the Swoffords to incur medical bills in excess of $140,000.00.

196. As a direct result of the Defendants' acts, Mr. Swofford has had several post-Shooting surgeries and will be in need of other surgical procedures and treatments in the future.

197. As a direct result of the Defendants' acts, Mr. Swofford has trouble falling sleep, suffers from depression, has recurring nightmares, has trouble walking, cannot exercise, and suffers from multiple ailments that have diminished his quality and expectancy of life.

198. As a direct result of the Defendants' acts, Mr. Swofford must take periodic medication to treat his conditions, ailments and reduce his constant pain and

34

suffering.

199. As a direct result of the Defendants' acts, the Swoffords' have no marital life or it has been severely diminished.

200. As a direct result of the Defendants' acts, Mr. Swofford suffers and will continue to suffer severe pain and suffering.

201. As a direct result of the Defendants' acts, Mr. Swofford cannot dedicate his full attention to the Swoffords' several businesses including but not limited to the managing of the Swoffords' finances.

202. As a direct result of the Defendants' acts, Mr. Swofford's life expectancy has diminished.

203. As a direct result of the Defendants' acts, the Swoffords cannot enjoy their good financial fortune because they can no longer travel or engage in activities that were normal and customary prior to the Shooting.

204. As a direct result of the Defendants' acts, Mr. Swofford will be in need of medical care in the immediate and distant future and for the duration of his life.

205. As a direct result of the Defendants' acts, the Swoffords' quality of life has been reduced substantially.

206. As a direct result of the Defendants' acts, Mr.

Swofford suffered and will continue to suffer severe pain and mental anguish, life-threatening bodily injuries and severe emotional distress.

## COUNT I - 42 U.S.C. § 1983
## (MR. SWOFFORD AGAINST ESLINGER)

207. Mr. Swofford restates the allegations contained in paragraphs 1-206 above, as if fully set forth herein.

208. This is a cause of action for violation of civil rights under 42 U.S.C. §1983 against Eslinger in his official capacity.

209. Mr. Swofford has a right under the United States Constitution to be secure from unlawful search and seizure of his person and liberty, which may be restricted only as allowed under the Fourth Amendment to the United States Constitution.

210. Mr. Swofford also has the right under the United States Constitution to be free from the use of excessive force and battery.

211. Mr. Swofford has the right to be free from violations of his constitutional rights.

212. On or about April 20, 2006, Eslinger through his employees and agents, acting in the course and scope of their duties, and under the color of law deprived Mr. Swofford of

36

his rights under the United States Constitution in violation
of 42 U.S.C. §1983 in that without probable cause that Mr.
Swofford had committed a violation of law, illegally
trespassed and entered the Property, shot Mr. Swofford
multiple times thereby causing Mr. Swofford physical and
emotional pain and suffering.

213. The primary, obvious and sole purpose of the
illegal and wrongful shooting of Mr. Swofford was to deprive
and infringe upon Mr. Swofford's constitutional rights. As a
result, Mr. Swofford was deprived of his rights under the
Fourth Amendment to the United States Constitution. Violation
of these rights entitles Mr. Swofford to an award of damages
for a loss of those rights and the damages that result
therefrom.

214. Eslinger, through his employees and agents acting
in the course and scope of their duties, took the actions
complained of above with the knowledge that the actions were
in direct violation of the United States Constitution and the
rights of Mr. Swofford.

215. The policies or customs of Eslinger caused the
violation of the constitutional rights of Mr. Swofford.

216. Eslinger, his employees and agents acting in the
course and scope of their duties, knew that their actions

37

would deprive Mr. Swofford of his constitutional rights but proceeded with their unlawful actions with the willful disregard for the consequences of their actions.

217. Morris and Remus followed existing policy, custom, and practice of Eslinger when they illegally entered and trespassed on the Property without a search warrant or exigent circumstances and discharged their guns seven times on Mr. Swofford, without prior identification or further investigation into the situation.

218. The actions of Morris and Remus were done under the color of law pursuant to the official policy, customs and practices of Eslinger.

219. Remus and Morris had improper and inadequate training from Eslinger including, but not limited to: tracking and usage of police K-9s, use and maintenance of firearms, and the use of force both deadly and non-deadly.

220. Eslinger's policies, customs and procedures were the moving force causing Remus and Morris to use excessive force on Mr. Swofford's person and the Property. The shooting of Mr. Swofford was an unreasonable seizure. Mr. Swofford did not pose a threat or serious physical harm, either to Remus or Morris or to others: Mr. Swofford was standing still when Morris and Remus approached, his sidearm's muzzle was pointing

38

at the ground on Mr. Swofford's center or left side and not
visible to Morris and Remus in the darkness, and Mr. Swofford
had not committed a felony crime involving the infliction of
or threatened infliction of serious physical harm or was a
fleeing felon.

221.   Mr. Swofford did not pose an immediate threat to
Morris and Remus. He did not commit a felony crime and was
not resisting arrest or attempting to evade arrest by flight.

222.   Eslinger approved or ratified the unlawful and
deliberate conduct of Remus and Morris based on Eslinger's
failure to discipline Remus and Morris for use of excessive
force. Failure to discipline is an unconstitutional custom
employed by Eslinger.

223.   As a direct result of Eslinger's policies and
customs which were the moving force of the violation of Mr.
Swofford's Fourth Amendment rights, Mr. Swofford suffered
severe damages as a result of his Fourth Amendment rights
being violated and use of excessive force on Mr. Swofford's
person and the Property, including but not limited to,
multiple life-threatening gunshot wounds to his abdomen, wrist
and leg, which resulted in a six-week stay at the hospital,
several surgeries, physical therapy, and pain and suffering
that Mr. Swofford experiences on a daily basis, and emotional

suffering and damage that will continue into the future.

224.   Mr. Swofford has retained the undersigned counsel
to bring this action under 42 U.S.C. §1983 and is entitled to
recover from Eslinger a reasonable fee for said counsel
pursuant to 42 U.S.C. §1988.

WHEREFORE, Plaintiff, Mr. Swofford, respectfully
requests judgment in his favor against Eslinger, in his
official capacity as Sheriff of Seminole County, Florida, and
to award him compensatory damages, plus interest, costs and
attorneys' fees pursuant to 42 U.S.C. §1988 and other
applicable laws and for such other and further relief as this
Court deems just and proper under the circumstances.

**COUNT II - 42 U.S.C. § 1983**
**(MR. SWOFFORD AGAINST MORRIS)**

225.   Mr. Swofford restates the allegations contained in
paragraphs 1-206 above, as if fully set forth herein.

226.   This is a cause of action for violation of civil
rights under 42 U.S.C. §1983 against Morris.

227.   Mr. Swofford has the right under the United States
Constitution to be secure from unlawful searches or seizure of
his person and liberty, which may be restricted only as
allowed under the Fourth Amendment to the United States
Constitution.

228. Mr. Swofford has the right under the United States Constitution and the Constitution of the State of Florida to be free from the use of excessive force and battery.

229. On April 20, 2006, Morris, under the color of law and as an employee of Eslinger, deprived Mr. Swofford of his rights under the United States Constitution, in violation of 42 U.S.C. §1983, in that, without probable cause that Mr. Swofford had committed a violation of law, illegally trespassed/entered upon the Property and shot Mr. Swofford numerous times, thereby causing Mr. Swofford life-threatening physical and emotional pain and suffering. Morris had no legal right to physically touch or harm Mr. Swofford. Morris' use of deadly force against Mr. Swofford was excessive force.

230. The primary, obvious, and sole purpose of the illegal trespassing, entry and/or shooting of Mr. Swofford was to deprive and infringe upon Mr. Swofford's constitutional rights. As a result, Mr. Swofford was deprived of his rights under the Fourth Amendment to the United States Constitution. Violation of these rights entitles Mr. Swofford to an award of damages for loss of those rights and the damages that resulted therefrom.

231. Morris took the actions complained of above with knowledge that the actions were in direct violation of the

41

United States Constitution and the rights of Mr. Swofford.
The acts of Morris violated the clearly established
constitutional rights of Mr. Swofford, rights of which every
reasonable member of a public or governmental entity should
have known.

232. Morris knew that his actions would deprive Mr.
Swofford of his constitutional rights but proceeded with the
unlawful actions with willful disregard for the consequences
of his actions.

233. As a direct result of Morris' actions, Mr. Swofford
suffered severe damages as a result of his Fourth Amendment
rights being violated and use of excessive force on Mr.
Swofford's person and property, including but not limited to,
multiple life-threatening gunshot wounds to his abdomen, wrist
and leg, which resulted in a six-week stay at the hospital,
several surgeries, physical therapy, and pain and suffering
that Mr. Swofford experiences on a daily basis, and emotional
suffering and damage that will continue into the future.

234. Mr. Swofford has also suffered damages as a result
of his Fourth Amendment rights being violated.

235. Mr. Swofford has retained undersigned counsel to
bring this action under 42 U.S.C. §1983 and is entitled to
recover from Morris a reasonable fee for said counsel pursuant

to 42 U.S.C. §1988.

WHEREFORE, Plaintiff, Mr. Swofford, respectfully requests judgment in his favor against Morris awarding him compensatory and punitive damages, plus interest, costs and attorneys' fees pursuant to 42 U.S.C. §1988 and other applicable laws and for such other and further relief as this Court deems just and proper under the circumstances.

## COUNT III - 42 U.S.C § 1983
## (MR. SWOFFORD AGAINST REMUS)

236. Mr. Swofford restates the allegations contained in paragraphs 1-206 above, as if fully set forth herein.

237. This is a cause of action for violation of civil rights under 42 U.S.C. §1983 against Remus.

238. Mr. Swofford has the right under the United States Constitution to be secure from unlawful searches or seizure of his person and liberty, which may be restricted only as allowed under the Fourth Amendment to the United States Constitution.

239. Mr. Swofford has the right under the United States Constitution and the Constitution of the State of Florida to be free from the use of excessive force and battery.

240. On April 20, 2006, Remus, under the color of law and as an employee of Eslinger, deprived Mr. Swofford of his

rights under the United States Constitution, in violation of
42 U.S.C. §1983, in that, without probable cause that Mr.
Swofford had committed a violation of law, illegally
trespassed/entered upon the Property and shot Mr. Swofford
numerous times, thereby causing Mr. Swofford life-threatening
physical and emotional pain and suffering. Remus had no legal
right to physically touch or harm Mr. Swofford. Remus' use of
deadly force against Mr. Swofford was excessive force.

241. The primary, obvious, and sole purpose of the
illegal trespassing/entry and shooting of Mr. Swofford was to
deprive and infringe upon Mr. Swofford's constitutional
rights. As a result, Mr. Swofford was deprived of his rights
under the Fourth Amendment to the United States Constitution.
Violation of these rights entitles Mr. Swofford to an award of
damages for loss of those rights and the damages that resulted
therefrom.

242. Remus took the actions complained of above with
knowledge that the actions were in direct violation of the
United States Constitution and the rights of Mr. Swofford.
The acts of Remus violated the clearly established
constitutional rights of Mr. Swofford, rights of which every
reasonable member of the public or governmental entity should
have known.

44

243.    Remus knew that his actions would deprive Mr.
Swofford of his constitutional rights, but proceeded with the
unlawful actions with willful disregard for the consequences
of his actions.

244.    As a direct result of Remus' actions, Mr. Swofford
suffered severe damages as a result of his Fourth Amendment
rights being violated and use of excessive force on Mr.
Swofford's person and property, including, but not limited to,
multiple life-threatening gunshot wounds to his abdomen, wrist
and leg, which resulted in a six-week stay at the hospital,
several surgeries, physical therapy, and pain and suffering
that Mr. Swofford experiences on a daily basis, and emotional
suffering and damage that will continue into the future.

245.    Mr. Swofford has also suffered damages as a result
of his Fourth Amendment rights being violated.

246.    Mr. Swofford has retained undersigned counsel to
bring this action under 42 U.S.C. §1983 and is entitled to
recover from Remus a reasonable fee for said counsel pursuant
to 42 U.S.C. §1988.

WHEREFORE, Plaintiff, Mr. Swofford, respectfully
requests judgment in his favor against Remus awarding him
compensatory and punitive damages, plus interest, costs and
attorneys' fees pursuant to 42 U.S.C. §1988 and other

45

applicable laws and for such other and further relief as this
Court deems just and proper under the circumstances.

## COUNT IV - BATTERY
## (MR. SWOFFORD AGAINST ESLINGER)

247.  Mr. Swofford restates the allegations contained in
paragraphs 1-206 above, as if fully set forth herein.

248.  Eslinger is responsible for the intentional acts of
Morris and/or Remus within the scope of their employment under
*respondeat superior*.

249.  This is a cause of action for battery against
Eslinger because of the intentional acts of Morris and/or
Remus as Eslinger's employees and agents.

250.  By shooting Mr. Swofford on April 20, 2006, Morris
and/or Remus as employees and agents of Eslinger intentionally
caused a harmful and offensive touching upon Mr. Swofford
against his will and without his consent.

251.  Morris and/or Remus intended to cause such contact
when he aimed his firearm at Mr. Swofford and pulled the
trigger repeatedly.

252.  The force used by Morris and/or Remus was excessive
and unreasonable under the circumstances.

253.  As a direct result of said unlawful and offensive
touching, Mr. Swofford has suffered damages which include

46

physical suffering, physical inconvenience, physical
discomfort and pain, medical expenses, loss of time, and
mental suffering, all which are continuing to this day and
will continue in the future.

254.   Mr. Swofford continues to see his healthcare
professionals for treatment of injuries associated with the
Shooting.

WHEREFORE, Plaintiff, Mr. Swofford, respectfully
requests judgment in his favor against Eslinger, in his
official capacity, and to award him compensatory damages, plus
costs, and for such other and further relief as this Court
deems just and proper under the circumstances.

### COUNT V - BATTERY
### (MR. SWOFFORD AGAINST MORRIS)

255. The Swoffords restate the allegations contained in
paragraphs 1-206 above, as if fully set forth herein.

256. This is a cause of action for battery against
Morris.

257. By shooting Mr. Swofford on April 20, 2006, Morris
unlawfully caused a harmful and offensive touching upon Mr.
Swofford against his will and without his consent.

258. Morris intended to cause such contact when he aimed
his firearm at Mr. Swofford and pulled the trigger

47

repeatedly, and acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property; or in the alternative, Morris was acting outside the course and scope of his employment at the time of his battery on Mr. Swofford.

259. As a direct result of said unlawful and offensive touching, Mr. Swofford has suffered damages which include physical suffering, physical inconvenience, physical discomfort and pain, medical expenses, loss of time, and mental suffering, all which are continuing to this day and will continue in the future.

260. Mr. Swofford continues to see his healthcare professionals for treatment of injuries associated with the Shooting.

WHEREFORE, Plaintiff, Mr. Swofford, respectfully requests judgment in his favor against Morris, in his individual capacity, and to award him compensatory and punitive damages, plus interest and costs, and for such other and further relief as this Court deems just and proper under the circumstances.

### COUNT VI - BATTERY
### (MR. SWOFFORD AGAINST REMUS)

261. The Swoffords restate the allegations contained in paragraphs 1-206 above, as if fully set forth herein.

262. This is a cause of action for battery against Remus.

263. By shooting Mr. Swofford on April 20, 2006, Remus unlawfully caused a harmful and offensive touching upon Mr. Swofford against his will and without his consent.

264. Remus intended to cause such contact when he aimed his firearm at Mr. Swofford and pulled the trigger repeatedly, and acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property; or in the alternative, Remus was acting outside the course and scope of his employment at the time of his battery on Mr. Swofford.

265. As a direct result of said unlawful and offensive touching, Mr. Swofford has suffered damages which include physical suffering, physical inconvenience, physical discomfort and pain, medical expenses, loss of time, and mental suffering, all which are continuing to this day and will continue in the future.

266. Mr. Swofford continues to see his healthcare professionals for treatment of injuries associated with the Shooting.

WHEREFORE, Plaintiff, Mr. Swofford, respectfully requests judgment in his favor against Remus, in his

49

individual capacity, and to award him compensatory and
punitive damages, plus interest and costs, and for such other
and further relief as this Court deems just and proper under
the circumstances.

## COUNT VII - GROSS NEGLIGENCE
## (MR. SWOFFORD AGAINST MORRIS)

267. Mr. Swofford restates the allegations contained in
paragraphs 1-206 above, as if fully set forth herein.

268. This is a cause of action for gross negligence
against Morris.

269. Morris owed Mr. Swofford a specific duty of care
when Morris (together with Remus) created a foreseeable zone
of risk by drawing and pointing their weapons at Mr. Swofford.

270. Morris breached that duty by, in bad faith or with
malicious purpose or in a manner exhibiting wanton and willful
disregard of human rights, safety, or property, breaking
through the Property's privacy fence and entering the Property
without a warrant or exigent circumstances, and, in bad faith
or with malicious purpose or in a manner exhibiting wanton and
willful disregard of human rights, safety, or property,
opening fire on Mr. Swofford without any verbal or physical
warning whatsoever and without identification; or in the
alternative, Morris was acting outside the course and scope of

his employment at the time of his entry and use of force.

271.   Due to Morris' breach of duty, Mr. Swofford
suffered damages, including severe life-threatening bodily
injuries and severe emotional distress.

272.   Morris' breach was the proximate cause of Mr.
Swofford's physical and mental injuries.

WHEREFORE, Plaintiff, Mr. Swofford, respectfully
requests judgment in his favor against Morris, in his
individual capacity, and to award him compensatory and
punitive damages, plus interest and costs, and for such other
and further relief as this Court deems just and proper under
the circumstances.

## COUNT VIII – GROSS NEGLIGENCE
## (MR. SWOFFORD AGAINST REMUS)

273.   Mr. Swofford restates the allegations contained in
paragraphs 1-206 above, as if fully set forth herein.

274.   This is a cause of action for gross negligence
against Remus.

275.   Remus owed Mr. Swofford a specific duty of care
when Remus (together with Morris) created a foreseeable zone
of risk by drawing and pointing their weapons at Mr. Swofford.

276.   Remus breached that duty by, in bad faith or with
malicious purpose or in a manner exhibiting wanton and willful

51

disregard of human rights, safety, or property, breaking

through the Property's privacy fence and entering the Property

without a warrant or exigent circumstances, and, in bad faith

or with malicious purpose or in a manner exhibiting wanton and

willful disregard of human rights, safety, or property,

opening fire on Mr. Swofford without any verbal or physical

warning whatsoever and without identification; or in the

alternative, Remus was acting outside the course and scope of

his employment at the time of his entry and use of force.

277.  Due to Remus' breach of duty, Mr. Swofford suffered

damages, including severe life-threatening bodily injuries and

severe emotional distress.

278.  Remus' breach was the proximate cause of Mr.

Swofford's physical and mental injuries.

WHEREFORE, Plaintiff, Mr. Swofford, respectfully

requests judgment in his favor against Remus, in his

individual capacity, and to award him compensatory and

punitive damages, plus interest and costs, and for such other

and further relief as this Court deems just and proper under

the circumstances.

### COUNT IX - SIMPLE NEGLIGENCE
### (MR. SWOFFORD AGAINST ESLINGER)

279.  Mr. Swofford restates the allegations contained in

52

paragraphs 1-206 above, as if fully set forth herein.

280.   This is a cause of action for negligence against
Eslinger.

281.   Eslinger is responsible for the negligent acts of
Morris and/or Remus within the scope of their employment under
*respondeat superior*.

282.   Morris and/or Remus owed Mr. Swofford a specific
duty of care when they created a foreseeable zone of risk by
drawing and pointing their weapons at Mr. Swofford.

283.   Morris and/or Remus breached that duty by
negligently breaking through the Property's Wooden Fence and
entering the Property without a search warrant or without
exigent circumstances, and negligently maintaining and using
their firearms and opening fire on Mr. Swofford without any
verbal or physical warning whatsoever and without
identification.

284.   These acts were made in the scope of Morris and/or
Remus' employment as law enforcement officers.  Both Morris
and Remus were on duty at the time of the Shooting.

285.   Morris and/or Remus in breaking through the
Property's privacy fence and entering the Property without a
search warrant or without exigent circumstances, not properly
employing a police K-9 and in maintaining and using their

53

firearms were negligent and reflect a secondary decision on how to implement already existing operational policies and procedures.

286.   Due to Morris and/or Remus' breach of duty, Mr. Swofford suffered damages, including severe life-threatening bodily injuries and severe emotional distress.

287.   Morris and/or Remus' breach was the proximate cause of Mr. Swofford's physical and mental injuries.

WHEREFORE, Plaintiff, Mr. Swofford, respectfully requests judgment in his favor against Eslinger, in his official capacity, and to award him compensatory damages, plus costs, and for such other and further relief as this Court deems just and proper under the circumstances.

## COUNT X - SIMPLE NEGLIGENCE
## (MR. SWOFFORD AGAINST MORRIS)

288.   Mr. Swofford restates the allegations contained in paragraphs 1-206 above, as if fully set forth herein.

289.   This is a cause of action for simple negligence against Morris for actions taken outside the course and scope of his employment.

290.   Morris owed Mr. Swofford a specific duty of care when Morris (together with Remus) created a foreseeable zone of risk by drawing and pointing their weapons at Mr. Swofford.

54

291. Morris breached that duty by negligently maintaining and using his firearm on Mr. Swofford without any verbal or physical warning whatsoever and without identification, while acting outside the course and scope of his employment at the time of his negligent entry and use of force.

292. Due to Morris' breach of duty, Mr. Swofford suffered damages, including severe life-threatening bodily injuries and severe emotional distress.

293. Morris' breach was the proximate cause of Mr. Swofford's physical and mental injuries.

WHEREFORE, Plaintiff, Mr. Swofford, respectfully requests judgment in his favor against Morris, in his individual capacity, and to award him compensatory damages, plus interest and costs, and for such other and further relief as this Court deems just and proper under the circumstances.

## COUNT XI - SIMPLE NEGLIGENCE
## (MR. SWOFFORD AGAINST REMUS)

294. Mr. Swofford restates the allegations contained in paragraphs 1-206 above, as if fully set forth herein.

295. This is a cause of action for simple negligence against Remus for actions taken outside the course and scope of his employment.

296. Remus owed Mr. Swofford a specific duty of care when Remus (together with Morris) created a foreseeable zone of risk by drawing and pointing their weapons at Mr. Swofford.

297. Remus breached that duty by negligently maintaining and using his firearm on Mr. Swofford without any verbal or physical warning whatsoever and without identification, while acting outside the course and scope of his employment at the time of his negligent entry and use of force.

298. Due to Remus' breach of duty, Mr. Swofford suffered damages, including severe life-threatening bodily injuries and severe emotional distress.

299. Remus' breach was the proximate cause of Mr. Swofford's physical and mental injuries.

WHEREFORE, Plaintiff, Mr. Swofford, respectfully requests judgment in his favor against Remus, in his individual capacity, and to award him compensatory damages, plus interest and costs, and for such other and further relief as this Court deems just and proper under the circumstances.

## COUNT XII - NEGLIGENT TRAINING AND/OR SUPERVISION (MR. SWOFFORD AGAINST ESLINGER)

300. Mr. Swofford restates the allegations contained in paragraphs 1-206 above, as if fully set forth herein.

301. This is a cause of action for negligent training

56

and/or supervision against Eslinger.

302.   Eslinger owes Mr. Swofford a duty to properly train and supervise the persons employed by him in carrying out their duties including, but not limited to, how to properly track suspects, how to employ the use of police K-9s, how to search an area for a potential suspect, how to carry and use a firearm, how to identify themselves when entering private property or during an encounter, how to maintain and use a firearm, and how and when to appropriately use deadly or non-deadly force.

303.   Eslinger's failure to properly train and supervise Morris and/or Remus created a foreseeable zone of risk.

304.   Eslinger's failure to properly train and supervise is an operational function of the Seminole County Sheriff's Office, regarding the implementation of existing training policies.

305.   Due to Eslinger's breach of duty, Mr. Swofford suffered damages, including severe life-threatening bodily injuries and severe emotional distress.

WHEREFORE, Plaintiff, Mr. Swofford, respectfully requests judgment in his favor against Eslinger, in his official capacity, and to award him compensatory damages, plus costs, and for such other and further relief as this Court

deems just and proper under the circumstances.

## COUNT XIII - LOSS OF CONSORTIUM
## (MS. SWOFFORD AGAINST ESLINGER)

306. Ms. Swofford restates the allegations contained in paragraphs 1-206 above, as if fully set forth herein.

307. This is a cause of action for loss of consortium against Eslinger.

308. At the time of the incident and at all times material hereto, Ms. Swofford was the wife of Mr. Swofford, and remains so to this date.

309. As a result of the injuries suffered by Mr. Swofford, Ms. Swofford has lost the value of her husband's companionship, consortium and services.

310. Due to Eslinger's breach of duty, Mr. Swofford suffered damages, including severe life-threatening bodily injuries and severe emotional distress. As a result of the damages suffered by Mr. Swofford, Ms. Swofford has suffered the loss or a diminution of Mr. Swofford's love or affection.

311. Ms. Swofford has suffered and will continue to suffer a loss of consortium to the detriment of her marital relationship, which loss and detriment are a proximate consequence of the aforementioned acts, omissions, failures and breaches of duty and law by all Defendants.

WHEREFORE, Plaintiff, Ms. Swofford, respectfully requests judgment in her favor against Eslinger in his official capacity and to award her compensatory damages, plus costs, and for such other and further relief as this Court deems just and proper under the circumstances.

## COUNT XIV - LOSS OF CONSORTIUM
## (MS. SWOFFORD AGAINST MORRIS)

312.   Ms. Swofford restates the allegations contained in paragraphs 1-206 above, as if fully set forth herein.

313.   This is a cause of action for loss of consortium against Morris.

314.   At the time of the incident and at all times material hereto, Ms. Swofford was the wife of Mr. Swofford, and remains so to this date.

315.   As a result of the injuries suffered by Mr. Swofford, Ms. Swofford has lost the value of her husband's companionship, consortium and services.

316.   Due to Morris' acts, omissions, failures and breaches of duty by Morris, Mr. Swofford suffered damages, including severe life-threatening bodily injuries and severe emotional distress.  As a result of the damages suffered by Mr. Swofford, Ms. Swofford has suffered the loss or a diminution of Mr. Swofford's love or affection.

317. Ms. Swofford has suffered and will continue to suffer a loss of consortium to the detriment of her marital relationship, which loss and detriment are a proximate consequence of the aforementioned acts, omissions, failures and breaches of duty and law by Morris.

318. Morris' actions were in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property; or in the alternative, Morris was acting outside the course and scope of his employment.

WHEREFORE, Plaintiff, Ms. Swofford, respectfully requests judgment in her favor against Morris, in his individual capacity, and to award her compensatory damages, plus interest and costs, and for such other and further relief as this Court deems just and proper under the circumstances.

## COUNT XV - LOSS OF CONSORTIUM
### (MS. SWOFFORD AGAINST REMUS)

319. Ms. Swofford restates the allegations contained in paragraphs 1-206 above, as if fully set forth herein.

320. This is a cause of action for loss of consortium against Remus.

321. At the time of the incident and at all times material hereto, Ms. Swofford was the wife of Mr. Swofford,

60

and remains so to this date.

322. As a result of the injuries suffered by Mr. Swofford, Ms. Swofford has lost the value of her husband's companionship, consortium and services.

323. Due to Remus' acts, omissions, failures and breaches of duty by Remus, Mr. Swofford suffered damages, including severe life-threatening bodily injuries and severe emotional distress. As a result of the damages suffered by Mr. Swofford, Ms. Swofford has suffered the loss or a diminution of Mr. Swofford's love or affection.

324. Ms. Swofford has suffered and will continue to suffer a loss of consortium to the detriment of her marital relationship, which loss and detriment are a proximate consequence of the aforementioned acts, omissions, failures and breaches of duty and law by Remus.

325. Remus' actions were in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property; or in the alternative, Remus was acting outside the course and scope of his employment.

WHEREFORE, Plaintiff, Ms. Swofford, respectfully requests judgment in her favor against Remus, in his individual capacity, and to award her compensatory damages, plus interest

and costs, and for such other and further relief as this Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Under the provisions of Fed. R. Civ. P. 38, a trial by jury is demanded for all issues so triable.

## CERTIFICATE OF SERVICE

I hereby certify that on May 16th, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to the following parties of record: D. Andrew DeBevoise, Esq. and Thomas W. Poulton, Esq., DeBevoise & Poulton, P.A., Lakeview Office Park, 1035 S. Semoran Blvd., Suite 1010, Winter Park, FL 32792.

/s/ Kenneth J. Idle
Kenneth J. Idle, Esquire
Florida Bar number: 0020988
kenneth.idle@hklaw.com
Albert F. Tellechea, Esquire
Florida Bar number: 0323675
albert.tellechea@hklaw.com
Suzanne E. Gilbert, Esquire
Florida Bar number: 040168
suzanne.gilbert@hklaw.com
HOLLAND & KNIGHT LLP
2600 SunTrust Center
200 South Orange Avenue
Orlando, Florida 32801-3461
Telephone: (407) 425-8500
Facsimile: (407) 244-5288
Attorneys for Plaintiffs

# 5307146_v5

62