## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ROBERT G. SWOFFORD, JR.,
an individual, and his wife,
SHARON L. SWOFFORD, an
individual,

     Plaintiffs,

*vs.*             Case No.: 6:08-cv-00066-MSS-DAB

DONALD ESLINGER,
in his official capacity
as the SHERIFF OF SEMINOLE
COUNTY, STATE OF FLORIDA;
WILLIAM MORRIS, JR.,
in his individual capacity,
and RONALD REMUS,
in his individual capacity,

     Defendants.
_____/

## PLAINTIFFS' MOTION FOR SANCTIONS AGAINST DEFENDANTS
## FOR SPOLIATION OF EVIDENCE

   The Plaintiffs, Mr. Robert G. Swofford, Jr., and Ms. Sharon L. Swofford ("the Swoffords"), pursuant to Federal Rule of Civil Procedure 37 and this Court's inherent authority, and Middle District Local Rule 3.01(a), request that this Court sanction Defendants herein for spoliation of evidence by awarding to the Swoffords the use of adverse inferences and such other relief as this Court feels just, proper and equitable.

**I.**  **Introduction**

   The Defendants, and primarily the Sheriff (hereinafter sometimes referred to as the "Sheriff's Office" or "SCSO"), have destroyed or lost a large amount of the key evidence in this case, namely the guns used by Deputies Morris and Remus to shoot Mr. Swofford as he

investigated who was breaking into his property in the middle of the night, the cartridges they used to do so or had with them that night, the uniforms worn by the deputies and the radios used by the deputies that night, the laptop used by Deputy Remus at the time of the shooting, and the electronic data on the server which contained all agency-wide, pre-June 2007 emails. All of this evidence was destroyed or lost despite the Swoffords' need for it in this case, despite the Defendants' knowledge of the imminent lawsuit through public records requests, a § 768.28 notice, and two different lawyers' *specific* and *explicit* requests for preservation of this evidence. This bad faith spoliation has caused unfair prejudice to the Swoffords, and adverse inferences are necessary to remedy it.

## II.   Defendants Destroyed or Lost Evidence After Notice of the Swoffords' Need for the Evidence and The Defendants' Duty to Preserve It

The Defendants have destroyed or lost key evidence in this case despite their knowledge of their duty to preserve the evidence, their knowledge of the Swoffords' need for the evidence, and the Swoffords' specific requests that they not destroy the evidence.

### A.   Destroyed Electronic Evidence

The new electronic data discovery rules went into effect in December 2006. Kenneth J. Withers, *We've Moved the Two Tiers and Filled in the Safe Harbor: Federal Rulemakers Respond to Public Comments on Electronic Discovery*, 52 Fed. Law 50 (Nov./Dec. 2005); Kenneth J. Withers, *Electronically Stored Information: The December 2006 Amendments to the Federal Rules of Civil Procedure*, 4 NW. J. Tech. & Intell. Prop. 171 (2006). *See also*, Robert H. Thornburg, *Electronic Discovery in Florida*, 80 Fla. B.J. 34 (Oct. 2006). But the duty to preserve relevant e-discovery had been known, and around, for a long time. *See* Stephen M. Cohen, *Electronic Data and Discovery: Nightmare or Opportunity?*, 76 Fla. B.J.

30 (Feb. 2002). It just became more *express* in the new federal rules. *See In re Krause*, 367 B.R. 740, 764-65 (Bkrtcy.D.Kan. 2007) ("The discoverability of electronically stored information, including the duty to preserve, is now *expressly* recognized by the 2006 amendments to the Federal Rules of Civil Procedure that went into effect December 1, 2006.") (footnote omitted; emphasis added).

Moreover, the Sheriff's Office knew that Mr. Swofford had retained civil counsel almost immediately after the April 20 shooting. Indeed, by letter dated August 24, 2006, Mr. Swofford's counsel informed Sheriff Eslinger that the criminal investigation of Mr. Swofford was concluded and requested that "all evidence in your possession be maintained in its original order" – in fact, the Sheriff admits that he received that letter in August or September of 2006. (*Cf.* Requests #1 and #2 in Plaintiffs' Second Request for Admissions (and Exhibit A thereto), attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2). It is clear that this preservation letter was received the next day, as revealed by the email to Scot Vanderweide dated Friday, August 25, 2006, attached hereto as Exhibit 3. Moreover, the Sheriff forwarded this letter to various departments (*See* cc's on Exhibit 4 hereto), and co-opted this letter as its "litigation hold" letter without making any other efforts to preserve evidence. *See* Response to Request #145 in Defendant Sheriff's Response to Plaintiffs' First Request for Production, attached hereto as Exhibit 5.

More to the point, *undersigned counsel*, on behalf of the Swoffords, sent a second "litigation hold" letter to Sheriff Eslinger, dated February 6, 2007, stating in no uncertain terms:

Holland & Knight LLP has been retained to represent Mr. Robert Swofford and Ms. Sharon Swofford. We are investigating the incident of April 20, 2006 at their residence at 400 North Forest Lake Drive, Altamonte Springs, Florida. Potential defendants may be the Sheriff of Seminole County, Deputy William James Morris Jr. and Deputy Ronald R.G. Remus.

We request that all evidence, *firearms, firearms' clips, ammunition*, policies and procedures, manuals, training manuals, disciplinary proceedings, radio transmissions, *cartridge casings*, tests, statements, photographs, movies, videos (on tape, hard drive or compact disc or other media) training records or qualifications, documents, reports, recordings and the like and *all electronic evidence or documents including e-mails*, images, photographs, video streams compact discs, tapes, *hard drives, servers*, floppy disks *located in any computer property of or leased or used by the Sheriff of Seminole County or his agency, Officer Morris or Officer Remus*, with regard to the incident being investigated by Holland & Knight or the officers involved be kept intact and that everything pertaining to the matter being investigated by Holland & Knight be preserved. *Failure to act accordingly could result in one or more civil counts for spoliation of evidence* being filed against you, individually, or your agency.

Exhibit 6 hereto (emphasis added).

The Sheriff's Office admits that it received this February 6, 2007 preservation letter, but for obvious reasons does not admit when it received it. (*Cf.* Requests #3 and #4 in Plaintiffs' Second Request for Admissions (and Exhibit B thereto), attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2). But as revealed in the production of the Sheriff, this second evidence preservation letter was forwarded to various departments at the Sheriff's Office,[1] including but not limited to Lt. Bill Morris (*See* cc's on Exhibit 6 hereto), the Sheriff's "head of training"[2] and coincidentally, *Defendant Deputy Morris' father*.[3]  *See*

---

[1] As with the prior letter, the SCSO co-opted the letter as its own "litigation hold" letter, but carbon copying it to a select few department heads was the extent of the SCSO's preservation efforts. *See* Response to Request #145 in Defendant Sheriff's Response to Plaintiffs' First Request for Production, attached hereto as Exhibit 5.

[2] *Young v. Eslinger*, 2006 WL 2854997, *5 (M.D.Fla. 2006) ("...Lt. William Morris ("Morris"), the head of training for the Sheriff's Office,...").

Response to Request #145 in Defendant Sheriff's Response to Plaintiffs' First Request for Production, attached hereto as Exhibit 5. It is unclear how much more explicit undersigned counsel could have been that all relevant electronic evidence was to be preserved.

These letters are clear and explicit to put the Sheriff's Office on notice of its duty to preserve evidence.[4] Moreover, about three weeks after undersigned counsel sent the second "litigation hold" letter, on or about February 26, 2007, undersigned counsel served on the Sheriff and the Department of Insurance a notice letter pursuant to § 768.28, Florida Statutes, informing the Sheriff that a claim was to be filed against the Sheriff, Deputy Remus, and Deputy Morris. (*Cf.* Requests #5 and #6 in Plaintiffs' Second Request for Admissions (and Exhibit C thereto), attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2).

Furthermore, the Defendants have generally admitted that they received (and responded to) the public records requests dated March 19, 2007 (to which the SCSO responded on April 3, 2007 per Exhibit E to Exhibit 1 hereto), April 3, 2007 (per return

---

[3]  Deputy Morris' father is also head of training on PIT maneuvers, which he taught his son, Deputy Morris, and which maneuver Deputy Morris attempted which resulted in the death of two persons. *See* Deposition of Deputy Morris taken in case of *Marian Bridges as the Natural and Biological Mother, Next of Kin, and Personal Representative of the Estate of Robert Lee Clark, Jr.  v. Seminole County, Sheriff Donald Eslinger, in his Official  Capacity as Sheriff of Seminole County, and Deputy William Morris, in his individual capacity,* Case No. 6:07-cv-01010-Orl-28DAB,  at pages 17, 25-27, 29-30, 32, which are attached hereto as Exhibit 7. The Court is welcome to the entire deposition if it wishes.

[4]   *See e.g., Optowave Co., Ltd. v. Nikitin,* 2006 WL 3231422, *10 (M.D.Fla. 2006) ("Defendant was first notified on November 17, 2004, by Plaintiff's counsel ... of possible litigation arising out of the allegedly faulty equipment purchased by Optowave from PTG. ... Optowave subsequently retained [different] counsel... who on May 9, 2005, sent an explicit demand letter to Nikitin, making it abundantly clear that 'legal action' was anticipated. ... Either letter was sufficient to put Nikitin on notice that legal action would be taken if an amicable agreement could not be reached. In addition, Nikitin/PTG's duty to preserve all relevant materials (or those materials that could lead to other relevant materials) was triggered directly when PTG was put 'on notice that it has a legal duty to preserve all evidence as further set forth in the [the Non-Destruction Notice]. The Non-Destruction Notice spelled out that PTG could be liable for spoliation of evidence and subject to sanctions for deleting or altering files by storing newly created files to existing drives, loading new software, using utility programs to permanently wipe files, disks or drives, or disposing of media storage devices replaced to upgrades.").

receipt received by SCSO on April 5, 2007), April 9, 2007 (per return receipt received by SCSO on April 5, 2007), April 13, 2007, April 24, 2007, May 25, 2007 (which requests "computer files" and to which the SCSO responded on July 9, 2007 per Exhibit E to Exhibit 1 hereto), July 17, 2007, July 24, 2007 (to which the SCSO responded on July 24, 2007 per Exhibit E to Exhibit 1 hereto), and August 21, 2007 (per return receipt received by SCSO on August 22, 2007). (*Cf.* Requests #7 and #8 in Plaintiffs' Second Request for Admissions (and Exhibits 1-D (with some return receipts) and 1-E thereto), attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2).

In addition, the Sheriff knew that Mr. Swofford was asking for computer records as of June 11, 2007. *See* email dated June 11, 2007, attached hereto as Exhibit 8. Moreover, the aforementioned July 24, 2007 public records request specifically requested: "Any and all e-mail communications generated by or received by anyone at the Seminole County Sheriff's Office regarding or relating in anyway to the Shooting, including but not limited to internal investigations of the Shooting and the FDLE's investigation of the Shooting." (*Cf.* Requests #8 and #9 in Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2). The August 21, 2007 public records request also requested "[a]ny and all ...email communications ... regarding or relating in anyway to the Shooting and the FDLE's investigation of the Shooting." *Id.*[5]

---

[5] As an aside, many of these aforementioned letters and public records requests were sent by the Sheriff or his counsel to the Florida Sheriff's Self-Insurance Fund (the "Fund"), the insurance company that is paying for the defense of this case, beginning at least as of March 1, 2007 (*Cf.* Requests #7 and #8 in Plaintiffs' Second

### 1.    Deputy Remus' Laptop

Notwithstanding *all* of this notice, the Sheriff sent Deputy Remus' laptop computer (which Deputy Remus was assigned on the night he shot Mr. Swofford, April 20, 2006, and for months thereafter), which computer the Sheriff calls an "MCT," along with many others, *to be erased and donated* to Creative Recycling on or about October 18, 2007. (*Cf.* Requests #12 – 13, and 18 in Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2).   This is the laptop of the same Deputy Remus who joked in an instant message that he should get "lotto killa" put on the side of his car, a true and correct copy of which is attached hereto as Exhibit 9. It is important to note that Mr. Swofford is referred to by numerous deputies in instant electronic messages as the "lotto guy" or "lotto winner," as reflected in various messages attached hereto as Exhibit 10.

### 2.    All Pre-June 2007 Emails

Destruction of Deputy Remus' laptop would not be an insurmountable problem if the server which contained the Sheriff's Office's emails still existed.   It doesn't because the Sheriff's Office changed to a new email system in June of 2007 and the prior server was re-purposed, which for all practical purposes destroyed all of the electronic data including emails.   When the Sheriff put all emails on a dedicated server in June of 2007 and switched to the Symantec Vault System, the Sheriff made no effort to   preserve electronic evidence,

---

Request for Admissions (and Exhibit F thereto), attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2). It is important to note that Sheriff Eslinger is the Fund's Vice Chairman of the Board of Managers and the Fund's Chairman of the Audit Committee. http://www.dcf.state.fl.us/admin/apspanel/eslinger_bio.shtml

despite a request in February of 2007 by undersigned counsel that it do so, despite knowledge of the December 2006 electronic evidence rules, despite knowledge of the § 768.28 notice to the Sheriff and numerous public records requests, and despite knowledge of the Swoffords' representation and the imminence of this lawsuit. So now, the only source of emails (as opposed to instant messages) that predate June 2007 is the individual's actual computer that sent or received the emails (to the extent not overwritten by use, of course). Thus, the prejudice caused by the destruction of Deputy Remus' laptop is compounded. Morever, even if Remus' laptop still existed, after the agency-wide destruction of pre-2007 emails, this computer-by-computer search can only be done by an expensive and time-consuming forensic search by an expert of that custodian's computer, and the search will only be successful to the extent the information has not been overwritten.

Although the Defendants have denied that Remus' computer is now the sole source of Remus' emails during the relevant time period,[6] the Sheriff has repeatedly asserted that no pre-June 2007 emails are available agency-wide in any sort of cost-effective or time-effective manner. As the Sheriff will admit, theoretically any deputy can use any computer he walks by in the Sheriff's office, but the Sheriff was not willing to forensically search every computer due to the time and expense involved. This is because the computers that remain must be forensically searched, which is an expensive, time consuming process, and in large part the emails that pre-existed June 2007 have been overwritten in whole or in part. Of course, it is the emails contemporaneous with the April 20, 2006 shooting and the subsequent

---

[6]  *Cf.* Request #20 in Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2.

FDLE investigation that would have produced fruit for the Swoffords. Sadly, the emails no longer exist in any usable or reachable form. In fact, the Sheriff has asserted that, even if Remus' pre-June 2007 emails still exist even in bits and pieces on the prior server (other than on each computer that sent or received the emails), the emails only exist on a server that has been devoted to another use and the Sheriff would have to purchase another server for approximately $50,000, and then engage a computer analyst to perform forensic searches, and that the odds of finding anything useful at this date are practically nil. Discovery is pending on this issue (attached hereto as composite Exhibit 29) and will be filed once responses are received, but the facts herein have been gleaned from discovery and verbal and written discussions of the issue.

The Sheriff will likely argue that the Court cannot possibly believe that switching a whole server system was a bad faith effort to destroy incriminating emails. But when the Sheriff was on notice that Mr. Swofford's undersigned counsel had requested that all emails and servers be preserved, and a few months later re-purposes the server that previously housed all pre-2007 emails, what else can the Court decide? One must remember that the Sheriff and his deputies are largely in the business of finding and preserving evidence. Moreover, the Sheriff's Office is highly competent in computers, indeed having its own IT department, cyber crimes unit and computer server system. The response of the Defendants to this Motion will also likely demonstrate the computer-savvy status of the Sheriff's personnel. Finally, this case was high-profile at the Sheriff's Office, and Captain Martin Linnekugel was directing that Linda Linnekugel in the Sheriff's legal department

"coordinat[e] all record requests from plaintiff's attorney,"[7] even before Mr. Swofford was

even *technically* a "plaintiff" when the Sheriff was "officially served."[8]

> As Magistrate Baker has held:

> Based on the evidence introduced at the hearing, there are only two explanations why the missing Tudor emails were not produced, and both explanations point to Nikitin's intentional conduct. The Court finds that either the Tudor emails were selectively deleted or they were lost when Nikitin hired the computer consultant to reformat PTG's server after Tudor left the company on April 27, 2005, and after Nikitin had been placed on notice that Optowave would be asserting claims against PTG.
> …
> Almost five months after being put on notice as to possible litigation in November 2004 and May 2005, Defendant allowed another party to reformat the hard drives of his employees' computers without first preserving relevant files contained on the computers to be reformatted. These included the computer used by Tudor, according to Nikitin, the employee who dealt exclusively with Optowave and who was terminated prior to the reformatting of the hard drive. Due to the reformatting of the employee hard drives, all information contained on those drives, including e-mails between Tudor and Optowave discussing various aspects of the Contract and the disputed specifications, as well as other internal company e-mails discussing the Optowave account, were erased.

*Optowave Co., Ltd. v. Nikitin,* 2006 WL 3231422, *9, *10 (M.D.Fla. 2006).

This pre-June 2007 problem is not solely related to Deputy Remus' computer – it is a

problem endemic to any and all emails that pre-date June 2007.[9]   Indeed, although the

Sheriff's Office has performed searches for emails on Deputy Morris' and Remus' work

computers that the Sheriff's Office *did* still have access to, an email search can *now* only be

done *forensically*, one computer-at-a-time. What this means is that, for all practical purposes,

the Swoffords cannot get at the emails on the computers, to the extent any still exist in a

---

[7]   *See* Email attached hereto as Exhibit 11 (Bates stamp 002450).
[8]   *See* Email attached hereto as Exhibit 12 (Bates stamp 002370).
[9]   This lawsuit is obviously not the only lawsuit before this Court against the Sheriff, so the Court is very likely to hear this issue come up again.

readable form.   Although the Sheriff's Office is performing searches on five computers of Deputy Morris' father's computer (Lt. Morris) and Sgt. Kloth's computer, that is all that the Sheriff has agreed to search due to time constraints, and reportedly that will be a monumental task which will take weeks. Indeed, the Swoffords are met with constant complaints of time spent by the Sheriff's Office incurred because of the effort required to respond to Plaintiffs' e-discovery requests, and threats to draw the line and go to the Court for relief. In other words, because the Sheriff's Office's resources and time are finite, the Swoffords are effectively denied access to pre-June 2007 emails because the prior server was re-purposed.  This has essentially forced the Swoffords, as an accommodation, to accept affidavits from other key personnel stating that they neither sent nor received emails or prepared documents regarding the case, in lieu of individual forensic computer searches -- a poor substitute for a mass search on a server. The Sheriff will not even agree to provide affidavits for all employees that it listed on the Defendants' initial disclosures, but only those who actually went to the scene on the night of the shooting.

The Sheriff's response has been, well, deputies don't typically use emails – they use instant messages, which the Sheriff still has.  *But see, In re Krause*, 367 B.R. 740, 764-65 (Bkrtcy.D.Kan. 2007) ("The preservation of relevant evidence cannot be selective, saving evidence favorable to the party's case while destroying evidence favorable to the party's opponent or adversary.") (footnote omitted).   But we know that emails regarding this case *were* sent, as according to the instant message on Exhibit 30 hereto, which states in reference to Mr. Swofford's shooting, "YOU HAVE SOME EMAILS THAT'S ABOUT IT."

There is no reason to think that Deputy Remus might not have sent even more incriminating emails like the "lotto killa" joke[10] using email on the spoliated laptop (which he had at the time of the shooting on April 20, 2006, and used until October of 2006). But we will never know. Similarly, *other* deputies or SCSO employees might have discussed relevant information via email, even with outside law enforcement agencies. For instance, via instant messages (which do still exist), a Sanford Police Officer named Robert Shull (apparently also a K-9 officer as Deputy Morris is) referred to Deputy Morris as a "real moron," and basically said it "figures" (regarding Deputy Morris) to *two* different Sheriff's Office employees (Laura Cresswell and Kristina Fuller) on the night of the shooting, both of which agreed with him. *See* Exhibit 13. Similar emails, or even more incriminating *emails* might exist – but the Swoffords will never know because the Sheriff's Office claims that it cannot forensically search every computer it has do to time and personnel constraints, nor would most of these emails still exist on them due to use even if they did.

Absent the spoliation of all pre-2007 emails by the Sheriff, a search could easily be run for emails relevant to the claims of the Swoffords, which would have been far more effective and cost-effective for the Sheriff's Office, and would have ensured the Swoffords' access to relevant emails. But then, the Sheriff's Office knew that.

**B.  Deputies' Complete Uniforms**

The Defendants have also gone to some lengths to avoid admitting that they have spoliated the Deputies' uniforms that they were wearing on the night the Deputies shot Mr. Swofford, and when they did so. (*Cf.* Requests #43 – #52 in Plaintiffs' Second Request for

---

[10] *See* Exhibit 9.

Admissions (and Exhibit B thereto), attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2).   But it is an admitted fact that no one knows the location of the exact uniforms with the exact type of Sheriff's insignia worn by the Defendant Deputies that night. *See* Response # 21 to Defendant Remus' Supplemental Response to Plaintiffs' First Request for Production, attached hereto as Exhibit 14; Response # 21 to Defendant Morris' Supplemental Response to Plaintiffs' First Request for Production, attached hereto as Exhibit 15. Apparently, the uniforms are not all identical. Yet the Swoffords' counsel's "litigation hold" letters specifically requested that the Sheriff preserve "all evidence." *See* Exhibits 4 and 6 (emphasis added). These letters are in addition to all of the other notice described above.

The unfair prejudice to the Swoffords caused by loss or destruction of the Deputies' uniforms that they were wearing is that the Deputies have both asserted that it was Mr. Swoffords' fault for failing to recognize they were deputies. *See* Morris' answer to Interrogatory #5 (second affirmative defense, part (a)) in Defendant Morris' Answers to Plaintiffs' First Set of Interrogatories, attached hereto as Exhibit 16; Remus' answer to Interrogatory #5 (second affirmative defense, part (a)) in Defendant Remus' Answers to Plaintiffs' First Set of Interrogatories, attached hereto as Exhibit 17; Sheriff's answer to Interrogatory #5 (second affirmative defense, part (a)) in Defendant Sheriff's Answers to Plaintiffs' First Set of Interrogatories, attached hereto as Exhibit 18.   At the very least, the Swoffords were entitled to show the exact uniforms and insignia which the Deputies were wearing to the jury so that this defense could be determined. This is especially true since neither deputy was wearing a typical deputy uniform (Morris was in a K-9 ranger outfit and

Remus was in a bike cop uniform). *Cf.* Amended Complaint (Doc. #34 at ¶¶18-19 and 70-71), *with* Defendants' Answers (Doc. #35, #36 and #37 at ¶¶ 18-19 and 70-71).

### C.      Deputies' Radios

The Sheriff and the Deputies have also spoliated the radios they were using at the time of the incident. *See* Sheriff's Answers to Requests #1 and #2 in Defendant Sheriff's Response to Plaintiffs' Seventh Request for Production, a true and correct copy of which is attached hereto as Exhibit 19. The Sheriff posits that "exemplars" can be produced and will suffice because they are identical to the ones used by the Deputies at the time of the incident. However, the Swoffords would have no choice but to take the Defendants' word for it. The Swoffords needed these radios to demonstrate that the radios were vox-enabled, which the Defendants have denied. *Cf.* Amended Complaint (Doc. #34 at ¶¶20 and 62), *with* Defendants' Answers (Doc. #35, #36 and #37 at ¶¶ 20 and 62). *See* Requests #15-16 and 83-84 to Plaintiffs' First Request for Admissions, attached hereto as Exhibit 20, and the responses thereto in Defendants' Responses to Plaintiffs' First Request for Admissions, attached hereto as Exhibit 21, and the amended responses to #15-16 in Defendants' Amended Responses to Plaintiffs' First Requests for Admissions, attached hereto as Exhibit 22.

### D.      K-9 Academy Training Records

Both Paul Gallagher, Dr. Lawrence Myers, and Karen Overall, would like to be able to review the K-9 academy's training records, but they only have the Sheriff's internal evaluations of the dog. The K-9 academy states that the records went with the dog to the Sheriff's Office, but the Sheriff's Office denies it or that it lost any records. *Cf.* Amended Complaint (Doc. #34 at ¶¶58-59), and Defendants' Answers (Doc. #35, #36 and #37 at ¶¶58-

59). But the simple fact is that all K-9 training records regarding Deputy Morris' dog named Strike were requested from the Sheriff and none from the K-9 academy have been produced.[11]

### E. Deputies' Guns

The Sheriff has spoliated both guns of both Deputies Morris and Remus which were used to shoot Mr. Swofford. (*Cf.* Requests #23 and #28 in Plaintiffs' Second Request for Admissions (and Exhibit B thereto), attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2). *See* Responses to Requests #140 and #141 in Defendant Sheriff's Response to Plaintiffs' First Request for Production, attached hereto as Exhibit 5; Fourth Supplemental Responses to Requests #140 and #141 in Defendant Sheriff's Fourth Supplemental Response to Plaintiffs' First Request for Production, attached hereto as Exhibit 23.

The Sheriff's Office admits that it received the February 6, 2007 preservation letter from undersigned counsel, but for obvious reasons does not admit when it received the letter. (*Cf.* Requests #3 and #4 in Plaintiffs' Second Request for Admissions (and Exhibit B thereto), attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2). The Sheriff's Office has, through counsel, stated that the guns used by Deputies Morris and Remus to shoot Mr. Swofford have been disposed of (*see* Responses # 23 and #28 of Defendant's Responses to Plaintiff's Second Request for Admissions, Exhibit 2 hereto). The guns were

---

[11] *Cf.* Requests #7 and #8 in Plaintiffs' Second Request for Admissions (and the letters dated March 19, 2007 (at p.1), April 13, 2007 (at p.1), and April 24, 2007 in Exhibit 1-D, and the invoice dated April 17, 2007 in Exhibit 1-E thereto), attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2.

sent to Sig Sauer on June 19, 2007 (in large part) (*See* composite Exhibit 24 hereto for Fed Ex shipping paperwork). Prominent on the shipping information is the SCSO's Ann Mallory, (*See* Exhibit 24), who is a "cc" on both "litigation hold" letters to the Sheriff. *Cf.* Exhibits 4 and 6 hereto.

Undersigned counsel's February 6, 2007 letter specifically requested that the Sheriff preserve "all evidence, *firearms,* firearms' clips, ammunition," etc. *See* Exhibit 6 (emphasis added). This litigation hold letter is in addition to all of the other notice described above. The Sheriff's Office has gone to some contortionistic lengths to avoid admitting receiving notice prior to spoliation. (*Cf.* Requests #24-27, and #29-32, in Plaintiffs' Second Request for Admissions (and Exhibit B thereto), attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2). Deputies Morris and Remus are also to blame for failure to take any action to preserve their guns after notice of this lawsuit. *See* Morris' answer to Interrogatory #13 in Defendant Morris' Answers to Plaintiffs' First Set of Interrogatories, attached hereto as Exhibit 16; Remus' answer to Interrogatory #13 in Defendant Remus' Answers to Plaintiffs' First Set of Interrogatories, attached hereto as Exhibit 17.

The Sheriff will argue that the return of these two guns was part of an "agency-wide" mass return of guns to Sig Sauer, and therefore that the spoliation of the guns was unintentional and not in bad faith. But it seems *impossible* for that to be accurate when the Swoffords had specifically requested, through two different lawyers, for the guns to be preserved, and when the Sheriff had received a § 768.28 notice and numerous public records requests for evidence in the case, all of which are described at length above.

16

In short, the guns used to shoot Mr. Swofford no longer exist. The reason this is prejudicial to the Swoffords' claims is that, in particular, Deputy Morris' gun had a trigger pull weight that was significantly less than that allowed by the Sheriff's Office, a fact described in the report by FDLE, a true and correct copy of which is attached hereto as Exhibit 31. The Firearms Analysis Report completed by FDLE Senior Crime Laboratory Analyst Gregory Scala noted that Deputy Morris's 9mm's trigger pull deviated from the manufacturing specifications by one pound of pressure. While a normal P226 9mm Sig Saur would have a trigger pull of 4.5 pounds for single action, Deputy Morris's P226 9mm had a trigger pull of 3 1/2 to 3 1/4 pounds of pressure. The Report of Richard Ernest, attached as Exhibit 26, page 10, shows that the gun may have been tampered with in violation of General Order #51 (weapons issuance policy), which is also attached hereto as part of Composite Exhibit 27. If Mr. Ernest were able to examine the gun, Mr. Ernest could have determined whether the gun had been modified by a "layperson" such as Deputy Morris, by the Sheriff's Armorer with special expertise and tools, or whether the reduced trigger weight was caused by wear and tear of the gun (as Defendants will likely argue). Reduced trigger pull would make the gun easier to fire, thus contributing to Mr. Swofford's injuries.

### F.    Deputies' Bullets and Magazines

The Sheriff has spoliated all three of the magazines (all of which were loaded with bullet cartridges) which Deputies Morris and Remus were carrying the night they shot Mr. Swofford. (*Cf.* Requests #33 and #38 in Plaintiffs' Second Request for Admissions (and Exhibit B thereto), attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2). *See*

17

Responses to Requests #142 and #143 in Defendant Sheriff's Response to Plaintiffs' First Request for Production, attached hereto as Exhibit 5; Responses to Requests #142 and #143 in Defendant Sheriff's Fourth Supplemental Response to Plaintiffs' First Request for Production, attached hereto as Exhibit 23.

The Sheriff admits the SCSO received the February 6, 2007 preservation letter from undersigned counsel, but for obvious reasons does not admit when he received the letter. (*Cf.* Requests #3 and #4 in Plaintiffs' Second Request for Admissions (and Exhibit B thereto), attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2).   Undersigned counsel's February 6, 2007 letter specifically requested that the Sheriff preserve "all evidence, ... *firearms' clips, ammunition,*" etc. *See* Exhibit 6 (emphasis added). This letter is in addition to all of the other notice described above. As in other instances, the Sheriff's Office has gone to some lengths to avoid admitting notice prior to spoliation.   (*Cf.* Requests #34-37, and #39-42, in Plaintiffs' Second Request for Admissions (and Exhibit B thereto), attached hereto as Exhibit 1, *with* the responses thereto in Defendants' Responses to Plaintiffs' Second Request for Admissions, attached hereto as Exhibit 2).

The Sheriff, in his policy #51 § IX(A)(4)(a)(6), states that bullet cartridges that are used can be anywhere from 90 to 147 grains. *See* Exhibit 27.   The report from FDLE's firearms expert in this case says that the headstamp on the collected and spent casings were Winchester +P+ (manufactured in 2002 and 2004). *See* Exhibit 25 (bates stamp FDLE # 173720060607112208). The only ammunition that fits that description, of the law enforcement variety, comes in 127 and 115 grain, which is what the Swoffords' ballistics

18

expert Richard Ernest used as the basis for his ballistics testing. *See* Ex. 26 page 11. The grain, or weight, affects the speed and damage of a bullet.

The Sheriff, now, out of left field, says in answers to interrogatories that the grain was 124 +P+, which according to page 11 of the report of Richard Ernest, does not exist. (*Cf.* Sheriff's Answer to Interrogatories #1 and 2 in the Sheriff's Answers to Second Set of Interrogatories, attached hereto as Exhibit 28, with Mr. Ernest's Expert Report, attached hereto as Exhibit 26, page 11). Of course, the unspent cartridges do not now exist either, due to spoliation, so Plaintiffs cannot challenge the Sheriff's assertion. Plaintiffs justifiably are concerned that the Sheriff will attempt to impeach Richard Ernest or his report on this issue, which would be unfair due to the Sheriff's spoliation.

In an attempt to demonstrate good faith and mitigate Plaintiffs' unfair prejudice, the Sheriff asserts that his office has not spoliated the "five gun casings" and two bullet casings. (*See* Fourth Supplemental Responses to Requests #142 and #143 in Defendant Sheriff's Fourth Supplemental Response to Plaintiffs' First Request for Production, attached hereto as Exhibit 23). The problem is that those items are useless because only *unspent* cartridges are of any use in determining the grain of a bullet.

**III.    Federal Standard for Spoliation Sanctions**

This Court can sanction a spoliating party pursuant to Rule 37 or its own inherent authority. *See Optowave Co., Ltd. v. Nikitin*, 2006 WL 3231422 at *7-8 (M.D.Fla. 2006) ("The courts have the inherent power to enter a default judgment as punishment for a defendant's destruction of documents... Federal Rule of Civil Procedure 37 also authorizes a panoply of sanctions for a party's failure to comply with the rules of discovery."). *See also,*

*Banco Latino, S.A.C.A. v. Gomez Lopez,* 53 F.Supp.2d 1273, 1277 (S.D. Fla. 1999) ("The federal district courts of this nation possess the inherent power to regulate litigation and to sanction litigants for abusive practices. The power is broader and more flexible than the authority to sanction found in the Federal Rules of Civil Procedure."); *Flury v. Daimler Chrysler Corp.,* 427 F.3d 939, 944 (11th Cir. 2005) ("We have long acknowledged the broad discretion of the district court to impose sanctions. This power derives from the court's inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of cases."). If a federal court determines that a sanction for spoliation of evidence is warranted, the determination of an appropriate sanction is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis. *St. Cyr v. Flying J Inc.,* 2007 WL 1716365, *4 (M.D.Fla. 2007). *See Optowave Co., Ltd. v. Nikitin,* 2006 WL 3231422, *7 (M.D.Fla. 2006) ("The Court has broad discretion to impose sanctions derived from its inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of cases.").

The elements necessary to prove to obtain sanctions in Florida's *federal* courts are: (1) the missing evidence existed at one time; (2) the non-moving party had a duty to preserve the evidence; and (3) the evidence was crucial to the movant being able to prove its prima facie case or defense. *Optowave Co., Ltd. v. Nikitin,* 2006 WL 3231422, *8 (M.D.Fla. 2006); *Sharp v. City of Palatka,* 2008 WL 89762, *1 (M.D.Fla.2008). There is no question that the evidence described above *existed*, which is element 1. Indeed, this has been admitted. The destruction or loss of that evidence, or its "missing status," which is impliedly required in element 1, has also been admitted and demonstrated above.

There also can be no question that there was a duty to preserve here, which is the second element. *Banco Latino*, 53 F.Supp.2d at 1277 ("A litigant is under a duty to preserve evidence which it knows, or reasonably should know, is relevant in an action. ... Sanctions may be imposed upon litigants who destroy documents while on notice that they are or may be relevant to litigation or *potential litigation,* or are reasonably calculated to lead to the discovery of admissible evidence.") (emphasis added); *Silhan v. Allstate Ins. Co.*, 236 F.Supp.2d 1303, 1309 (N.D. Fla. 2002) ("The more prudent approach would be for a duty to arise when the possessor of the evidence is informed by the plaintiff that a lawsuit will be (or is) filed.") (interpreting Florida law); *Floeter v. City of Orlando*, 2007 WL 486633, *5 & n.6 (M.D.Fla. 2007) ("There may be additional circumstances from which a duty may arise if a party is on notice that documents or tangible items may be relevant or discoverable in pending or imminent litigation."). Defendants were not on notice of their duty to preserve the spoliated evidence due to the *ample* notice they received. *See Pennsylvania Lumberman's Mut. Ins. Co. v. Florida Power & Light Co.*, 724 So.2d 629, 630 (Fla. 3d DCA 1998).[12] As Magistrate Baker has stated:

---

[12]  This Florida case is relevant because, although federal law controls spoliation sanctions, the Court's opinion may be "informed by state law, as long as it is consistent with federal law, because federal law in the Eleventh Circuit does not set forth specific guidelines on spoliation." *Optowave Co., Ltd. v. Nikitin*, 2006 WL 3231422, *8 (M.D.Fla. 2006) (relying on *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005)). *See Martinez v. Brink's, Inc.*, 171 Fed. Appx. 263, 269 (11th Cir.2006) (federal law, not state law, governs the imposition of sanctions, such as an adverse inference instruction); *Floeter v. City of Orlando*, 2007 WL 486633, *5 (M.D.Fla. 2007) ("Federal law governs the imposition of spoliation sanctions in this case, but state law may be consulted to guide the Court in its analysis."); *St. Cyr v. Flying J Inc.*, 2007 WL 1716365, *3 (M.D.Fla. 2007) ("Federal law governs the imposition of sanctions for spoliation of evidence ... However, courts may look for guidance from state law as long as those principles are consistent with federal spoliation principles."); *Kimbrough v. City of Cocoa*, 2006 WL 3500873, *3 (M.D.Fla. 2006) ("Federal law governs the imposition of spoliation sanctions in this case, but state law may be consulted to guide the Court in its analysis."); *F.T.C. v Nationwide Connections, Inc.*, 2007 WL 4482607, *1 (S.D.Fla.2007)("Florida based federal courts to look to Florida law for guidance on when to impose sanctions for spoliation.").

> Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information. While a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request.

*Optowave Co., Ltd. v. Nikitin,* 2006 WL 3231422, *7 (M.D.Fla. 2006).

The third element is also satisfied, in that the evidence the Sheriff and the Deputies have lost or destroyed is evidence that is (was) crucial to the Swoffords' *prima facie* case, or to rebutting the defenses of the Defendants, or to preserving the Swoffords' experts' opinions which are based on evidence which is *still* available. This third element is also demonstrated above as well, a vivid demonstration of the palpable unfair prejudice to the Swoffords as to each and every category of spoliated evidence. *See Optowave Co., Ltd. v. Nikitin,* 2006 WL 3231422, *7 (M.D.Fla. 2006) ("Sanctions for discovery abuses are intended to prevent unfair prejudice to litigants and to insure the integrity of the discovery process."); *Flury v. Daimler Chrysler Corp.,* 427 F.3d 939, 944 (11th Cir. 2005) (same).

A spoliation sanction discussed in the case law, and which the Swoffords seek herein, is the adverse inference.[13] The adverse inference has been referred to as a mild sanction, *Victor v. Makita U.S.A., Inc.,* 2007 WL 3334260, *2 (M.D.Fla. 2007), and in federal court would encompasses a jury instruction. *St. Cyr v. Flying J Inc.,* 2007 WL 2850521, *1

---

[13] Other sanctions provided for in Rule 37(b)(2) of the Federal Rules of Civil Procedure, as applied to spoliators such as Defendants, include: a court order that certain matters are factually established as claimed by the non-spoliating party, that the spoliating party may not support or oppose designated claims or defenses, that the spoliator is prohibited from introducing designated matters into evidence, that the spoliator's pleadings or parts thereof are stricken, a finding that the spoliating party is in contempt, and that costs and attorney's fees which were caused by the spoliation are awarded against the spoliating party.

(M.D.Fla. 2007) ("an adverse inference jury instruction was a more appropriate sanction under the circumstances of this case.).

Specifically, the adverse inferences that the Swoffords seek are: that the emails on Remus' laptop would have been incriminating of the Defendants' actions; that the SCSO's pre-June 2007 emails that no longer exist would have been incriminating of the Defendants' actions; that the bullet cartridges that the Deputies used were either 127 or 115 grain; Deputy Morris' gun was tampered with by Deputy Morris or the SCSO Armorer at his request in violation of SCSO policies; that it was impossible for Mr. Swofford to recognize the Deputies as law enforcement officers due to their non-typical uniforms; that the Deputies' radios were both vox-enabled and vox-activated; and that Strike was not adequately trained as a tracking dog at the K-9 academy. *See Optowave Co., Ltd. v. Nikitin*, 2006 WL 3231422, *7, *8 (M.D.Fla. 2006) ("The Court finds that the appropriate sanction for Nikitin's spoliation is an adverse inference instruction to the jury directing that the destroyed evidence would have supported the Plaintiff's case on the following two issues: 1) the parties understood that acceptance tests, or the contract specifications, were incorporated into the Contract, and 2) the Contract must be construed against PTG, who drafted the Contract. The language of the adverse inference instruction must be left to the discretion of the District Judge to determine, depending on the issues remaining in the case at the time of trial.").

Bad faith is required on the part of the spoliator for an adverse inference (or any other sanction for that matter). *See Banco Latino,* 53 F.Supp.2d at 1277 ("In this Circuit, an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith.") (citations omitted); *Floeter v. City of Orlando,*

2007 WL 486633, *5 (M.D.Fla. 2007) ("Additionally, in this circuit sanctions for spoliation of evidence are appropriate 'only when the absence of that evidence is predicated on bad faith .... 'Mere negligence' in losing or destroying the records is not enough for an adverse inference, as 'it does not sustain an inference of consciousness of a weak case.'") (quoting *Bashir v. Amtrak,* 119 F.3d 929, 931 (11th Cir.1997) (quoting *Vick v. Tex. Emp. Comm'n,* 514 F.2d 734, 737 (5th Cir.1975))).

The Defendants' spoliation could not have been negligent in the face of the ample, indeed voluminous, notice they received, particularly the Sheriff's Office. If the Defendants' actions discussed above does not indicate bad faith, nothing will. Remember, the Sheriff and the Deputies are in the business of law enforcement, which in large part requires the *preservation* of evidence.

## IV.    Conclusion

Plaintiffs herein seek all of these adverse inferences and such further relief as this Court deems just and equitable to punish the Defendants' bad faith and cure the unfair prejudice which will otherwise inure to the Swoffords. For these reasons, Plaintiffs request that this Honorable Court grant the adverse inferences requested herein and such other relief as this Court deems just, proper and equitable.

## CERTIFICATE PURSUANT TO LOCAL RULE 3.01(g)

Pursuant to Local Rule 3.01(g), Rules of the United States District Court for the Middle District of Florida, counsel for Plaintiffs conferred with counsel for the Defendants regarding the requested relief herein and resolution could not be reached.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of November, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/Michael D. Starks
Albert F. Tellechea, Esquire
Florida Bar Number: 0323675
albert.tellechea@hklaw.com
Michael D. Starks, Esquire
Florida Bar Number: 0086584
michael.starks@hklaw.com
Kenneth J. Idle, Esquire
Florida Bar Number: 20988
kenneth.idle@hklaw.com
HOLLAND & KNIGHT LLP
2600 SunTrust Center
200 South Orange Avenue
Orlando, Florida 32801-3461
Telephone: (407) 425-8500
Facsimile:  (407) 244-5288
Attorneys for Plaintiffs

# 5695866_v4