UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

-O-

ROBERT G. SWOFFORD, JR., an      :
Individual, and his wife,
SHARON L. SWOFFORD, an           :   Case No.6:08-cv-00066MSS-DAB
Individual,
                                 :
          Plaintiffs,
                                 :
-vs-
                                 :
DONALD ESLINGER, in his
Official capacity as the         :      EXPERT DEPOSITION OF:
SHERIFF OF SEMINOLE COUNTY,
STATE OF FLORIDA; WILLIAM        :      KENNETH WALLENTINE
MORRIS, JR., in his individual
Capacity, and RONALD REMUS,      :
In his individual capacity,
                                 :
          Defendants.
                                 -O-


          Location:      Tempest Reporting, Inc.

                          175 South Main Street, #710

                          Salt Lake City, Utah



          Date:          January 16, 2009

                          10:00 a.m.



          Reporter:      Denise Kirk, CSR/RPR



                          -O-

A P P E A R A N C E S

For the Plaintiffs:

                ERIN A. WEBB and
                VICTORIA H. MITCHELL
                HOLLAND + KNIGHT
                200 South Orange Avenue
                Suite 2600
                Orlando, FL  32801-3461
                (407)244-1173
                (407)244-5288 (fax)
                Erin.webb@hklaw.com

For the Defendants:

                THOMAS POULTON
                DeBEVOUISE & POULTON
              Lakeview Office Park
                1035 S. Semoran Blvd. Suite 1010
                Winter Park, FL 32792
                Poulton@debevoisepoulton.com

-O-

I N D E X

| Witness | Page |
|---|---|
| KENNETH WALLENTINE | |
| Examination by Ms. Webb | 3 |
| Examination by Mr. Poulton | 190 |

-O-

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| 1 | Report of Kenneth R. Wallentine | 8 |
| 2 | Supplement to Report | 34 |

-O-

January 16, 2009                              10:00 a.m.

PROCEEDINGS

KENNETH WALLENTINE,

Called as a witness herein, being

First duly sworn was examined

And testified as follows:

EXAMINATION

BY MS. WEBB:

    Q.    Could you please state your name for the
record.

    A.    Ken Wallentine.

    Q.    What is your age?

    A.    51.

    Q.    Have you ever had your deposition taken
before?

    A.    Yes, I have.

    Q.    I assumed that you had.  I'm sure you've
heard these ground rules before at many of your
deposition.  I'm going to be asking you a series of
questions.  If there's something that you don't
understand, please let me know and I'll try to
rephrase it so that you understand.  Every response to
a question has to be verbal, as the court reporter
can't take down a nod of the head.  If at any time you

KENNETH WALLENTINE                           ROBERT G. SWOFFORD, JR.   v. DONALD ESLINGER, ET AL.

1    feel you need to take a break, please let me know.

2              Can we agree, for the record, that you

3    were subpoenaed here to appear for your deposition?

4         A.    Yes, I was.

5         Q.    Do you understand what an oath is?

6         A.    I do.

7         Q.    Do you understand that you have to answer

8    all of my questions truthfully?

9         A.    The questions that I answer I will answer

10   truthfully.

11        Q.    Are you on any medication today?

12        A.    Yes.

13        Q.    What are you on?

14        A.    You can spell it, if you want.  The common

15   name that I understand it to be is Prednisone.

16              In fact, I'll just make a note that I

17   injured my back a couple of days ago.  I'm in some

18   discomfort in being here.  I was given a large dose of

19   Prednisone and I'm now following up with oral

20   steroids.

21        Q.    Are you comfortable in this chair?

22        A.    I'm as comfortable as I'm going to get.

23        Q.    I have a bad back, so I feel your pain.

24              Did you review any documents today in

25   preparation for your deposition?

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1         A.     I did, but I hadn't finished my other
 2    answer.  I know that you don't care, but in order to
 3    be accurate I also take -- I haven't today -- but a
 4    cholesterol/hypertension medication.  I'm
 5    discontinuing that until the steroid course is done.
 6         Q.     Anything else?
 7         A.     No.  If you get really rough on me, I have
 8    two Tylenol in my pocket.
 9         Q.     Will any of these medications affect your
10    ability to answer truthfully today?
11         A.     No.  I do need to drink a lot.  This is
12    not a pleasant thing.  I do need to drink a lot.
13              MR. POULTON:  You mean water?
14         A.     Yes, a lot of water.
15              (Discussion off the record.)
16         Q.     (By Ms. Webb) I had asked you what
17    documents you reviewed today to prepare for the
18    deposition.
19         A.     In specific preparation for today, I've
20    only looked at things that were sent to me in the last
21    couple of weeks.  Before my report, I listed a number
22    of documents, but I really haven't returned to those
23    documents other than I did start to read the Florida
24    Department of Law Enforcement report in this matter
25    again.  So that one I started to read a second time.
```

1      Q.      Okay.

2      A.      I would refer you to my supplemental

3   report and second supplemental report that described

4   the documents that I've read in the recent past.

5              But to my immediate recollection, in the

6   last week or ten days, perhaps two weeks, I've

7   reviewed some additional training records that dealt

8   with the service dog at issue, Strike, that are

9   post-incident.

10             I read Deputy Morris's deposition

11  transcript, some perimeter search training materials

12  provided by the sheriff's office.

13     Q.      The Seminole County Sheriff's Office?

14     A.      Yes.  The course curriculum, essentially.

15  And that's all that I can recall in the recent past.

16  Those documents, everything that I've read before

17  coming today with one exception would be documented

18  either in my initial report or the first or second

19  supplement.

20             Late last night I looked at firearms

21  training curricula provided to me by defense counsel,

22  and I'll be adding that in a supplement if I have

23  other documents to read as well.

24     Q.      I only have here -- well, I have your

25  report and I have your supplement to the report.

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1        A.      First and second supplement.

2        Q.      **It doesn't say first but I'm assuming --**

3        A.      That's first.

4        Q.      **And then you issued a second?**

5        A.      I did.  I issued that yesterday and

6    provided that to Mr. Poulton's secretary yesterday.

7                MR. POULTON:  I don't know.  I was on a

8    plane for most of the day yesterday.  So I don't know.

9                THE WITNESS:  You received a message.

10                MR. POULTON:  Yes, you did.  I think it

11    lists out the new things you saw, right?

12                THE WITNESS:  I believe it lists the

13    documents that I've just given you, but there may have

14    been something there, but I think I've given you all

15    the documents.

16                You have the first supplement and I think

17    I've given you all the documents that were reviewed in

18    the second supplement.

19                MR. POULTON:  I could call my office and

20    just have them read to me the list of additional

21    things.

22        Q.      **Is this second supplement, is it simply**

23    **just a list of other materials that you reviewed?**

24        A.      Yes, it's less than three lines long.

25    It's two or three sentences.

1     Q.     Just so I want to make it clear, the
2     documents listed in your report, your first supplement
3     and your second supplement, does that contain all of
4     the documentation that you've reviewed in this case?
5     A.     Yes.
6            (Exhibit 1 marked for identification.)
7     Q.     You've just been handed what's been marked
8     as Plaintiff's Exhibit Number 1.  Can you tell me what
9     that document is?
10    A.     Yes, this is my report that I submitted in
11    this case.  And attached to it is a resume and also a
12    document that contains disclosure information
13    consistent with Rule 26 of the Federal Rules of Civil
14    Procedure.
15           There's also a copy of the first statement
16    that I have submitted to Mr. Poulton's firm.
17    Q.     I just want to ask you some questions
18    about both your resume as well as probably the first
19    seven pages of your report.
20           It says here that you were a police
21    officer from 1982 to 1987 with the Provo City Police.
22    I'm sorry, I'm looking at two documents.  I'm looking
23    at your resume as well.
24    A.     Okay.  Well, I know that to be correct.  I
25    don't see where you are reading it, but that is

```
 1    accurate.
 2         Q.    There it is.
 3         A.    Yes.
 4         Q.    It doesn't say this here, but I wanted to
 5    clarify, were you a K-9 officer while you were with
 6    that police force?
 7         A.    No, I worked with dogs but I was not a
 8    handler.
 9         Q.    When you say you worked with dogs, what do
10    you mean you worked with them?
11         A.    I served as what's known as a decoy or an
12    agitator.
13         Q.    Was this in training exercises for the
14    K-9s?
15         A.    Yes.
16         Q.    Did you actually set up tracks or you were
17    just the decoy?
18         A.    I set up tracks.  I can't recall back that
19    far how often or how many I did, but I have done
20    what's referred to as laying a track.
21         Q.    Were you in charge of the training of
22    these dogs or you were simply assisting?
23         A.    I was not.  I was simply one who was
24    interested in dogs, agreed to be a decoy; that is, to
25    be bitten and knocked down and tracked and followed
```

1    the instructions of other persons.

2         Q.    Okay.  What did you do before 1982?

3         A.    In 1982, prior to going to the Provo

4    Police Department, I worked for what was then known as

5    Brigham Young University Security.

6         Q.    Okay.

7         A.    It's now known as the Brigham Young Police

8    Department for, I don't know, I believe a year or

9    more.

10        Q.    Okay.  Do they have K-9s?

11        A.    Well, yes, but I don't believe at the time

12   that I was there.

13        Q.    Okay.  What did you do before 1982 when

14   you were with the security department?

15        A.    I'm trying to remember when I started

16   there.  I don't remember.  I worked at what is now

17   known as Utah Valley Regional Medical Center in their

18   protective services department.  I believe that I

19   started doing that when I moved to Provo to go to

20   school.  I believe that that would have been in 19 --

21   it would have been in the fall semester of 1979 or

22   perhaps the winter semester of 1980.

23        Q.    Okay.  I was just curious because your

24   resume started at 1982.  I didn't know what you had

25   done previously.

11

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1          A.     Oh, well, my first job other than being a
 2     cowboy bucking hay, moving sprinkler pipe on our
 3     family ranch was as a grave digger, but that's back
 4     into the early '70s.
 5          Q.     So after you leave Provo City Police you
 6     go on to work for the -- is it Uintah?
 7          A.     Uintah.
 8          Q.     Okay.  And you were there from 1994 to
 9     2001, correct?
10          A.     Yes.
11          Q.     It says you were a K-9 handler from 1997
12     to 2001?
13          A.     That's correct.
14          Q.     Did they already have a K-9 unit in place
15     when you joined them or did the K-9 department, for
16     lack of a better word, begin in 1997?
17          A.     No, there had been one there for quite
18     sometime.  I don't know when it started.
19          Q.     Okay.  How did you come to be a K-9
20     handler in 1997?
21          A.     I had also served there as a decoy,
22     agitator, expressed interest.  And the opportunity
23     came for the sheriff's office to add another dog and I
24     asked for that opportunity.
25          Q.     In this position where you were a K-9
```

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    handler, did you train your own dog yourself or did

2    the department hold some sort of team training for all

3    the K-9s and their handlers?

4           A.     There was a person in the department who

5    had the designated responsibility as trainer.

6                  When you asked whether I trained my own

7    dog, I understand that question to mean whether I was

8    the principal responsible for it, and the answer to

9    that is no.  I certainly participated in training with

10   my dog and trained my dog in certain skills and

11   activities on my own, but I was not the trainer and

12   never have been.

13          Q.     How often did they hold training for the

14   K-9 teams?

15          A.     Optimally weekly, but it didn't always

16   happen weekly.  Then typically there would be two

17   times a year when we would go as a unit to a four or

18   five or in some cases six-day training seminar at some

19   other location outside of the county.

20          Q.     When you would have this training which

21   optimally would be once a week but not always once a

22   week, were all of the K-9 teams together involved in

23   the training sessions?

24          A.     From the sheriff's office, yes.  And then

25   typically we would be joined or participate with other

1   agencies in the region.  Sometimes even agencies from

2   across the border in Colorado.  Perhaps Wyoming on

3   occasion.

4           Uintah County is in the far northeast

5   corner of this state.  The county bordered Indian

6   country; that is, federal Indian reservations, the

7   state of Colorado for quite some distance and the

8   state of Wyoming -- excuse me.  There was a small

9   section of Wyoming, but there's a little sliver of the

10  county that comes over.

11          So there's kind of an empty no man's land

12  between Wyoming and Uintah County.  So, practically,

13  the law enforcement agencies from Wyoming, Colorado

14  and Utah in that region as well as there's a national

15  park, national forest, there's a critical

16  infrastructure, bureau of reclamation facility, a

17  large power generating dam.

18          So there are a number of law enforcement

19  agencies from a variety of states and federal entities

20  that will train together, some of them at different

21  points had dogs.

22      Q.    What kind of K-9 did you have?  What was

23  he trained in?

24      A.    Oh, he was a dual purpose narcotics

25  detection and patrol dog.

1      Q.     I hear a lot of people use the words

2    "patrol dog".  What does that mean to you?

3      A.     Well, a patrol dog to me is a dog whose

4    primary mission is to be used as a locating tool and

5    secondary to apprehend individuals.

6            As a locating tool, a dog may be called

7    upon to locate persons who are hiding, persons who are

8    lost, and may be called on to locate, for instance,

9    articles.  That may be evidence, it may be lost

10   property.  It may be abandoned property that's been

11   thrown by persons fleeing from police.

12     Q.     And so to prepare, say your dog was a

13   narcotics dog and a patrol dog, what kind of training

14   exercises did you employ or did the department put you

15   and your dog through?

16     A.     We would have -- our weekly training would

17   typically consist -- the emphasis would have been on

18   narcotics on a weekly basis.  I would say that that's

19   the one thing we were more consistent in.

20            The trainer or other people working with

21   the trainer would do what were colloquially called

22   hides where someone would go to a location, such as

23   school, an office, a residence, an impound yard with

24   vehicles, an open field, and hide either articles

25   scented with the odors of controlled substance or

1      actually hide quantities of controlled substances.

2              The trainer would then introduce the

3      individual handler and dog team to the area, give

4      instructions and cause the handler to it deploy the

5      dog.

6              The object is pretty simple:  Go into an

7      area and find all of the items with the odors of

8      controlled substance.

9          **Q.    Were these double-blind or single-blind**

10     **tests?**

11         A.    As that term is used in the dog world, I

12     would refer to them as single-blind tests.

13         **Q.    Meaning that you, as the handler, did not**

14     **know the track that you were to put the dog on?**

15              MR. POULTON:  Object to the form.  Go

16     ahead.

17         A.    I did not know where the trainer or the

18     person assisting the trainer had hidden the drugs.

19              So, for example, if I went into -- we

20     would use the high school -- large regional high

21     school frequently.  Sometimes there would be drugs

22     hidden in school lockers.  Banks of hundreds of school

23     lockers in one large room.  Or in the gymnasium or

24     other large areas.

25              I was simply told to start at a particular

1    point, usually the entrance to the room or to the

2    area, told what my search area was, the confines that

3    I should work, and then told to find drugs.

4              I was not told what kind, I was not told

5    how many.  I did not know.  People observing me knew

6    but I had no idea and the dog, obviously, had no idea.

7        Q.      Okay.

8        A.      I understand that to be single-blind

9    testing.

10       Q.      Okay.  Now that was for your dog to find

11   narcotics?

12       A.      The odors of narcotics.

13       Q.      You said your dog was also a patrol or

14   apprehension dog, how was he trained to be a tracking

15   dog and apprehension dog?

16       A.      When the dog came to me, he had been

17   trained in tracking.  Frankly, because of our

18   environment, we didn't do that much tracking.  So I

19   didn't train the dog in his initial training and the

20   tracking was not provided by me.

21       Q.      Who was it provided by?

22       A.      The dog, we obtained the dog from the

23   Suffolk County of New York sheriff's office.  I don't

24   recall the circumstances, but the dog hadn't worked

25   out for them.

1          The sheriff's office there, as I

2    understood it, was wanting to return the dog to the

3    vendor.  The vendor was someone with whom the trainer

4    had dealt and knew, had confidence in, and apparently

5    the price was right, and so the dog came as a trained

6    dog.

7          So I don't know how the original tracking

8    training was done.  I can tell you how maintenance --

9    how we did maintenance training for both area searches

10   for apprehensions and for tracking.

11       Q.    Can you tell me about that?

12       A.    Sure.  In fact, returning to the example

13   of the high school, we wouldn't necessarily know when

14   we arrived at the high school -- I mean, we knew we

15   needed to show up Wednesday night at 9:00 p.m.  We

16   wouldn't necessarily know whether we'd be doing

17   apprehension or narcotic work or what.

18         So we might go to the front door of the

19   high school and be given the problem.  Sometimes there

20   would be a deputy there who was unrelated to K-9 and

21   would describe the problem and the trainer would be

22   off in the area where we were to find the decoy.

23         We would be told there had been a burglar

24   alarm at the high school.  Our search area was from

25   the north wing of classrooms and then sent to find the

1    suspect in what's known as an area search.

2          We might do that out in the back of the

3    high school.  We might do it at the football stadium.

4    And we would be evaluated on a couple of things:  What

5    kind of search pattern we chose, how well we kept the

6    dog on task within that search pattern, how quickly we

7    worked and ultimately, of course, whether we located

8    the person known as the decoy.  That would be the

9    person who would be playing the role of the criminal

10   who might have what's called a bite suit on.

11          Simply repeating that basic exercise,

12   although changing the variables of how high the person

13   would hide, whether the person would go upstairs,

14   whether the person would appear and then run and then

15   hide again, the kind of places in which the person

16   would hide.

17          When we did tracking exercises, I was

18   about to say almost exclusively -- I think that's

19   accurate -- almost exclusively exercises done outside.

20   Q.    **Outside meaning outdoors?**

21   A.    Outdoors.  There was a huge athletic

22   complex there with baseball fields.  High school

23   football is big there, really big.  A very nice

24   stadium with practice fields.

25          Typically, the tracking exercises were

```
 1   done there.
 2        Q.    What was the purpose of having these tests
 3   be single-blind tests?
 4              MR. POULTON:  Object to the form.  Go
 5   ahead.
 6        A.    I didn't participate in designing the
 7   training exercises.  It was the way it was done and
 8   the way I was told to do it.
 9        Q.    Do you think that you as a handler of this
10   K-9 would have a better idea of whether or not your
11   dog was successfully tracking because he was
12   undergoing a single-blind test?
13              MR. POULTON:  Object to the form.
14        A.    I think that a test in which I did not
15   know where drugs were located, or where a suspect was
16   located in an area search or where a suspect or decoy,
17   as it were, had laid the track.
18              I think I was a better handler because it
19   required me to watch the dog's behavior more carefully
20   and let the dog work out the problem.
21              So, yes, I think the dog became a better
22   dog too because, in my belief, it removed the
23   opportunity for me to cue the dog to the direction we
24   were going.
25        Q.    Was the dog trained on various types of
```

1    tracks, meaning did you -- I know that you said

2    sometimes there would be a building search like in the

3    high school, sometimes it would be outdoors.  Did you

4    vary things like the ground that the dog was walking

5    on, meaning pavement or grass or different

6    environments for the dog?

7         A.    Well, what I said was that the tracking

8    was almost exclusively in the sports complex and I

9    would refine that further and say it was almost

10   exclusively on vegetation, either grass or through the

11   brush and weeds or the tree area.

12             We did not do much what's referred to as

13   hard surface; that is, asphalt, or concrete or tile.

14   We never did any indoor tracking at all.

15        Q.    Was your dog ever trained in cross-tracks?

16        A.    I'm not sure what you mean by that term.

17        Q.    I understand cross-tracks to mean that

18   someone sets a track, you know, say a walking track,

19   and then you have someone else do another walking

20   track across that track.  Do you use a different term

21   for that?

22        A.    No.  My understanding of that term is

23   generally the same as your understanding insofar as

24   when you say cross-track to me, it means that someone

25   has introduced a distraction track.  It's a test

1    essentially to see whether the dog will stay on track.

2    I don't recall specifically that we ever did.

3            Again, our emphasis was not so much on

4    tracking as was on -- if I had to rank the missions

5    for these dogs, narcotics did a lot of

6    methamphetamines and a lot of cocaine work,

7    apprehension and tracking.

8            There may have been situations where the

9    trainer and decoys laid out a track that contained a

10   cross-track for distraction.  I don't recall ever

11   being told that there was a cross-track in a problem

12   that I worked through.

13       Q.     I'm sorry.  Continue.

14       A.     I do recall, however, some training

15   seminars that I went to with another handler and our

16   trainer from that agency provided by a third party

17   where I do recall that there were tracks laid that had

18   distraction tracks or cross-tracks on them.

19       Q.     **Did you train your dog at this meeting or**

20   **presentation?**

21       A.     Yes.  Typically these conferences

22   typically worked like this:  That you showed up Sunday

23   night for orientation.  You were out in the field at

24   7:00 on Monday mornings.  Sometimes we didn't get back

25   to the hotel room until 11:30, twelve o'clock at

 1    night.
 2              Typically we'd work all morning, take a
 3    two or three-hour break for the dogs to relax from the
 4    charge and then work into the evening.  Typically you
 5    would be working through problems that other people
 6    had laid out or created for us.
 7         Q.    Okay.
 8         A.    Yeah.  So these weren't conferences where
 9    you sat and -- we did have some classroom training.
10         Q.    **That's what I thought you meant.**
11         A.    In fact, the dogs got to rest sometimes in
12    the afternoon and that's the sort of thing I do now.
13    I go and do the classroom part.
14              So, yes, other people created problems
15    which the handler and the dog worked out.  I didn't
16    work with other people's dogs and other people didn't
17    work with my dog.
18              It's a week-long thing where the handler
19    and dog trained as a team.
20         Q.    **These cross-tracks that you went through**
21    **at this conference, I don't know if you remember this,**
22    **were those double-blind or single-blind?**
23         A.    I don't know.
24         Q.    Okay.
25         A.    I don't know.  We paid money for other

```
 1   people to set up the problems and we went and solved

 2   them.

 3        Q.    Did you ever train your dog in scent

 4   detection -- or scent discrimination, I'm sorry?

 5             MR. POULTON:  Object to the form.

 6        A.    I'm not sure what you mean by that.  I

 7   believe that I did.

 8        Q.    I think of scent discrimination -- and

 9   maybe you've already answered this question.  I think

10   of scent discrimination almost similar to

11   cross-tracks, where there is a distraction for the

12   dog.  He has an initial scent, and another scent is

13   intervening and he has to learn to follow the initial

14   scent.

15        A.    I don't know the answer to that.  I think

16   that there were problems that the trainer set up where

17   the dog had to make a choice between different scents

18   on the track.

19             When you talk about scent discrimination,

20   to me, it's a broader term.  I can tell you there were

21   many, many, many times when my dog would be introduced

22   into a problem and the trainer might put in one large

23   search area -- for example, there could be six rooms.

24   Two of those rooms would be blank; that is, they had

25   no controlled substances or odors, items scented with
```

1    the odors of controlled substances.

2              But at the same time the trainer would

3    also put in elk urine, because you can readily obtain

4    that here, cat urine, dog food.

5              My dog -- in particular I remember that he

6    put a rabbit carcass in the room once because we had a

7    problem with my dog and rabbits.

8         **Q.    What do you mean you had a problem with**

9    **your dog and rabbits?  He would be distracted by them?**

10        A.    You ask personal questions.  No.  I lived

11   out in a rural area outside of town and my daughters

12   participated in 4-H.  We had a large garden.  City

13   dwellers call it a farm.  And my daughters raised

14   rabbits.

15             My dog was able one time to throw the

16   latches on all of the rabbit cages and, unfortunately,

17   he found great delight in chasing the rabbits.  None

18   of the rabbits survived.

19             I made the mistake of telling the trainer

20   that.  He then introduced -- he found a roadkill

21   rabbit.  So the dog had to discriminate between the

22   scent of something that to him -- I believe the dog

23   thought, oh boy, chase the thing around the field, and

24   oh boy, the odor of marijuana.

25             So when you are talking about scent

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    discrimination, I think of the ability of the dog to

2    discriminate between a scent that he's trained to find

3    and a scent that one hopes he'll ignore.

4         Q.     Uh-huh.  Have you heard the term

5    "proofing" before?

6         A.     Yes.

7         Q.     Is that similar to proofing?

8                MR. POULTON:  Object to the form.

9         A.     It is similar to proofing.  When you say

10   proofing, I'm thinking of extinguishing or making sure

11   that the dog never begins to give a change of behavior

12   to an odor that I don't want the dog to tell me about.

13        Q.     Can you give me he an example?

14        A.     Yes.  As I said, our focus was on

15   narcotics.  The Uintah Basin now and then was one of

16   the countries hotbeds of mineral activity.

17        Q.     What's mineral activity?

18        A.     Oil exploration, oil and gas recovery, and

19   the Uintah basin is home to the United States -- I

20   believe it's the leading, if not one of the world's

21   leading sources, of a hard hydrocarbon known as

22   Gilsonite.

23               Because of the huge boom in the '90s,

24   there were oil workers that came from all over, oil

25   workers that brought with them a lot of cocaine and a

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.   v. DONALD ESLINGER, ET AL.

1    lot of methamphetamine.  At one time Uintah County was

2    in the top, I was told, top five.  I think it was

3    probably more like the top ten of locations for

4    illicit methamphetamine labs in the United States.

5            We had methamphetamine just -- I think we

6    produced as much methamphetamine in the mid '90s as we

7    did natural gas.

8            So, with that came money.  Money would

9    often be tainted with the odor of controlled

10   substances.  So if we would do a cash seizure, target

11   stopped, get searched, there's a bunch of cash in it,

12   and there may be some drug paraphernalia, maybe some

13   drugs.

14           At the time under Utah State law, we were

15   able to seize that cash.  If the cash is enough, we

16   would seize it through a federal process.

17           One of the ways of showing that the cash

18   was associated with illicit drug trafficking would be

19   to have the dog sniff the cash.

20           Obviously, you don't want the dog sniffing

21   the cash and giving you a change of behavior.  Some

22   people call it alerting.  You don't want the dog

23   alerting to the odor of the linen bond or the fibers

24   that are unique to the United States currency.

25           So you proof the dog.  The way you would

1    do that is we would take the dog to a local bank

2    shortly before opening, have three or four of the

3    tellers put their cash drawers out on top and give the

4    dog the find or seek command to find the odors of

5    controlled substance.

6              The dog would walk or would pass by the

7    currency in general circulation in that area.  That

8    was called proofing.  We could then in court swear

9    that the dog didn't alert to the odor of currency.

10             I walk my dog every day.  If the dog were

11   going to alert to the odor of currency, he would have

12   bitten my buttocks many times.  My wife usually lets

13   me have folding money in my billfold.  I carried it in

14   my hip pocket.

15             So that's proofing.  It's demonstrating

16   that the dog will not alert to an odor that you don't

17   want the dog to tell you about.

18        **Q.     I thought that I've read that US currency,**

19   **a very high percentage of it, has traces of cocaine or**

20   **other illegal substances on it; is that true?**

21        A.     There's a gentleman by the name of Jay

22   Poupko from your state of Florida -- I don't recall

23   where -- who has made the claim in publications that a

24   large percentage of 20 dollar bills in the United

25   States carries the residue that is detectible by

KENNETH WALLENTINE                         ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    scientific instruments of cocaine.

2              I don't know that to be true.  I do know

3    that Dr. Ken Ferton, the director of the Forensic

4    Institute of Florida International University, has

5    published hundreds of pages on that topic.

6              There is a difference between the residue

7    of a controlled substance and the odor of a controlled

8    substance.

9              Most reliable experts with whom I have

10   spoken -- in fact, I just heard an lecture on this

11   shortly ago -- would tell you that it can be

12   demonstrated through scientific means to a reasonable

13   degree of scientific certainty that currency does

14   not -- the majority of currency does not carry a

15   detectible odor of controlled substance.

16             If that were the case, ma'am, you know, I

17   would expect to see Salt Lake City, which has a large

18   dog program, every time the dogs would go out in

19   public, would be nipping at people's wallets.  That

20   would be a bad thing, I guess.

21             (Discussion off the record.)

22        Q.    (By Ms. Webb) You said that your dog was

23   also trained in apprehension.

24        A.    Yes.

25        Q.    What specifically was your dog trained to

1    do?

2         A.    My dog was trained to find persons who

3    were hiding, to apprehend persons who were fleeing.

4         Q.    **How did you train your dog to do that?**

5         A.    Again, by providing exercises where

6    persons engaged in behaviors of hiding and fleeing,

7    giving the dog the command; when the dog performs

8    successfully, praising the dog, and when the dog

9    performed unsuccessfully, correcting it.

10        Q.    **Was your dog ever trained in, I guess, use**

11   **of force exercises?**

12             MR. POULTON:  Object to the form.  Go

13   ahead.

14        A.    One of the challenges in the dog world,

15   ma'am, is that many people use different terms

16   differently.  The dog was trained to bite people and

17   that is, in my view, a use of force.

18        Q.    **Uh-huh.  Was your dog ever trained --**

19             MR. POULTON:  Well, he may not have

20   finished his answer.

21        A.    No, that's it.

22        Q.    **Was your dog ever trained to apprehend a**

23   **suspect who may be pointing a weapon at you?**

24        A.    Not directly at me, but we did do training

25   exercises where the dog was sent to apprehend a person

KENNETH WALLENTINE                              ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    who was holding a weapon.

2        **Q.    In your career as a law enforcement**

3    **officer and specifically a K-9 handler, did you ever**

4    **run into a situation similar to the one at issue in**

5    **this case?**

6              MR. POULTON:  Object to the form.

7        A.    "Similar" is a hard word.  I would tell

8    you that there have been in my career a number of

9    incidents, a small number ever of incidents, where I

10   have been close to shooting individuals and I have

11   been involved in one deadly incident.

12             In none of those incidents was a dog -- in

13   only one of those incidents was a dog present but the

14   dog was in the car.  In none of the incidents was a

15   dog part of the equation.

16       **Q.    You said there was -- if I heard you**

17   **correctly -- that there was only one incident where**

18   **you had a dog present; is that what you said?**

19       A.    Yes.

20       **Q.    You said the dog was in the vehicle?**

21       A.    Yes.  And I didn't say I had the dog

22   present.  There was another person there with a dog in

23   his car.  I did not have a dog.  I believe that I was

24   off duty.

25       **Q.    Okay.  Did your police department have any**

1    policies on whether you could release a K-9 in various

2    -- so many of these terms are used or defined

3    differently by different people.

4         A.    They are.

5         Q.    Did you have any policies where if a

6    suspect was pointing a weapon at you or another

7    officer, that a dog could be released to apprehend

8    that suspect?

9              MR. POULTON:  Object to the form.  Go

10   ahead.

11        A.    In the departments in which I've worked,

12   and as a dog handler, I don't recall that any of the

13   policies under which I operated articulated with that

14   kind of specificity; that is, that if a person were

15   pointing a weapon, that then would justify sending the

16   dog to apprehend that person.

17        Q.    Okay.

18        A.    I believe that under the policies of which

19   I have worked, that there may be circumstances where a

20   person was pointing a weapon and I would be justified

21   in sending the dog to apprehend that person.

22        Q.    Are there specific circumstances where a

23   dog can be released to apprehend a suspect?

24              MR. POULTON:  Object to the form of the

25   question.  You mean -- well, in that scenario?

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

 1                     MS. WEBB:  Yes.

 2          A.     Yes.

 3          Q.     **Any other circumstances?**

 4                     MR. POULTON:  Well, object to the form.

 5          Q.     **You are looking at me like you don't**

 6   **understand.**

 7          A.     Yeah, you lost me there.  There's too much

 8   breadth to that.  I'm not sure what you mean.

 9          Q.     **We've been deposing experts all week on**

10   **this very issue.  Some experts have said that there**

11   **are only certain circumstances where a dog can be**

12   **released to apprehend a suspect.  They've given me**

13   **examples of instances where in their policies a dog**

14   **can be released or should be released or can be**

15   **released.  I'm just wondering in the policies that you**

16   **had in -- and I'm going to say it wrong again --**

17   **Uintah, were there policies that prescribe when a dog**

18   **could be released to apprehend a suspect?**

19          A.     Yes.

20          Q.     **What did those policies state?**

21          A.     I have not looked at those policies for

22   several years and don't purport to be able to remember

23   them as I sit here today.  I can tell you the

24   generalities and that would be pretty darn close, if

25   that's acceptable.

1        Q.      Sure.

2        A.      When our sheriff promulgated a policy that

3    called on us to consider some very basic questions --

4    three basic questions and then there was an additional

5    consideration.  The first thing that we were to

6    consider was the type of crime believed to have been

7    committed by the suspect; not only whether that crime

8    was classified under Utah law as a felony or a

9    misdemeanor, but also whether that crime involved the

10   threat or use of unlawful force against a person.

11          After considering the type of crime

12   involved or the officer believed to be involved, the

13   next question is what was the suspect doing at the

14   moment that presented a danger to the officers

15   involved trying to apprehend that suspect or to

16   members of the public.  Evaluation of those factors.

17          The third principle question was whether

18   the suspect was actively fleeing, which almost always

19   was the situation, or actively trying to resist arrest

20   or evade in some other way.

21          By "evade in some other way", typically

22   that would include a situation where the suspect would

23   be hiding in an area -- in a contained area and

24   believed to be hiding in a contained area.

25          Our sheriff also called on us to ask

1    whether or not the suspect had some other factors such

2    as being a juvenile.  I don't remember whether it was

3    written or not, I believe it was.  I believe that we

4    were to consider what other means might be available

5    to capture the suspect.  I don't recall.

6             Our sheriff had this notion that the use

7    of force policy for deploying a dog should very

8    closely mirror the language used in a particular

9    Supreme Court case.  In fact, I remember that case

10   being spelled out in the policy and might even have

11   been named.

12        Q.    What case was that?

13        A.    Graham versus Connor.

14             (Exhibit 2 marked for identification.)

15        Q.    Did your police department have

16   helicopters?

17        A.    It was a sheriff's office.  And if you are

18   referring to the Uintah County Sheriff's Office, not a

19   helicopter in regular patrol service.

20        Q.    Did you have one that was not in regular

21   patrol service?

22        A.    There was a helicopter owned by a private

23   citizen who was a member of the sheriff's posse that

24   could be called, but not expeditiously.  But the

25   helicopter crashed and a deputy was killed in the

KENNETH WALLENTINE                              ROBERT G. SWOFFORD, JR.   v. DONALD ESLINGER, ET AL.

```
 1     helicopter.  So that ended the helicopter program.

 2               It wasn't much of a program.  I don't want

 3     to mislead you.  This was a helicopter that would be

 4     used -- Uintah County is a county the size of maybe

 5     Rhode Island and most of Delaware that encompassed a

 6     couple of very desolate areas, high mountainous areas,

 7     high desert terrain.

 8               When people would become lost in inclement

 9     weather, a helicopter might be the difference between

10     survival or not.  So that's when the helicopter would

11     be used.

12               But in this case, a helicopter like was

13     used in this case in patrol, never at that department

14     when I worked there.

15               MR. POULTON:  Off the record for a second.

16               (Discussion off the record.)

17          Q.   (By Ms. Webb) Why did you end up leaving

18     the Uintah County Sheriff's Office?

19          A.   Well, there was an odd turn of events in

20     approximately 1998 or 1999 I began -- I had done a

21     little consulting work here and there.  I think it was

22     1999 I began doing some consulting for the Utah

23     Department of Public Safety in the area of curriculum

24     development.

25               I had worked for the United States
```

1    Department of Justice and done some consulting here

2    and there in little pieces.  In 2000, for a period of

3    time I worked almost full-time at two different jobs:

4    The Commissioner of Public Safety -- the Department of

5    Public Safety is based here in Utah, it's the umbrella

6    over the uniformed police of the state as opposed to

7    the investigators, which are now -- I command those

8    different groups.

9            I was made an attractive offer to me to

10   work full-time for that department in curriculum

11   development for all of the police academies.

12           So I did.  But that commissioner was

13   removed by the governor, a new commissioner was

14   appointed.  The new commissioner liked me but he

15   discovered one day that I was commuting 175 miles to

16   work each way.  And he didn't like that.  I did, quite

17   a bit.

18           So I was given a choice that within -- I

19   don't remember -- six months or so I had to make a

20   decision to move my family from where we lived, which

21   was in a very small town to Salt Lake City, or no

22   longer work for the Department of Public Safety.

23           I was having a lot of fun.  Financially it

24   made sense.  So I moved to Salt Lake, worked only one

25   full-time job.  I continued to do a little bit of work

1    in Uintah County on a murder until that case was

2    resolved.   But by Thanksgiving of 2001, I was living

3    here and working full-time for the Department of

4    Public Safety.

5         **Q.      When you obtained your -- it says here**

6    **that you are a licensed attorney, having practiced law**

7    **since 1990.  Did you become a licensed attorney in**

8    **1990?**

9         A.    Yes.

10        **Q.    Did you work as an attorney while you were**

11   **an deputy sheriff?**

12        A.    I have worked as an attorney since 1990 at

13   least part-time, yes.

14        **Q.      What kind of law did you practice?**

15        A.    I prosecuted a little.  I learned after a

16   couple of unpleasant experiences not to practice

17   family law.  I did adoptions.  I still do.  I have a

18   small practice.  I'm on the board of directors for the

19   Utah Legal Services Corporation.

20             I do not every, but I do most of the pro

21   bono adoptions that come in through Catholic Community

22   Services or Utah Legal Services.

23             I continue to prosecute, although I have

24   one major felony case on my docket right now and then

25   occasionally the city in which I live, I will go

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

 1    volunteer to handle the misdemeanor trial calendar one

 2    day maybe every six months.  Then I work part-time as

 3    a judge.

 4              MR. POULTON:  Off the record for a second.

 5              (Discussion off the record.)

 6              THE WITNESS:  I do the adoptions because

 7    it's a reflection on certain moral views that I hold.

 8    There's not that many people that do pro bono

 9    adoptions.  And I do other stuff because I don't want

10    to forget how to be in a courtroom.

11              I have one case right now where one of

12    our prosecutors in our office who doesn't work

13    directly for me was being a wimp.  Oh wait, I can't

14    have this on the record.

15              MR. POULTON:  Let's go off the record.

16              (Discussion off the record.)

17         Q.    (By Ms. Webb) I just want to clarify

18    because it seems like you have a lot of overlapping

19    jobs, job titles, and I just want to clarify --

20         A.    I do.

21         Q.    It says Deputy Sheriff Reserve, Uintah

22    County Sheriff, 1994 to 2001.  K-9 handler 1997 to

23    2001.  Then it also says Chief Deputy/Uintah County

24    Attorney 1994 to 2001.

25         A.    You may want to ask me chief of how much.

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1        Q.     So a deputy sheriff reserve, is that like
 2   you were in the reserves, kind of like the military?
 3        A.     No.  It was more like I worked part time.
 4   I was required to do at least one shift a week.
 5        Q.     Okay.
 6        A.     I probably did more than that every week.
 7   But, no, it's a category of peace officer in Utah,
 8   that one would have the same authority as a full-time
 9   peace officer.
10               There are different categories.  One would
11   have to be trained and certified to the level of peace
12   officer and then one could work as a reserve, which
13   would mean less than 40 hours a week.
14               I was Chief Deputy because that was an
15   appointed position.  I was Chief of one.  Well, I
16   mean, it's the title.
17        Q.     Were you ever just the county sheriff?
18        A.     I was not.
19        Q.     Okay.  So when it says Uintah County
20   Sheriff, that's the office?
21        A.     That's the office.
22        Q.     And then when it says Chief Deputy Uintah
23   County Attorney, is that the prosecutor position?
24        A.     There was an elected county attorney who
25   concentrated -- most of her work was in the civil
```

KENNETH WALLENTINE                           ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    area.  There were two prosecutors, I believe, by the
2    time I left and then it went to four.  She appointed a
3    chief deputy.
4          I did the felony not exclusively, but I
5    did most of the felony crimes involving drugs and
6    violent crimes.
7          Q.    Okay.  So in between working for the Provo
8    City Police and as deputy sheriff and also Chief
9    Deputy Uintah County Attorney, I guess you clerked for
10   a few judges?
11         A.    I did.  Two.
12         Q.    And it says that you were an attorney at
13   the law firm of Parsons Behle & Latimer?
14         A.    Yes.
15         Q.    And then you were an adjunct professor?
16         A.    Yes.  Still a.m.
17         Q.    In addition to being a deputy sheriff, a
18   chief deputy, Uintah County Attorney, you were also
19   curriculum development supervisor at the Department of
20   Public Safety?
21         A.    No, not all at the same time.
22         Q.    That's 2000 to 2001?
23         A.    Yes.  If you would like, I'd be happy to
24   explain with greater specificity the dates.
25         Q.    We might need seven hours for this

Tempest Reporting, Inc.
(801)521-5222

1    **deposition.**

2              MR. POULTON:  Well, the more you want to

3    qualify him, the happier I am.

4         A.    Let's not do seven hours.  Here we go.  In

5    approximately 2000 -- and at that point I was working

6    part-time as the Chief Deputy County Attorney.

7         **Q.    Okay.**

8         A.    Being Chief Deputy actually is what

9    enabled me to work part-time because I was an

10   political appointee, not a merit service employee.

11             My consulting work at the Department of

12   Public Safety in 2000 -- I think I had said it might

13   have been 1999, I now correct that, as I look at my

14   resume and see that I've written 2000, that refreshes

15   my recollection.

16             That consulting work turned into a regular

17   employment where I was paid a salary.  I continued to

18   live in Uintah County in the small town of Maeser,

19   Utah began to do some commuting back and forth

20   working.  By September of 2001, I was handling just a

21   couple of cases as Chief Deputy County Attorney.

22             On July 6th of 2001, in a gunfight in

23   Roosevelt, Utah at 8:36 in the evening, the Chief of

24   Police was killed.  He was my dear friend.  I was

25   there.

1          He was shot in Duchesne County, he fell

2     backward into Uintah County; meaning he was shot with

3     his heels on the county line.  He actually expired two

4     inches in Uintah County.

5          There was no one there who had ever

6     prosecuted a capitol homicide.  I was for all intents

7     and purposes done being a prosecutor by that point.

8     However, I was the only attorney in the three-county

9     area who had ever had any murder experience of any

10     consequence.

11          So the county then asked me to stay in my

12     place, and continue that one case.  But I was

13     effectively by then driving back and forth.  I didn't

14     drive back and forth every day.  I don't mean to say

15     that I drove 350 miles a day.  I did that twice a

16     week.

17          When that murder case wrapped up, I no

18     longer did any prosecution.  I think I went a couple

19     years before I ever handled another criminal case.  So

20     that's why there's an overlap.

21          Q.     Okay.

22          A.     I didn't work full-time as a prosecutor.

23          Q.     **Okay.  It says here that from 2001 to 2005**

24     **you were Administrative Counsel Utah Police Officer**

25     **Standards and Training?**

```
 1        A.      Yes.

 2        Q.      What did that position actually entail?

 3        A.      I provided legal counsel to the director

 4   of the Peace Officers Standards and Training division

 5   of the state.  That's the entity that oversees, I

 6   believe, seven -- I might be mistaken on that number

 7   -- police academies throughout the state.

 8                I provided legal counsel to the 17-member

 9   council Peace Officers Standards and Training.  That's

10   a supervisory body appointed by the governor to

11   oversee all law enforcement training and standards.

12        Q.      What type of legal counsel were you

13   providing?

14        A.      Boy, a broad range, but primarily in the

15   sorts of things that a police academy would typically

16   deal with.  What should we be teaching with respect to

17   Fourth Amendment?  What should we be teaching with

18   respect to use of force?  What should we teach in our

19   K-9 program?

20                Much of my work had to do with

21   investigations and discipline.  The agency was

22   responsible for investigating allegations of peace

23   officer misconduct.

24                The Commissioner of Public Safety would

25   call on me to do other sorts of things, answer other
```

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1    sorts of legal questions or to do other things.

 2              I was then, still am, somewhat involved in

 3    politics.  One of my responsibilities was to chair a

 4    committee of chiefs and sheriffs that dealt with

 5    legislative and public policy.  So it was a policy and

 6    an advisory position.

 7        Q.    When you say that you would provide legal

 8    counsel as to what should be taught at the academy,

 9    did you ever provide advice as to K-9 handler

10    training?

11        A.    Yes.

12        Q.    Or K-9 team training?

13        A.    Yes.

14        Q.    What types of advice were you offering?

15              MR. POULTON:  Object to the form.

16        A.    I helped design the curriculum for a

17    number of courses, including the basic K-9 handlers

18    course which was taught to patrol dogs.  I had a much

19    broader involvement in the narcotic dog course

20    curriculum.  I instructed in those two courses.

21              I have instructed in the class for

22    administrators.  We had a class not for dog handlers,

23    but for people who supervised dog units.

24              I directly supervised the coordinator of

25    the police academy's K-9 training programs.
```

KENNETH WALLENTINE                                ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1        Q.      How involved were you?

2        A.      In what?

3        Q.      You said that you would help design the

4   curriculum on basic K-9 handler training.  I mean, was

5   it so specific that you were actually writing out how

6   the training should be employed?  I'm just trying to

7   get an idea.

8        A.      No.  The coordinator over that program --

9   the sergeant over that program would come to me and

10  say:  Here are my documents for this course.  He

11  tabbed what we're going to talk about in terms of use

12  of force, deployment policies, search and seizure

13  issues, give me your by office incident, and I would

14  look at those and say that's an adequate course or

15  adequate scope for this particular course.  That's

16  approved.  You may go ahead and teach that.

17              Then when it came time to do a ten-week --

18  ten or 12-week, I don't recall how long the basic

19  patrol school would be -- he would come to me and say,

20  Chief -- because I was a bureau chief -- he would come

21  and say, would you teach this four-hour class on

22  search and seizure next Tuesday for narcotic detector

23  dogs?  Would you teach this four-hour class on

24  deployment policies for our patrol class?

25              Since it was cheaper for me to do it than

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    to hire one of our outside contract attorneys to do it

2    and because I loved doing the dog work typically I

3    would do it.

4        Q.    Was this curriculum for police officers in

5    the entire state of Utah?

6        A.    Yes.  Did you mean police officers that

7    were K-9 handlers?

8        Q.    Yes.

9        A.    Yes.

10       Q.    Do you remember what the policies or the

11   training was with respect to releasing of K-9s?

12            MR. POULTON:  Object to the form.  Go

13   ahead.

14       A.    I remember what I taught with respect to

15   when K-9s should be released.  When you say

16   "policies", I would respond that it was not the police

17   academy's responsibility and is not the police

18   academy's responsibility to set policy for individual

19   agencies.

20       Q.    Okay.

21       A.    There are roughly 150 police departments

22   and precisely 29 sheriff's offices, and five or six

23   state law enforcement agencies in the state of Utah.

24   They can each have their own individual K-9 policies.

25       Q.    But are you saying that the training that

1      -- are these for police cadets?

2          A.     No, I provided training for police cadets

3      on other subjects.  The training that we've been

4      talking about here, I'm referring to when handlers,

5      new handlers would come and be trained to be police

6      K-9 handlers.

7              I would instruct principally on -- maybe a

8      better way to help you understand what I would do

9      would be to say that I would instruct on

10     constitutional principles regarding when it's

11     appropriate to deploy a police service dog as well as

12     a broad range of issues dealing with search and

13     seizure as applied to vehicle sniffs, school locker

14     sniffs, packages and so forth.

15              There was a broad gamut of search and

16     seizure issues related to contraband detector dogs.

17         Q.     With respect to the release of a K-9, what

18     were you training the handlers?

19         A.     I can't sit here and tell you what I said

20     for four hours in each of many classes that I taught

21     several years ago.

22              I can tell you that the focus would have

23     been on the core questions of Graham versus Connor,

24     the three factors there, the severity of the crime at

25     issue, whether the suspect is presenting an immediate

1    threat to the public or officers and whether the

2    suspect is actively resisting arrest or attempting to

3    evade arrest.  That's the core foundation of what I

4    would teach.

5         Q.    Okay.

6         A.    If I can be permitted an observation of

7    the several of us in the room, I'm the one with the

8    empty water class.  May we take a break?

9              MS. WEBB:  Let's take a break.

10             (Brief recess.)

11        Q.    **(By Ms. Webb) I just wanted to ask you**

12   **about these trainings that we've been talking about,**

13   **these K-9 team trainings, would the officers show up**

14   **with their own dogs from their own agencies for the**

15   **training?**

16        A.    Yes.

17        Q.    **When you were at Uintah County Sheriff's**

18   **Department, I know that the dog that you were the**

19   **handler for had come from New York and had been**

20   **trained there in tracking, correct?**

21        A.    I believe that the dog was trained in

22   Canada.

23        Q.    **Okay.**

24        A.    But I don't know that.

25        Q.    **But you obtained him from --**

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

 1        A.      Suffolk County Sheriff's Office in New
 2   York.
 3        **Q.      Do you know if that dog had ever received**
 4   **any other type of training such as Schutzhund**
 5   **training?**
 6        A.      I do not believe that it had.
 7        **Q.      Do you know if it had obtained IPO**
 8   **training?**
 9        A.      I do not believe that it had.
10        **Q.      Were there any other dogs at the Uintah**
11   **County Sheriff's Department who had undergone those**
12   **trainings?**
13        A.      Yes.
14        **Q.      There were?**
15        A.      Yes.
16        **Q.      About how many of them?**
17        A.      There was one dog that I know had been a
18   Schutzhund III -- and when you I three, it's the Roman
19   numeral three, please -- Schutzhund III title.
20               There was another dog that I didn't know
21   the handler that well and I don't know whether that
22   dog had done Schutzhund or not.  But I know one had
23   for sure.
24        **Q.      Do you know if it was the department's**
25   **preference to purchase dogs that had undergone that**

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1      training?

2           A.     I don't believe the sheriff cared.

3           Q.     Okay.  In the depositions that we've taken

4      this week there have been a number of experts who were

5      actually at one point in time police officers.  They

6      said that they actually preferred green dogs.  Do you

7      understand what that term means?

8           A.     I do.

9           Q.     What does it mean to you?

10          A.     A green dog generally means a dog that has

11     received no training.  Some people might use -- and I

12     think it would be proper to do so -- the term "green

13     dog" for a dog that had only the basic obedience

14     training, potty training, heeling.

15          Q.     Do you have a preference with respect to

16     K-9 dogs?

17          A.     I respect that both preferences have their

18     strengths.  If I have a preference, it's a very mild

19     preference.

20          Q.     And what would that be?

21          A.     My preference, based on my experience,

22     would be to have a green dog if there were certain

23     other factors present.

24          Q.     What are those factors?

25          A.     May I give you an example?  My preference

1    for green dogs comes from my experience of supervising

2    -- having in my direct command -- the K-9 training

3    program of the police academy.

4             That role, that is the K-9 training

5    program at the police academy, also encompassed the

6    man who was over that program -- his responsibilities

7    also encompassed supervision of the 12 to 14 dogs in

8    service for the Utah Department of Public Safety.

9             The Utah Department of Public Safety had

10   great success in purchasing green dogs directly from

11   breeders in Europe.

12            The circumstances that would give me that

13   preference in this case are these:  The green dogs

14   came from reputable breeders with whom the Department

15   of Public Safety had a good track record.

16            They came healthy, they came with good

17   guarantees, they came at a reasonable price but, most

18   importantly, they came to us -- and we had the right

19   person, we had a trainer there that was eminently

20   qualified to train green dogs into really good police

21   service dogs.

22            If those circumstances are preferable, I

23   would have a mild preference for green dogs.

24        Q.    **Have you ever certified a dog under**

25   **Schutzhund training?**

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1        A.     I have not.  You mean being a judge?
 2        Q.     Yes.
 3        A.     I am not either an IPO or Schutzhund
 4   judge.
 5        Q.     Are you familiar with Schutzhund and
 6   what's required to certify a dog?
 7        A.     I have served as the ringmaster, master of
 8   ceremonies for various trials.  So I have observed on
 9   many occasions Schutzhund and ring sport and IPO dogs
10   in competition for -- they're called trials.  When you
11   say competition, I hear you to mean trials.
12        Q.     Uh-huh.
13        A.     That is being tried to receive either a I,
14   II or III title.
15        Q.     As master of ceremonies, would you ever
16   evaluate dogs --
17        A.     No.
18        Q.     -- in these competitions?
19        A.     No.
20        Q.     Can you tell me what Schutzhund actually
21   is?
22        A.     I can't tell you without pulling up the
23   document from my office the whole title in German.
24   And when we talk about DSV and some of the other
25   titles, they mean big long German words.
```

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1              Schutzhund generally refers to a sporting
 2      organization that was born in the late 1800s in
 3      Germany.  It has many iterations in many nations.
 4      Even in the United States, there are different
 5      Schutzhund organizations.
 6              But most, if not all, of the Schutzhund
 7      organizations adhere to the basic rules for
 8      competition for awarding titles for performance.
 9              There are three principal titles:
10      Schutzhund I, Schutzhund II, and Schutzhund III.  I
11      think it can best be summarized as a sporting dog
12      competitive organization.
13          Q.    Can anyone enter their dog into these
14      competitions or trials?
15          A.    It depends on the rules of the
16      organization sponsoring the trials.  I don't know
17      that.
18          Q.    Does the dog have to be a police K-9 dog
19      to compete?
20          A.    Generally not.
21          Q.    Is that the same for the IPO competitions
22      or trials?
23          A.    IPO dog is the same generally.  Most of
24      the IPO clubs or the organizations following IPO do
25      not require that the dogs be in active police service.
```

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1          Q.      It says here on your resume that you are

2     an adjunct professor of criminal justice at Excelsior

3     College in Albany, New York from 2004 to the present?

4          A.      That is correct.

5          Q.      Do you teach your classes over the

6     Internet, through web cast or do you fly to New York?

7          A.      I have done all three.  I have not flown

8     to New York to teach.  I may have recorded a pod cast

9     there, I don't know.

10               But I teach Internet-based courses that

11    may include pod casts.  When you say "web cast" do you

12    mean camera or audio?

13         Q.      Both.

14         A.      I have never done camera.  I don't feel

15    comfortable on camera over the Internet.  Your mouth

16    is always moving at a different rate than your voice.

17    I hate that.

18         Q.      It says from 2005 to the present that you

19    were the Chief of Law Enforcement.  Is that in the

20    Utah Attorney General's Office?

21         A.      Yes.

22         Q.      What do you do in this position?

23         A.      I have a myriad of responsibilities but

24    they can be divided into two main categories.  Within

25    the attorney general's office there are three

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    principal investigative bureaus.  Each of those

2    bureaus is under my direct command.

3              So I oversee in a command role all of the

4    investigative efforts on the criminal side, and many

5    on the civil side for the Attorney General.

6              The other main category of my

7    responsibility is as a political appointee reporting

8    directly to the Attorney General to support him in a

9    variety of policy bodies to represent him in a number

10   of committees and to coordinate with the governor's

11   office and other cabinet officers.

12        Q.    Okay.  You write in the beginning of your

13   report that as Chief of Law Enforcement, you

14   supervised the police service dog certification and

15   training program, is that correct?

16        A.    Where are you reading?

17        Q.    I'm reading this from paragraph number one

18   on page two of your report.

19        A.    Okay.

20        Q.    I'm sorry.  This was as the bureau

21   chief --

22        A.    Yes, bureau chief at the Department of

23   Public Safety.  The Attorney General's office has no

24   dogs, at least not of the K-9 variety.

25        Q.    So when it says here that you were

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1      formerly employed as bureau chief of Utah Department
 2      of Public Safety, Peace Officers Standards and
 3      Training division, that you supervised the police
 4      service dog training and certification program, is
 5      this what we were talking about earlier when you were
 6      talking about -- because I can't keep all of your
 7      positions straight -- where you were giving legal
 8      counsel as to the curriculum for K-9 handlers?
 9           A.     Yes, as well as directly supervising the
10      people who did the work in the field for that training
11      and certification.
12           Q.     Okay.
13           A.     They were my employees.
14           Q.     Okay.  It says here also that you are a
15      member of the scientific working group on dog and
16      orthogonal detector guidelines.
17           A.     Yeah, you'll find that on the Internet.
18           Q.     Is this known as SWGDOG for short?
19           A.     Yes, it is.
20           Q.     Can you tell me what SWGDOG actually is?
21           A.     SWGDOG is one of approximately 13 or 14
22      SWGs, or scientific working groups sponsored by,
23      primarily, the Federal Bureau of Investigation and the
24      Department of Homeland Security.
25                  It is an organization that consists of
```

KENNETH WALLENTINE                                      ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    approximately 55 scientists, researchers, military

2    service persons, federal, state and local law

3    enforcement persons, clinicians, professors that have

4    the mission to promulgate best practices for detector

5    dogs in public service in the United States.

6          Q.      How long have you been a member?

7          A.      I don't know.  I believe at least two

8    years, perhaps three.

9          Q.      How did you become a member?

10          A.      I don't really know.  I was approached by

11    a couple members of -- I knew about the organization.

12    They had asked my opinion on a few things.  I was

13    approached by a couple of members of the executive

14    board.  I was told that I'd been nominated.  I don't

15    know what that process was.

16                If they pursued -- they asked for some

17    background information and said if they pursued the

18    nomination would I accept?  I said, well, what is it

19    you want out of me?  I said yes, and quite sometime

20    later, three months later or so, I received a letter

21    saying "we invite you to join", and I did.

22          Q.      Okay.  Why did you want to join?

23          A.      A couple of reasons.  There's some issues

24    in the police K-9 world, and you've touched on one

25    which is very important to me, and that is that the

KENNETH WALLENTINE                                ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    profession -- the police service dog world has done a

2    very poor job of having uniform vernacular.  There's

3    not a consistent language with which we can

4    communicate.

5           Q.    Do you mean nationally?

6           A.    Yes, in court and amongst one another.

7    That's an area that I knew that SWGDOG was very

8    interested in.  And I participated in commenting on

9    that.

10                 Also, I had participated in a program in

11   conjunction with the military in counterterrorism and

12   knew that somebody needed to take a lead in responding

13   to -- are you familiar with the Russ Ebersol

14   situation?

15          Q.    No.

16          A.    Well, Mr. Ebersol is today sitting in a

17   federal prison.  He was a big name in the dog world.

18   He sold many dogs and he contracted for services at

19   areas of critical infrastructure.

20          Q.    When you say he sold many dogs, you mean

21   K-9s?

22          A.    He sold explosive detector dogs to state,

23   local and federal government agencies and he defrauded

24   them.  He sold them dogs that were incapable.

25                 I felt strongly about this.  I believed

Case 6:08-cv-00066-MSS-DAB   Document 140   Filed 03/02/09   Page 59 of 204 PageID 10852

59

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1      that SWGDOG was part of the answer in creating
 2      practices that agencies could then look to as goals.
 3      They could look to those best practices as a guiding
 4      path towards certification standards.
 5              Frankly, there were some people there that
 6      I had known and for whom I had immense respect, and I
 7      thought it was an opportunity to good do some good
 8      with some people I liked.
 9              The last thing I needed was another
10      meeting in Fredricksburg or Quantico in the winter,
11      but they were nice people.
12          Q.    Does this group get together in person?
13          A.    Yes.
14          Q.    How often?
15          A.    We have general sessions twice a year,
16      typically a week long, in very unattractive locations,
17      at cheap federally funded hotels by airports with
18      noise and away from decent restaurants.
19              MR. POULTON:  Let the record reflect we're
20      all having a good laugh.  I don't want you to get in
21      trouble.
22          Q.    It says that you are a member of the
23      United States Police Canine Association.
24          A.    Yes.
25          Q.    Is that also known as the USPCA?
```

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.   v. DONALD ESLINGER, ET AL.

1          A.      It's more commonly known as the USPCA.

2          Q.      **What is your role as a member of that**

3  **organization?**

4          A.      My activity is really only being a member,

5  receiving publications, occasionally providing some

6  input.

7                  I was recently solicited to write an

8  article and I'm going to do so.  It's on my list.  I

9  might speak with a director once or twice a year.

10         Q.      **It says that over the past years you've**

11 **lectured and trained police officers and**

12 **administrators and you list a lot of states.**

13         A.      Uh-huh.

14         Q.      **What are you training these police**

15 **officers and administrators on?**

16         A.      The majority of the courses that I teach

17 have to deal with search and seizure issues,

18 particularly pertaining to dogs.

19                 I also teach courses pertaining to

20 constitutional principles for K-9 deployment.  I

21 occasionally will teach a course on risk management

22 for administrators.

23         Q.      **Were you ever certified as a K-9 handler**

24 **with the state of Utah?**

25         A.      The state -- yes.  Certification in the

```
 1    state of Utah is not mandatory.
 2         Q.     When were you certified?  Was that back
 3    when you were --
 4         A.     It's when I was actively working a dog.  I
 5    don't recall the year, I'm sorry.
 6         Q.     Has that certification lapsed?
 7         A.     Yes.
 8         Q.     You said earlier that you had your
 9    deposition taken before?
10         A.     Yes.
11         Q.     Have you ever had it taken in a civil
12    lawsuit?
13         A.     Yes.
14         Q.     Were those in cases where you were
15    retained as an expert witness?
16         A.     The majority of the times, yes.
17         Q.     What were the other times?
18         A.     I was sued.  So I would have been a
19    defendant.  And I was deposed once -- once, of which I
20    am certain -- where I was the investigating officer in
21    a case.
22         Q.     Are these two separate cases you are
23    talking about?
24         A.     Yes.
25         Q.     The case where you were sued personally,
```

1      what kind of case was that?

2          A.      It was a use of force case.

3          Q.      Okay.  Were you sued as a police officer?

4          A.      Yes.

5          Q.      Were you sued by an individual that you

6      had used force against?

7          A.      No.

8          Q.      What was the case about?

9          A.      There was a shooting in a bar, a gunfight

10     really.  I was the closest officer.  As I came into

11     the bar parking lot, two men came running from the

12     bar, I couldn't see their hands, I shouted at them,

13     they hopped into a Jeep, they drove away.

14              I pursued them.  Without apparent

15     explanation they stopped.  I walked up to the car,

16     there was no other officer there.  It was late at

17     night.

18              When I got up to the car I realized that I

19     had exercised perhaps to that point in my life the

20     poorest judgment I'd exercised, for when I looked at

21     the face of the driver, I saw rage and I saw him

22     reaching for a gun on his transmission hump.

23              I screamed at him to put his hands up.  He

24     and the passenger both, remarkably, did.  Then I

25     thought what do you do now?  So I had my weapon, I

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    backed up to my car, another officer came, we had them

2    walk back towards us.

3              The other officer handcuffed the driver,

4    told him to put -- excuse me -- in the process of

5    handcuffing the driver, he told the driver to go to

6    the ground, face down on the ground.

7              The driver told him something to the

8    effect that he wouldn't.  They argued for a minute.

9    Tensions were pretty high because now the passenger

10   was thinking that he was going to not go to his knees

11   and he would run off.

12             The other officer doubled up his fist and

13   suddenly struck the driver in the stomach.  He went to

14   the ground.  He was handcuffed.  I handcuffed the

15   other person.  We locked them up.  They were

16   convicted.

17             After being convicted, they turned around

18   and sued myself and the other officer for excessive

19   force.

20        Q.    **What was the excessive force used?**

21        A.    That the other officer had essentially

22   sucker punched this fellow to get him to go to the

23   ground and the guy -- he went to the ground rather

24   quickly.  He didn't break anything in his face, but he

25   hit pretty hard.

1      Q.      What was the outcome of the case?

2      A.      They settled the case.  This will hurt

3   your feelings.  Nothing on my behalf.  They didn't pay

4   anything out on my behalf.  I think they called it a

5   no-cause.  The other guy, they paid his attorney fees

6   and I believe he was given $250 which, you know, we're

7   talking well over 20 years ago.  Maybe that was a lot

8   of money then.  But I didn't think so.  That was the

9   first time I'd ever been deposed.

10      Q.      And then you said there was another case?

11      A.      There was another case where I

12   investigated a traffic crash.  I believe that a

13   gentleman died.  I don't know.

14              Many years after the traffic crash, after

15   I'd gone to law school, when I was clerking for the

16   Fifth Circuit, I was called to give a deposition.

17              So I came here and gave a deposition.  I

18   have know clue what I said.  I have no clue what the

19   case was about.  I just know that I literally -- I was

20   the investigating officer but it was literally four or

21   five years, maybe even six, after the traffic crash.

22   It was a very unproductive case.  I felt very badly.

23      Q.      Obviously, from what you've attached to

24   your report, you've been retained as an expert witness

25   before, correct?

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1          A.     Yes.

2          Q.     I'm just going to pull out that list.

3          A.     It's on page seven.

4          Q.     Thank you.  Have you always been an expert

5     witness for the defense?

6          A.     No.

7          Q.     Actually, I do see a couple where they say

8     plaintiffs.

9          A.     Yes.

10         Q.     You listed here on page seven of your

11    report -- it says that you've testified in or provided

12    depositions in the following cases, which may be

13    generally related to the subject of the instant

14    litigation in the past four years and you list a

15    handful of cases.

16                Have you been retained as an expert in

17    more cases and these are just the cases that you think

18    are most related to this case?

19         A.      I object to the form of the question as

20    compound.  Having noted my objection, I have been

21    retained in other cases.  However, none of those cases

22    have proceeded to deposition or formal report.

23                Therefore, pursuant to my practice and, I

24    believe, consistent with Rule 26 at least in our

25    district I have not listed them.

1              I have not attempted to discriminate by

2      subject matter for you.  I have listed every case in

3      which I have given deposition or court testimony in

4      the last four years.

5          **Q.      Okay.  I just wanted to clarify because I**

6      **didn't hear a word, one word that you said in your**

7      **last statement.  Did you say that the other cases that**

8      **are not listed here, that they didn't go to formal**

9      **report?  You didn't write out a formal report?**

10         A.      Correct.  I have four cases presently

11     where I'm still in the process of reviewing documents.

12     In one case I've actually started writing the report.

13     The other three I have not even begun.

14             I have been consulted by a law firm, asked

15     to review documents and meet with an attorney on

16     another case where the case is proceeding and counsel

17     has not yet hit their deadline.

18             It's my understanding that they're going

19     to wait to see what the plaintiff does before they

20     decide whether to retain an expert.  Ma'am, it may be

21     that I have five cases.  Can we go off the record a

22     minute.

23             (Discussion off the record.)

24             THE WITNESS:  I can't honestly remember if

25     I have four or five cases pending, I'm sorry.

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1      Q.     Do any of them concern K-9s?

2      A.     No.

3      Q.     Excessive force?

4      A.     Yes.

5      Q.     All of them?

6      A.     No.

7      Q.     The ones that concern excessive force,

8   what is the case about?

9      A.     I don't mind telling you what the cases

10  are about.  I'm not sure whether I'm required, and I'm

11  not sure whether I have an ethical obligation to my

12  client to not disclose in one matter.  There is one

13  matter involving the use of a Taser.

14          I have attorney/client conversations with

15  the law firm, with the lawyers there, and I believe

16  that it would be inappropriate for me to talk about

17  that case because they haven't decided whether to

18  retain me for testimony or not.

19      Q.     Okay.

20      A.     I don't know, but that's my belief.  I

21  would prefer, unless you tell me I have to, to not

22  answer questions about that.

23          I have another case that is where I am

24  retained on behalf of a law firm representing a

25  municipality where a police officer deployed a Taser

1    device.

2              I have a case for a city that all I know

3    is it involves use of force.  A file is sitting on my

4    desk and I have not opened the cover at all yet.  The

5    deadline to work on that case isn't until May.  So I

6    probably won't open the cover for a while.

7              Those three cases I have, two of which I

8    know I've formally been retained in, deal with use of

9    force.  The other two cases that I have do not deal

10   with use of force.

11        Q.    **What do they deal with?**

12        A.    One deals with whether a female officer

13   properly conducted a search of a female person.  And

14   the other deals with whether a police officer was

15   negligent in failing to -- if in fact he did fail --

16   whether he was negligent in failing to complete

17   certain paperwork to register a sex offender who had

18   recently moved to that community and then offended

19   against a young boy.

20        Q.    **In the cases that you have listed on page**

21   **seven through eight of your report, the first case you**

22   **list is Becker versus Bateman.  Is that still pending?**

23   **It says 2008.**

24        A.    It is pending.  I only recently gave a

25   deposition.

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1        Q.      Okay.  You represent the defendants in

2    that case?

3        A.      I'm employed by the law firm representing

4    the defendants.

5        Q.      Okay.  And the subject matter is excessive

6    force?

7        A.      Yes.

8        Q.      What is that case about?

9        A.      An officer was attempting to arrest a man

10   for driving under the influence.  The man did not

11   cooperate in the arrest.  The officer -- I'm, of

12   course, representing this from the facts as

13   represented to me -- the officer attempted to handcuff

14   the man and the officer and the man who was quite

15   large, a former athlete, a very powerful man, they

16   went to the ground and the man struck his head on the

17   asphalt.

18           He had a pre-existing wound to his head

19   from having been hit by a tree two days -- three days

20   before -- had not been diagnosed.

21           There's a claim against the officer that

22   the arrest exacerbated that injury and I think a claim

23   against the medical center for having failed to

24   miss -- I've forgotten the name of the medical

25   condition.

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1          Q.      Is Bateman --

 2                  MR. POULTON:  You said failed to miss.

 3     Did you --

 4          A.      I'm sorry.  When he went to the doctor,

 5     they missed the fact that he had this major head

 6     injury and sent him home.  The doctor malpracticed.

 7          Q.      Did you issue a report in that case?

 8          A.      I did.

 9          Q.      For Mr. Bateman, I assume?

10          A.      Yes.

11          Q.      Is that the officer?

12          A.      Yes.

13          Q.      And the next case is Salva versus Kansas

14     City Board of Police Commissioners.  It's in Missouri.

15     It says 2008.  Is that case still pending?

16          A.      It is my understanding that the case has

17     been resolved.

18          Q.      Okay.  It says that you've given

19     deposition testimony on behalf of the defendants.  It

20     says the subject matter is wrongful death.  What is

21     that case about?

22          A.      Miss Salva was driving down the road.  She

23     purchased a counterfeit vehicle registration tag.

24     Police officers working a counterfeit vehicle

25     registration tag enforcement project stopped her.
```

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1            She alleged to them that -- during the
2    arrest she alleged to them that she was bleeding.  She
3    was a person of limited English proficiency.  And the
4    claim was that she told the officers that she was
5    having a miscarriage.
6            The officers, one of them was a female
7    officer, and specifically the female officer, for
8    whatever reason, medical attention was not provided
9    until sometime later at the county jail.
10           She was taken to the hospital from the
11   county jail where she delivered a fetus.  I've
12   forgotten.  It might have been a 12-week fetus.
13       Q.      Did it survive?
14       A.      It did not.  It was not at a viable age.
15   She sued -- under the system in Missouri, the chief of
16   police works for the board of police commissioners.
17   The chief was sued.  I was retained by his counsel.
18           I understand that litigation -- that
19   that's been resolved.  I do understand that litigation
20   of some form proceeds today involving the two
21   officers.  I don't know.  I never was involved with
22   them.
23       Q.      Did you issue a report?
24       A.      I did.
25       Q.      What were your opinions in that regard?

1          A.      That the police training in that case was

2    not inadequate and that the supervision was not

3    inadequate.

4          Q.      **In the prior case that we just discussed,**

5    **Becker versus Bateman, what was your opinion in that**

6    **case?**

7          A.      That the method by which the officer

8    attempted to arrest Mr. Becker was reasonable, that

9    the officer had not used excessive force.

10         Q.      **What did the officer in that case actually**

11   **do to bring the suspect to the ground?**

12         A.      I'll demonstrate for you and I'll describe

13   to the best of my ability to the reporter as I

14   demonstrate.  It really would require two people, one

15   being much larger than me.

16              The officer was smaller, by quite a bit,

17   than Mr. Becker.  When Mr. Becker was told to assume a

18   position for handcuffing, he refused and started to

19   pull away, either to run or to turn around and engage

20   the officer.

21              That's a dispute.  And Mr. Becker is not

22   in a mental condition that he can reliably say who he

23   is or what he was doing.

24              The officer reached between Mr. Becker's

25   body and Mr. Becker's right hand to grab the right

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1    wrist and put it into a wrist lock.

 2              At one point the officer had Mr. Becker

 3    into a wrist lock.  Mr. Becker was easily able to

 4    escape the officer's wrist lock.

 5              The officer felt that his arm was trapped

 6    by Mr. Becker's powerful arm and his body, and that

 7    Mr. Becker was about to pull him down.

 8              So the officer then pivoted, attempting to

 9    take and successfully taking Mr. Becker to ground on

10    his side.

11              I do not know because I have not heard the

12    officer's deposition or seen the transcript, but it

13    appeared to me based on the evidence that I saw that

14    Mr. Becker -- again a very large man -- landed on the

15    officer.  The officer temporarily had the wind knocked

16    out of him.  That's my term, not a medical conclusion.

17              Mr. Becker at some point in that process

18    struck his head on the asphalt and lost consciousness

19    for some period of time.

20         Q.    What is Mr. Becker's condition now, do you

21    know?

22         A.    I don't know.  I've heard only

23    anecdotally.  I believe that he is -- I'm told that

24    his wife has become his guardian, that he has been

25    declared incompetent.  I use that term as a lay
```

1     person, not as an attorney.

2          Q.     Right.

3          A.     So that he's not able to -- I do know he

4     claims through counsel to not be able to give a

5     deposition.

6          Q.     Okay.  I didn't know if he was in a coma

7     or something.

8          A.     No.  And he, Mr. Becker, at one point was

9     a world class, world champion downhill skier.  But he

10    had deteriorated through copious imbibing of alcohol

11    on a regular basis.  He's still a large man.

12         Q.     You also have listed here Turnbow versus

13    Ogden City.  That's in Utah, 2008.  A deposition given

14    on behalf of the defendant.  Subject matter wrongful

15    death.  Is that case still pending?

16         A.     It is.

17         Q.     Did you issue a report in that case?

18         A.     I did.

19         Q.     What is the case about?

20         A.     Mr. Turnbow was on parole.  He came home

21    one day to the home where he lived with his

22    girlfriend.  They both lived next door to her father.

23              Mr. Turnbow became agitated.  The cause of

24    his agitation, I don't believe, is known by anyone

25    that's spoken about it.  Perhaps his girlfriend knew.

1          He got into a quarrel with the

2     girlfriend's father and pointed a loaded 12-gauge

3     shotgun at contact distance to the belly of the

4     girlfriend's father.

5          The girlfriend's father told him to go

6     away.  Harsh words were exchanged.  Rather than shoot

7     the girlfriend's father, a commendable decision, I

8     think, he went out into the street, and just began

9     shooting randomly into the neighborhood.

10         Several of the neighbors were alarmed.  It

11     was Christmastime.  Five o'clock in the afternoon.

12     Children were out.  People were about.  They called

13     the police.  The police responded.

14         When one of the officers arrived, Mr.

15     Turnbow at a fairly short distance turned and fired

16     the 12-gauage shotgun directly at the officer's face.

17         The pellets, for whatever absolutely

18     inexplicable reason, parted at the officer's face,

19     went around him, blew out his radiator, blew out the

20     window on this side of his face, blew out the light

21     bar on this side of his face.

22         The officer decided to -- as Mr. Turnbow

23     then racked the shotgun and went to shoot at the

24     officer again, the officer decided to shoot back.

25         They engaged in a gunfight.  Mr. Turnbow

1    continued to fire on the officer.  The officer was

2    alone.  Other officers were responding.

3            When other officers appeared, and they saw

4    that the officer was being fired upon, they got out of

5    the car.  All of this time, according to witnesses and

6    information given to me, the officers were shouting at

7    him to drop his weapon, please don't shoot us, please

8    don't, please drop it, please.

9            The second officer drew his weapon.  As he

10   drew his weapon, Mr. Turnbow started to stumbled back,

11   returned the shotgun fire, again fell back, the

12   officers stopped fire.

13           They gave Mr. Turnbow, who was still

14   yelling at them, still talking to them, commands to

15   release his shotgun, to toss it away.  He did not.

16           He raised the shotgun up.  The officers

17   shot at him again.  He shot back at them.  He then

18   fell back.  He was hit a number of times.

19           The officers were about to approach him.

20   He raised the shotgun up again, said:  "Today is a

21   good day to die", pointed the shotgun at one of the

22   officers.  They then returned a series of shots.  He

23   died.

24      Q.    So what was your opinion in that case?

25      A.    My opinion was that the contention in that

1    case is rather unusual, ma'am.  Plaintiff's counsel

2    alleges that the first round of shots was clearly

3    justified and all the bullets that impacted him from

4    the first officer were lawfully delivered bullets.

5    One of those may or may not have been fatal.

6              The second questionably.  But the third

7    round is a contention.  He said that they should not

8    have shot him the third time, that all he wanted to do

9    was die.

10             They should have divined that when he said

11   it was a good day to die that he did not intend to

12   kill them.  He was simply trying to persuade them to

13   shoot him.

14             My opinion was that it was reasonable for

15   each and every one of the 52 rounds to be fired as he

16   continued to fire at the officers.

17        Q.    The next case is Nielson versus Salt Lake

18   City and Burnham.  It says you've given deposition

19   testimony on behalf of the defendants and that this

20   concerned sexual misconduct?

21        A.    Yes.

22        Q.    Is that case still bending?

23        A.    It is.

24        Q.    Did you issue a report?

25        A.    I did.

1      **Q.    What is the case about?  Sexual**
2      **misconduct, is what it says.**
3           A.    Yes.  Jason Burnham was driving down the
4      road at two o'clock morning.  He saw Erin Nielson
5      walking down the road.  Erin Nielson was a young girl
6      of 19 years of age.
7                She had been consuming a beer in Utah.
8      That's unlawful.  She was with another young man.  A
9      second officer showed up.  They issued a citation, I
10     believe, if I remember correctly to both the young man
11     and the young woman.
12               She walked away from the scene.  Officer
13     Burnham then re-approached her, offered her a ride
14     home.  In his car she began to cry.
15               She was a very unfortunate young woman
16     with poly drug and social problems.  He offered to
17     take her to his home.  He took her to his home.
18     Because of her state of intoxication, and apparent use
19     of drugs at some point earlier, she became sleepy.
20               He offered to let her sleep in his bed.
21     She did so.  She awakened in the middle of the night
22     with him touching her on her genitals.  She told him
23     to stop.  There may or may not have been sexual
24     intercourse.  He went to sleep on the couch.  She went
25     to sleep.  He woke up the next morning, told her to

KENNETH WALLENTINE                           ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    shower and leave.

2              She went home, went to the hospital,

3    reported that she had been raped.  Medical evidence

4    was that there had been vaginal trauma.  He was

5    immediately suspended and then terminated by the

6    police department.

7              She is suing the police department for

8    negligent supervision, of course, under a theory of

9    respondent superior for his actual actions and then

10   negligent hiring.

11        Q.    **Who have you been retained by?**

12        A.    The city itself.

13        Q.    **What was your opinion in this case?**

14        A.    That Jason Burnham should never be a

15   police officer again in the State of Utah and that he

16   should burn in hell and go to prison; and that the

17   city, however, had no way to know that an he would do

18   such despicable acts, and once they learned, they

19   immediately terminated his employment as a police

20   officer.

21             They immediately notified my agency.  At

22   the time I was the bureau chief at the Department of

23   Public Safety.  They immediately did everything they

24   possibly could to ensure that he would go into custody

25   and they reported him to the district attorney for

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    criminal prosecution and that he would lose his police

2    license, which he did.  Therefore, they had done

3    everything that they could have.

4         Q.    **Okay.**

5               MR. POULTON:  Off the record for a second.

6               (Discussion off the record.)

7         Q.    **(By Ms. Webb) The next case is Trammell**

8    **versus Jacksonville Beach City Police Department,**

9    **deposition testimony on behalf of plaintiffs, and the**

10   **subject matter is excessive force.  Is that case still**

11   **pending?**

12        A.    I believe that he -- I know that the case

13   -- well, summary judgment was awarded to the

14   defendants, the Jacksonville Beach Police Department.

15              I do not know but I believe that the

16   plaintiff has appealed the case to the 11th Circuit

17   Court Appeals.  I do not know that for a fact.  So I

18   also do not know whether an appeal is actually

19   pending.

20        Q.    **What is that case about?**

21        A.    There was a young man who was involved in

22   a domestic dispute with a former girlfriend.  He broke

23   into the former girlfriend's relative's home.  A

24   number of people were there.  They told him to leave.

25   He didn't leave until he damaged something.  I don't

1    recall what.

2              He fled.  They notified the Jacksonville

3    Beach Police Department.  He was six foot two, quite

4    athletic, dressed in dark clothing, and a very

5    dark-skinned African-American man.

6              He fled.  There was a dog track.  He fled

7    to the -- I'm not really familiar with Florida, ma'am,

8    but I understand there are waterways in many

9    communities.

10             He fled and there was a waterway that

11   confined his path to a bunch of backyards that had

12   privacy fences.

13             It appeared that he had broke through a

14   privacy fence and was hiding somewhere.  He ultimately

15   that night was not caught.

16             The officer who was tracking him with the

17   dog had to cover officers, that is two officers

18   watching the handler's back.  The dog came to the

19   break in the fence -- there was a hole in the fence.

20   This may sound familiar.

21             The dog went through the hole in the fence

22   of.  The officer did not believe that he could get

23   through the fence.  The dog's behavior indicated that

24   the dog had found the suspect.  The dog began to bark

25   loudly.

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.   v. DONALD ESLINGER, ET AL.

1          There is some dispute about whether the
2   dog broke away from the officer, whether the lead was
3   long enough for the dog to get all the way into this
4   backyard.
5          The officer had to break through the fence
6   but he let the dog go through the fence before he went
7   through the fence.
8          Testimony from the officer is inconsistent
9   as to whether he let the dog -- the lead actually go.
10  Nonetheless, the dog went into the backyard, a very
11  small backyard.
12         Mr. Trammell was in the backyard talking
13  on his cell phone or checking his voice mail, I
14  believe, on his cell phone.
15         Mr. Trammell was a short, plump, old white
16  man dressed in white clothing, not a tall athletic
17  thin black man dressed in dark clothing.  The dog
18  jumped up and bit Mr. Trammell in the throat sinking
19  all four teeth into the throat.
20         Mr. Trammell had recently suffered from
21  throat cancer and had had significant medical
22  treatment to his throat and, as a result, had suffered
23  substantial damage, substantial aggravation of earlier
24  injuries, substantial damage through the dog bites.
25         I suppose you can get on Westlaw and read

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.   v. DONALD ESLINGER, ET AL.

1     the -- there's some dispute over how long the dog was

2     allowed to bite into his throat.

3            Q.     Did you issue a report in that case?

4            A.     I did.

5            Q.     And what was your opinion?

6            A.     My opinion was that the dog generally had

7     behaved well until the dog got to the fence.  My

8     opinion was that that the handler should not have

9     allowed the dog to go into the area until he had some

10    better idea as to whether the suspect was behind the

11    fence or there was some, as it turned out, innocent

12    third-party homeowner standing and talking.

13           I don't remember if it was voice mail or

14    checking a baseball score or talking on his phone.  He

15    was doing something on his phone.

16           Q.     Do you think that the dog successfully

17    tracked in that case?

18           A.     I think the dog successfully tracked.  I

19    don't know that -- and none of us know whether the

20    suspect in that case went through that hole in the

21    fence and then went over another fence.

22           We don't know that because once,

23    obviously, I think, they discovered that they had, the

24    dog had bitten the wrong person and this man was in

25    significant medical distress, all activity turned to

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    providing immediate medical attention to Mr. Trammell.

2              I don't know that all activity, but I

3    believe that all activity to find the actual burglary

4    suspect ended.

5        Q.    Did they ever find him?

6        A.    I think they did.  They knew who he was.

7    One of the officers -- oh, I'm sorry.  You know,

8    again, you can read this yourself, but one of the

9    officers in addition to believing the dog had tracked

10   well, one of the officers actually saw the suspect run

11   and go down this path.

12             So a police officer actually confirmed

13   that the suspect was right there on that path.

14       Q.    Do you know where they began the track?

15       A.    I don't recall.  I believe that it was the

16   fence line behind the place he broke into, but I don't

17   recall.

18       Q.    You said that the defendants were awarded

19   summary judgment?

20       A.    Yes.

21       Q.    Do you know on what basis?

22       A.    I don't.  I haven't read the opinion.

23       Q.    Okay.  Do you know Charles Mezlo?

24       A.    I do.

25       Q.    Do you know if he was retained as an

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    expert witness in that case?

2         A.     He was.  We were opposite table.

3         Q.     Do you know that he's been retained as an

4    expert in this case?

5         A.     I have heard recently.

6         Q.     Have you spoken with him about this case?

7         A.     I have not.

8         Q.     Did you speak with him about the Trammell

9    case?

10         A.     Not the details of it.  We had a

11    conversation about some other business and about -- I

12    called to ask if I could borrow some of his

13    intellectual property.  And he said:  "So, Charlie, I

14    heard you guys won the Trammell case."  And he said:

15    "Yeah, well."  I said:  "Well, every once in a while

16    we're going to be on the other side of the table."  He

17    said:  "Well, you did a good report.  You were just

18    wrong."  That was the extent of our conversation.

19         Q.     Okay.  Your opinion in that case was it

20    simply that the handler shouldn't have allowed the dog

21    to go under or that the dog shouldn't have been

22    released?

23         A.     I'd have to refer back to my report as to

24    exactly what I wrote.  But the principle concern was

25    that there had not been adequate efforts to identify

KENNETH WALLENTINE                                      ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1    who was on the other side of the fence.
 2         Q.      And what should they have done to identify
 3    who was on the other side of the fence?
 4         A.      Looked.  Peeked up over the fence.  Peeked
 5    through the hole.  There was some dispute as to when
 6    the warnings were given.
 7         Q.      What do you mean "the warnings"?
 8         A.      The yelling that they were sheriff's
 9    deputies and about to release a dog.  There was a
10    claim that the dog was actually moving through the
11    fence before anybody thought to give a warning.
12         Q.      Okay.  Do you think that they should have
13    contacted the homeowner before permitting the dog to
14    go on to the homeowner's property?
15              MR. POULTON:  Object to the form.  Go
16    ahead.
17         A.      I think that would have been an option.  I
18    don't know whether it would have been a reasonable
19    option because I don't know what kind of -- and was
20    never asked to look at what kind of perimeter and what
21    kind of other resources.  I don't know what kind of
22    neighborhood it was, other than knowing that there was
23    a pretty strong belief that the suspect had not gone
24    one direction because of this large waterway that was
25    flowing with water.
```

1          I was told that it was -- I didn't inspect

2     it, I haven't seen pictures, but I was told that it

3     was too large for a person to -- and enough water

4     flowing for a person to cross.  I suppose he could

5     have swam, I don't know.

6          You know, I suppose there's probably

7     alligators in those things too.

8          MR. POULTON:  It depends.

9     **Q.     In that case was the dog on lead until he**

10    **tried to go under the fence?**

11    A.     There is some dispute over that.  I

12    believe the dog was on lead.  I believe that the

13    handler lost control of the dog on lead.

14         There was some allegation that the handler

15    claimed an injury from the dog jerking his wrist and

16    the lead slipping off.  That was never resolved for

17    me.  The handler disappeared.

18    **Q.     What do you mean the handler disappeared?**

19    A.     Well, he had some kind of domestic

20    situation.

21    **Q.     Of his own?**

22    A.     Yes.  And he had private detectives and he

23    had other use of force issues.  I don't know if he was

24    on -- there was some other disciplinary thing going

25    on.  He just up and quit town.  The plaintiff's

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

 1    attorneys couldn't find him, nor could the defense

 2    attorneys for the longest time.

 3              I'm told ultimately they tracked him down

 4    in Vermont or something.  But he basically just

 5    dropped life and went somewhere else.

 6        **Q.      In your opinion, how do you think that**

 7    **that incident should have been handled?**

 8        A.      Differently than it was?

 9        **Q.      Uh-huh.**

10        A.      One of my principal contentions in that

11    case was that they were looking at a bunch of areas

12    where there were pretty small yards and they were all

13    fenced.

14              They didn't know whether they had a

15    perimeter but it's been my experience -- I haven't

16    worked an area like that where there's small yards --

17    my career has been in wide open spaces where you don't

18    have small fenced yards.  But I felt that they should

19    have looked over, under, through the fence.

20              They could hear somebody back there.  If

21    they'd given even a quick look, there would have been

22    substantial cause for doubting that the suspect was on

23    the other side.

24              They would have seen Henry Trammell

25    standing there with his cell phone.  They would have

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    seen that he was much shorter than the suspect, much

2    whiter than the suspect.  Truly, ma'am, at the

3    opposite end of the skin color spectrum.  Dressed very

4    differently.

5              It would have been immediately apparent.

6    I think that an officer would conclude from the fact

7    that this short, squat, old white man was on the other

8    side of the fence talking on a cell phone which

9    suggests that there's not a large muscular young

10   African-American male in that same small enclosed

11   backyard and that would have caused them, I think,

12   then to shout out to Mr. Trammell, using him as a

13   resource:  Have you seen anybody running through here?

14   Have you heard anything?

15             That would have caused them, perhaps, to

16   get on the radio and suggest that he might have gone

17   over Mr. Trammell's fence into the next yard.  And, if

18   available, can we get a helicopter?  Can we do

19   something to secure the further end of the perimeter?

20             Those situations are always fraught with

21   what ifs and what would I do if I had this resource or

22   that resource.  It's easy for me to criticize in

23   hindsight.  I was not there.

24        **Q.    You stated earlier that in your opinion**

25   **you thought the dog the tracked successfully.  Why do**

1    you say that?

2         A.      Not only the handler but the other two

3    officers gave statements that suggested that the dog

4    was actually engaging in the tracking behavior; that

5    is, nose to the ground.

6              The dog's movements were consistent with

7    where an eyewitness police officer had seen the

8    suspect run.

9              That wasn't really the issue in that case,

10   but there was no reason to believe that that dog had

11   not reliably tracked at least along the fence line

12   where the suspect had gone.

13        Q.      In that case, did you take a look at

14   Jacksonville Beach City Police Department's K-9

15   policies and procedures?

16        A.      I did.

17        Q.      Did you give an opinion as to those

18   policies and procedures?

19        A.      I believe I may have, but I don't recall

20   what I wrote in my report about them.

21        Q.      Did you review the training records for

22   the K-9 in question in that case?

23        A.      I don't have an independent recollection

24   of that but -- oh, wait.  I do have a recollection

25   that I reviewed the training records because I

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1   remember something that I saw there.
 2           But I don't recall anything about them
 3   other than a couple of notable things.
 4        Q.     What notable things?
 5        A.     Oh, not of any interest to you.  The
 6   sheriff of Salt Lake County, Jim Winder -- currently
 7   the sheriff.  There was an old picture of him with
 8   hair in the training records.  There were some
 9   documents that had language that was very familiar to
10   me because I'd written it.
11           Somebody had copied an article that I had
12   written on search after seizure -- or copied parts of
13   it.  Cut and pasted it off the Internet.
14        Q.     Uh-huh.
15        A.     Included in there.
16        Q.     Did you give an opinion in that case as to
17   the dog's training and tracking?
18        A.     I don't believe that I did.
19        Q.     Did you give an opinion as to the dog's
20   tracking ability?
21        A.     I don't believe so.
22        Q.     The next case that you have here is Harman
23   and Overton versus Utah Department of Public Safety.
24   It says you have given deposition testimony on behalf
25   of the defendants and the subject matter is wrongful
```

1    execution of a search warrant, negligent

2    investigation.  Is that case still pending?

3         A.    I don't know.

4         Q.    What was that case about?

5         A.    Harman and Overton, I don't know which was

6    male and which was the female.  They were a couple of

7    people who came together over the wintertime.  We have

8    transient employees.  One sometimes refers to them as

9    ski bums.

10            They fell in love temporarily.  They moved

11   into an apartment that was actually a converted garage

12   of a home -- the illegally converted garage of a home

13   in one of our inner city areas.

14            In the main part of the home, there was

15   some folks living engaging in substantial cocaine

16   trafficking.

17            Probably -- although Harman and Overton

18   were drug users because they were using drugs at the

19   moment the door was kicked in -- probably Harman and

20   Overton were not associated with the people who lived

21   in the home and had the cocaine business.  They were

22   mid-level distributors of a quantity of cocaine that

23   is not street level.

24            There was a narcotics investigation.

25   There were controlled buys made.  The controlled buys

1    resulted in surveillance of people who ultimately went

2    back to this home to purchase their quantities of

3    cocaine.

4              A search warranty was issued.  The police

5    officers failed to identify that there was an illegal

6    -- and by "illegal" I just mean zoning violations,

7    alright?

8         Q.      Uh-huh.

9         A.      And maybe some sanitation issues, but the

10   officers failed to recognize that these two places

11   weren't associated.

12             They actually had seen Harman or

13   Overton -- I don't remember who -- going to the main

14   home.  The explanation, I think, was that they were

15   getting mail or something.

16             Anyway, it came time to serve the search

17   warrant and because the folks in the home were -- one

18   of them had a record of violent crime, and because

19   they were engaged in dealer quantity narcotic

20   transactions, a SWAT team was used to execute the

21   search warrant.

22             The SWAT team broke out the window in the

23   back of Harman and Overton's garage apartment from the

24   adjoining property, at the same time that a ram was

25   used to go in the front door.

1            Harman and Overton were engaged in some

2    sort of physical liaison at the moment, in a state of

3    undress, in their studio apartment either on the floor

4    on the couch.

5            And it took about an hour and a half

6    before -- and they also complicated the fact that they

7    were smoking dope at the time.

8        Q.      Uh-huh.

9        A.      And, ultimately, after some investigation,

10    it was determined they were not involved in the main

11    crimes.

12            So they sued, saying that the officers

13    should have figured out that they were never involved

14    in the principle case.

15        Q.      Okay.

16        A.      They, too, disappeared.  But the case went

17    up to the 10th Circuit.  Summary judgment was granted

18    to the officers.  The case went to the 10th Circuit

19    and came back.  I believe that it's gone up again.  I

20    don't know.

21        Q.      What was your opinion in that case?

22        A.      That a more thorough investigation

23    exhausting all possible resources might have

24    identified that there was an illegal garage apartment,

25    might have shown that Harman and Overton were not

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    connected with -- I'm sorry, I've forgotten the names

2    of these people -- they were like from Mexico or

3    Columbia.   I don't know.

4              But that it was a reasonable mistake on

5    behalf of the officers.   Once they went into the home,

6    it was reasonable to take a while to figure things out

7    because of the complication that Harman and Overton

8    were actually engaged in albeit a relatively regular

9    minor drug crime, in Utah smoking dope is still

10   illegal.

11             So the officers did not act unreasonably.

12   Once they figured out they had made a mistake, you

13   know, they treated them okay.

14        Q.    **Coming to the end.  Herring versus City of**

15   **Colorado Springs.**

16        A.    Oh my gosh.  We've got a couple more and

17   we're going to have to take a break.  The Herring

18   versus City of Colorado Springs case was settled.  I

19   don't know how it was settled.  I did a report.  I did

20   deposition testimony.

21             Mr. Herring was a large man with body fat

22   of ten percent or less.  A large African-American

23   male, very muscled, who was very concerned with the

24   health intake.

25             He had vitamins, he had nutritional

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    supplements.  Then one day for reasons inexplicable to

2    anybody he went to McDonald's and gorged himself on a

3    Big Mac and fries and milkshake.  He continued to eat

4    McDonald's food.  High fat, high cholesterol, high

5    sodium diet.  He ate a lot of sugar for a week or so.

6              He had a prior history of mental illness.

7    He then had an episode which, in my opinion, was an

8    episode of a thing called excited delirium syndrome.

9              He had three children living in the

10   apartment and he threw the three children out, almost

11   literally threw their toys off them, he threw the

12   television set through the window, he threw knives, he

13   threw toasters and a microwave oven, he threw

14   furniture, he threw clothing out the windows.

15             He stripped his clothes off and on a very

16   cold afternoon in Colorado Springs, he screamed at his

17   children, he cut himself climbing through one of the

18   windows.

19             He took his arm, went around to the homes

20   around him in the apartment complex and put blood from

21   his arms on the lentil posts of each of the doorways

22   around his home.

23        Q.    **This is not just because he ate at**

24   **McDonald's, right?**

25        A.    It may well have been.  He didn't sue

KENNETH WALLENTINE                        ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    McDonald's but the gross electrolyte imbalance coupled

2    with some other things may have triggered it.

3         **Q.    I thought it would make you weaker and**

4    **tired?**

5         A.    One would think.  One would think.  He

6    screamed at one of the neighbors that he was Jesus

7    Christ.  He was apparently having religious delusions.

8              The blood was to keep the avenging angel

9    from attacking the people in his neighborhood in a

10   crude imitation of the Passover.

11             Police officers were called.  The police

12   officers came and, to make a very long story short,

13   they sprayed him with pepper spray.  He licked it up.

14             He attacked the officers.  They ended up

15   fighting him in a five-by-eight standard apartment

16   bathroom, three officers all in very good physical

17   condition.  He was able to do one-arm pushups with

18   three officers on his back.

19             He grabbed one of the officers by the

20   testicles and twisted the officer's testicles until

21   the scrotum began to detach from the officer's body,

22   while at the same time biting into the officer's

23   finger to the point that the teeth went into the bone.

24             They then struck him in the head several

25   times.  That had no effect.  He grabbed another

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1       officer's arm.  He grabbed for an officer's gun.

2               There were physically fit paramedic

3       firefighters standing by who then injected him with

4       five milligrams of Valium followed by five milligrams

5       of Haldol intramuscularly.

6               A firefighter joined into the fight.  All

7       four people were able to get him under control.  They

8       handcuffed him, started him to the hospital.  His core

9       temperature was exceedingly high.  I want to say 106,

10      107.

11              The autopsy was fascinating, but you don't

12      want to know about that.  Talking to the medical

13      examiner was quite a trip.  Anyway, he just suddenly

14      then died.

15              His survivors said that although he was

16      mentally ill, he was at the brink of developing a new

17      bathtub toy that would sweep the nation.  I think they

18      gave him a few hundred bucks.  I don't know.

19          Q.    **What was your opinion in that case?**

20          A.    That there was no excessive force.

21          Q.    **Okay.  Last case is Walker versus Orem**

22      **Department of Public Safety here in Utah, back in '04.**

23      **You gave deposition testimony on behalf of the**

24      **defendants.  And it just says the subject matter was**

25      **excessive use of force, wrongful death.**

1          A.      The case is over, it went to trial.  At

2     trial the jury -- in a federal trial no caused -- came

3     back with no cause for the department.

4          **Q.      Did you testify at trial?**

5          A.      I did not.

6          **Q.      What was the case about?**

7          A.      Mr. Walker took a person's car without

8     permission.  Whether he stole it or not is a legal

9     conclusion.  But it was reported that he stole it.

10               This too happened at Christmastime.  An

11    officer spotted him.  Mr. Walker's mother reported

12    that he was suicidal.

13               There was a pursuit on a major city street

14    at five o'clock in the afternoon, Christmas shopping,

15    and traffic.  A supervisor said it's too dangerous

16    call off the pursuit.  If he's a threat he's only a

17    threat to himself.

18               The officers followed him from some

19    distance.  He went from one city to the next.  At the

20    next city they thought they had him at an intersection

21    where they could stop and approach him and keep him

22    from getting away.

23               He then backed up and apparently in an

24    attempt to run over an officer or to get away --

25    whether he was attempting to kill the officer or not,

1    I don't know -- but that escalated the situation.

2    They pursued him again for some period of time.  He

3    was in a Subaru Forerunner or a four-wheel drive.

4          He went into the hills.  The officers

5    chose not to pursue him in the snowy hills in their

6    two-wheel drive Ford vehicles.  They lost him again.

7          They found him a third time, chased him

8    into the middle of an 80-acre farm plot.  In the

9    middle was a couple of homes.  They did not know until

10   later that it was his home.

11         He got out of the car.  One of the

12   officers got out of the car, was going to tackle him.

13   The officer closed to within about 15 feet of Mr.

14   Walker.

15         Mr. Walker ceased running away.  He placed

16   his hands together.  He pivoted.  He had a metallic

17   item in his hands, shining brightly.  In a two-handed

18   grip he raised it up into the classic firing stance,

19   pointed directly at the officer's chest.

20         The officer drew his weapon, fired, missed

21   Mr. Walker, fired again.  The second officer from some

22   distance away perceived because the first officer had

23   stumbled that the officer had been shot and had fallen

24   down.

25         From quite some distance he shot and fired

1    two rounds at Mr. Walker, killing him.

2         Q.    What was your opinion in that case?

3         A.    My opinion was that there was no excessive

4    force.

5         Q.    Do you want to take a break?

6         A.    I do.

7               (Brief recess.)

8         Q.    (By Ms. Webb) In the Trammell case, were

9    you qualified as a K-9 expert?

10        A.    I don't know that the court ever made any

11   statement to that effect.  I was hired to review the

12   reasonableness of the deployment in that case.

13        Q.    Because all of the cases we just discussed

14   state that you gave deposition testimony.  Did you

15   testify at trial in any of these cases?

16        A.    Let me look.  I don't think so.  The only

17   one of those that went to trial was Walker.

18        Q.    That's the one that you did not testify in

19   at trial?

20        A.    That's correct.

21        Q.    Do you know if you've ever been excluded

22   as a witness?  I realize you never testified, but do

23   you know whether or not a motion in limine to exclude

24   your testimony has ever been filed to exclude you from

25   testifying?

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1          A.     If that has happened, I'm not aware of it.
 2    To be more generous in my answer than you were precise
 3    in your question, however, in the Walker case it was
 4    defense counsel's intent to use me as a trial witness
 5    and the judge did not allow it.
 6          Q.     Do you know why?
 7          A.     Yes.
 8          Q.     Why was that?
 9          A.     Mr. Van Bogardus, who was the plaintiff's
10    expert in that case, he had quite a rough time in his
11    deposition.  There were a number of things that were
12    brought up in his deposition that, I believe, caused
13    him discomfort.
14          He no-showed despite being subpoenaed for
15    the trial.  At first the defense chose -- they said
16    they weren't going to use him at trial, so -- excuse
17    me, the plaintiffs.
18          So the defense said, well, we're going to
19    call him.  He did not come to trial.  The plaintiff's
20    attorney argued that it would be too prejudicial to
21    allow me to testify if they couldn't have their expert
22    testify and that their expert wasn't testifying
23    through no fault of their own.  So the judge decided
24    to not allow my testimony.
25          That was the second time, in fact, in
```

1  which he had done that in that period of time.

2      Q.    That the judge had done that?

3      A.    No.  Mr. Bogardus also did not show for

4  another major trial.

5           That would have been actually an amusing

6  case.  At the time I was president of the Inn 1 of the

7  American Inns of Court and the plaintiff's attorney,

8  who was a very dear friend of mine, a member of my Inn

9  of Court.

10          She had great trepidation, she had

11  bravado, but I know she was quite nervous about

12  deposing.  We'd clerked together for an appellate

13  court judge.  I was thinking it would be fun.  She

14  didn't.

15     Q.    Do you know what subject areas that you

16  are being offered as an expert witness in this case

17  for?

18     A.    I've had discussions with Mr. Poulton

19  about the parameters of my report.  I don't know that

20  there's been -- if there's been a designation, I have

21  not seen it.

22     Q.    What did you discuss with respect to the

23  parameters of your report?

24     A.    We discussed generally that I would talk

25  about the reasonableness of the dog deployment,

1    whether it was reasonable for Deputy Morris to believe

2    that his dog was tracking on April 20th, 2006 in this

3    incident, whether the conduct generally of Deputy

4    Morris and Deputy Remus as they tracked with police

5    service dog Strike was reasonable, and the

6    reasonableness of the officers' belief that they could

7    reasonably use their firearms in response to the

8    circumstances presented to them.

9            It would be a fair statement, I think, to

10   say that the issues that I have discussed in my report

11   are issues that I've discussed at the request or

12   falling in discussion with Mr. Poulton other than I

13   didn't discuss anything about how I put it together

14   and all of this one through seven that you've asked me

15   about.  He had not asked me about those things.  I

16   just did that on my own.

17       Q.    Okay.  Have you been qualified as an

18   **expert in any of the areas or issues discussed in your**

19   **report before?**

20            MR. POULTON:  Object to the form.  Go

21   ahead.

22       A.    When you say qualified as an expert, I

23   take it to mean that you are asking me whether I've

24   been in trial sitting on the stand and had a judge ask

25   to qualify me as an expert, is that correct?

KENNETH WALLENTINE                              ROBERT G. SWOFFORD, JR.   v. DONALD ESLINGER, ET AL.

```
 1          Q.     I don't know how things are done in the
 2     state courts, other courts where you have been
 3     retained as an expert.
 4          A.     Right.
 5          Q.     That is my understanding of what it means
 6     to qualify an expert.  But just to cover myself, I
 7     don't know if in other state courts you could be
 8     qualified at some other court hearing or something
 9     prior to a trial.
10          A.     Sure.  Typically in our state courts,
11     unless there's an objection, expert testimony is
12     admitted without a formal request.
13               You know, I've done it before where I've
14     gone through the motion in front of a jury for
15     strategic purposes.  But I have been in court before,
16     gone through my qualifications at great length and all
17     of my history at great length and then had in court
18     before a jury the attorney make a motion in court to
19     qualify me as an expert with a K-9 deployment.  That
20     has happened before, yes.
21          Q.     Has that been in criminal cases?
22          A.     No, in civil litigation.
23          Q.     As an expert witness?
24          A.     Yes.
25          Q.     But you never testified at trial in any of
```

1    these cases?

2         A.    I didn't in these cases but they only

3    cover four years.

4         Q.    Oh, okay.  These are from 2004 forward?

5         A.    Typically, every two or three months, I

6    update this Rule 26 disclosure and I let things fall

7    off that are more than four years.

8         Q.    Okay.

9         A.    And I add on anything that's recent.  So

10   the case to which I refer is not listed here.

11        Q.    Okay.  What were you qualified as?

12        A.    An expert in K-9 deployment and K-9 use of

13   force.

14        Q.    What does the word "deployment" mean to

15   you?

16        A.    When it is appropriate to use a dog to

17   accomplish one of the missions for a police service

18   dog.

19        Q.    What do you mean by "missions"?

20        A.    Some people use the term "profiles".  I

21   believe the term "mission" is preferable.  You may

22   have a dog with an apprehension mission.  You may have

23   of a dog with a locating mission.  You may have a dog

24   with a contraband detection mission.

25              Dogs are used to detect polycarbonate

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
1     disks, parrots, sharka disease in trees, epilepsy,

2     precancerous cells, blood disorders, drugs.

3              So some people would say that this dog's

4     profile -- that this is an epilepsy dog, this dog's

5     profile is epilepsy.  I prefer to say the dog's

6     mission is to detect the onset of an epileptic attack

7     and notify the potential victim that they need to

8     self-medicate and seek medical care.  That's what I

9     mean by "mission.

10         Q.     Okay.  Does deployment also include

11    releasing of a dog?

12         A.     Some people would use that term

13    synonymously.  I think it's a broader term.

14         Q.     What word would you use to describe that

15    instance?

16         A.     Releasing the dog?

17         Q.     Yes.

18         A.     Sending the dog or releasing the dog.

19         Q.     Some people use the word deployment

20    instead.  Some people use deployment only as using the

21    dog, using the dog on a track, etc., etc..

22         A.     Right.  For me, if you deploy a dog, that

23    may mean -- for example, I may say to you today the

24    Salt Lake City Police Department has probably three

25    dogs at this moment deployed, minimum.
```

1            They have a patrol service/narcotic

2    detector dog.  I'm fairly confident there's a bond dog

3    on the street, as we speak, and I'm fairly confident

4    that there's a bloodhound.

5            Those dogs are deployed.  They may go

6    their entire shift -- the bomb dog, I know, is

7    working.  But they may go the entire shift and not get

8    out of the car.  Some people may say that they have

9    not been deployed today.

10       **Q.     You said in this previous case you were**

11   **qualified as an expert in deployment and -- I'm sorry,**

12   **what was the other area?**

13       A.     K-9 use of force.

14       **Q.     What kind of case was that?**

15       A.     It's been quite a while.  I will do my

16   best.  Stolen car, man with a gun, parolee, classic

17   really bad guy.

18            A police officer spots him, I think, on a

19   traffic intersection.  There's a pursuit at high

20   speeds through the city into a residential area in the

21   late evening hours.

22            The man begins to run into a park adjacent

23   to a school.  He is going to run into a residential

24   neighborhood.  I don't remember whether officers

25   thought he had the gun at that moment or whether he

1    ditched the gun, I don't recall.

2            Anyway, they shouted at him, gave

3    warnings.  As he ran through the park -- this is one

4    where they never lost sight of him.  He ran through

5    the park.  He didn't stop.

6            They sent the dog.  They released the dog

7    and gave the dog the command to apprehend the man.  He

8    did apprehend the man.

9        Q.    Any other cases in which you've been

10   qualified as a K-9 expert?

11       A.    In the sense of knowing that some judge --

12   knowing about the motion and knowing that a judge has

13   actually made the ruling, I'm not aware of any.

14       Q.    Have you ever been excluded?

15       A.    No.

16       Q.    Is there any area where you feel that you

17   are not an expert and you would leave it to someone

18   else to be an expert in a case?

19            MR. POULTON:  Object to the form.

20       A.    Oh, my goodness.  Yes.

21       Q.    With respect to K-9s?

22            MR. POULTON:  That was the reason for the

23   objection.  I assume you are not an expert in brain

24   surgery or heart surgery, although I may be wrong.

25            MS. WEBB:  Look at all of his jobs.  Who

1    knows?

2              MR. POULTON:  That's why I say I may be

3    wrong.

4         A.    I've never -- I take that back.  I've only

5    had occasion to consider that question once before and

6    answer it.  So I think I can best answer it for you in

7    the context of what I've considered and determined

8    that I'm really not qualified to offer expert

9    testimony on.  I think that -- well, I can do better.

10   I can do better.

11             I do not know enough about human remains

12   detector dogs and the sub disciplines within human

13   remains detector dogs.

14             I've worked with accelerant detector dogs,

15   but I don't understand enough about the training and

16   it's distinct enough from narcotics training.

17             I think the same would apply to

18   explosives.  I have the general theory.  I would not

19   be able to say whether a dog has performed well as a

20   explosive detector dog or whether the training is

21   adequate for an explosive detector dog.

22             I have a general understanding of K-9

23   first aid and K-9 physiology.  I can talk to you

24   about, you know, nasoturbina and vomeronasal organ.

25             I can talk to you generally about the

1    structure and the respiratory abilities and pathways

2    of a dog.  But beyond that in terms of K-9 health,

3    whether to say a dog was healthy on this particular

4    day, no, I couldn't do that.

5          Q.    Okay.

6          A.    So there are a bunch of areas.  Those are

7    some that come to mind.

8          Q.    Okay.  Have you ever been retained by this

9    law firm before?

10         A.    No.

11         Q.    How did you become involved in this case?

12         A.    I believe Mr. Poulton called me, but it

13   might have been someone else from his firm.

14         Q.    What were you asked to do in this case?

15         A.    Initially I was asked to look at a volume

16   of documents.

17         Q.    Do you know when that was?

18         A.    I think I can give you a general answer if

19   you don't mind if I refer to my billing statement.

20         Q.    Okay.

21         A.    I think that that was in October of 2008.

22         Q.    Okay.

23         A.    It might have been in November, but I

24   don't think so.  It might even have been in September,

25   but I don't think so.  I believe it was October of

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    2008.

2         Q.    So what did you do after you looked at the

3    volume of documents?

4         A.    I called Mr. Poulton and gave him my

5    initial reactions to what I'd read.

6         Q.    What were those?

7         A.    You know, I don't recall the specifics of

8    that conversation, but I do recall having looked at my

9    billing statement that it only took me three-tenths of

10   an hour to do it.

11              I recall that based on what I'd seen, that

12   it struck me that it was an appropriate case to use a

13   dog.

14        Q.    In what way?

15        A.    In that there was a burglary, which I

16   understood to be felony conduct.  I believe that it

17   stuck in my mind, in fact, that not only was there a

18   burglary but apparently there had been some burglaries

19   in that area, and that the timeframe was such that one

20   could reasonably expect a dog to be in a good position

21   to track and locate and apprehend the suspects.

22              It was reasonable based on what I'd seen

23   for Deputy Morris to believe that police service dog

24   Strike was, in fact, tracking when he gave the command

25   to track to Strike, that the method by which the track

1    had been carried out was reasonable.  It was not a

2    detailed conversation.

3         **Q.     Okay.  Did you have any opinions in that**

4    **conversation that differ from what are in your report?**

5         A.     No.

6              (Discussion off the record.)

7         **Q.     (By Ms. Webb) Were you ever told by**

8    **whoever it was that you had spoken to at the law firm**

9    **what your opinions should be or what your conclusions**

10   **should be?**

11        A.     No.  In fact, let me tell you, I don't

12   know when I originally spoke with Mr. Poulton, but I

13   do have a habit and I know that I followed my habit in

14   this case of giving attorneys for whom I potentially

15   may work a little speech.

16        **Q.     What is that speech?**

17        A.     It is simply this:  This is what I charge.

18   I am honest and fair in my billing.  I do not believe

19   in bulldog litigation.  I will not be part of anything

20   where you are not civil to other people.

21              I'm still in the practice of being a

22   police chief and intend to be a police chief at least

23   for sometime.  So you are going to get what I think

24   and if you don't like it, then I ask that you fire me.

25   But you are not going to tell me what to do.

1        Q.      Okay.

2        A.      You know, I'm generally not quite that

3    blunt.  I mean, I believe in being kind in my speech

4    but I'm pretty firm in that I am not going to -- well,

5    a couple of things.  I'm not going to let people tell

6    me what I should think.

7        Q.      Okay.

8        A.      And I'm also pretty firm that if the right

9    case comes along, look, I'm a police chief and a

10   political one at that.  In this state I am somewhat

11   known in the law enforcement community.  In fact,

12   better than somewhat known, frankly.

13           I don't like to be a witness against

14   police officers.  But if the right case comes along, I

15   will not refuse it, not because I want the money, but

16   because I think it's the right thing to do.  The

17   Trammell case, frankly, is an example of that.

18           That's the speech I give.  So if Mr.

19   Poulton had tried to tell me what to think, we

20   wouldn't be here today, ma'am.

21       Q.      Were you asked to draft a report of your

22   findings or opinions?

23       A.      I was asked to write a report and I did

24   so.

25       Q.      Okay.  And I assume you submitted it to

KENNETH WALLENTINE                                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    Mr. Poulton or to the firm?

2         A.    I gave it to Mr. Poulton.

3         Q.    And did he have any changes to your

4    report?

5         A.    He had no substantive changes.  I think

6    that he may have caught a couple of typos that I had

7    not, but there were no substantive changes made at

8    all.

9         Q.    Okay.

10        A.    Essentially what I have here is what I

11   gave him.

12        Q.    The invoice that you are talking about

13   earlier, which is attached to your report, it shows

14   that you had one telephone conference with Tom Poulton

15   on November 13, 2008 and then a second one on December

16   8, 2008.  Then it appears that you -- did you finalize

17   your report on December 7, 2008?

18        A.    I think so, if that was the date it was

19   due.

20        Q.    Okay.

21        A.    Sometimes I wait until the last minute, I

22   admit.  I think that that's the date that I did.

23        Q.    On that date you also had a telephone

24   conference with Tom Poulton?

25        A.    I did.

1      Q.     Do you remember on the date of November 13

2   when you spoke with Tom Poulton, is that the first

3   time you had spoken with him about this case?

4      A.     I don't think so, nor do I believe that

5   All of my conversations are reported here.

6      Q.     Listed on page one of the report it says

7   that you reviewed the following documents, pleadings

8   records and reports.  Then there's a list of a number

9   of documents that you apparently reviewed.  Is this

10  everything that you reviewed in putting your report

11  together?  It says you looked at reports of the

12  Florida Department of Law Enforcement?

13     A.     This is everything I looked at prior to

14  the date I signed this -- or on the date that I had

15  signed this.

16     Q.     Okay.

17     A.     So December 7th.  I have looked at

18  documents subsequent to this.

19     Q.     Right, and we've already discussed those

20  at the beginning?

21     A.     Yes.

22     Q.     Did you ever inspect in person the scene

23  where this incident took place?

24     A.     No.

25     Q.     So I would assume then that you never

1    measured anything in this case?

2         A.    I did not.

3         Q.    You didn't photograph anything in this

4    case?

5         A.    I did not.

6         Q.    You didn't perform any tests in this case?

7         A.    No.

8         Q.    Have you had an opportunity to examine K-9

9    Strike?

10        A.    I have not.

11        Q.    Have you ever performed any calculations?

12        A.    In this case?

13        Q.    Yes.

14        A.    No.  Well, yeah.  When my wife did this

15   thing on the computer that has the bill, I just

16   thought it was high, so I did add the numbers up.  But

17   it's right.

18        Q.    Okay.  Have you prepared any exhibits in

19   this case?

20        A.    No.

21        Q.    Have you been asked to prepare any

22   exhibits in this case?

23        A.    No.

24        Q.    Do you know that the defendants in this

25   case have retained other experts?

KENNETH WALLENTINE                                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1         A.     I have learned that, yes.

 2         Q.     Have you spoken with any of those experts?

 3         A.     Yes.

 4         Q.     Who have you spoken with?

 5         A.     On your side?

 6         Q.     On your side.

 7         A.     I believe that I talked to Charlie Mesloh.

 8    And that's M-e-s-l-o-h.  And it's Doctor, actually,

 9    Dr. Charles Mezlo.

10            But I don't know whether I spoke to him

11    during the time that I was preparing my report or

12    working on this case but I believe so, because we had

13    two meetings coming up at which we had --

14         Q.     Two meetings of what?

15         A.     There was a meeting last week of the

16    California Narcotic K-9 Association where some other

17    people with who I do other work were attending as well

18    as a social event in southern California.

19            I had called Charlie, encouraging him to

20    -- inviting him personally and encouraging him to come

21    to this other event and to do a couple of things there

22    unrelated at all to this case, and to join us in the

23    social activity that we did.

24            Then we have an upcoming meeting of

25    SWGDOG.  I'd have to look at my calendar, but I
```

1    believe that that's in March.  And I think that it's

2    in Dallas.

3              We talked about getting a group to

4    complain about not so much the quality of the places,

5    but it seems like there is a bias that those of us in

6    the west always have to travel, you know, quite far

7    into cities where we have one or two connecting

8    flights.

9              I realize, ma'am, it's not appropriate to

10   complain to you at this moment because you have had a

11   pretty rough week, and I'm sorry for that, but there

12   are some of us that were going to make some noise that

13   instead of Dallas, couldn't we do Chicago or why not

14   once in a while Salt Lake City, for heavens sake.

15             So I know that I've had conversations with

16   him.  I don't know specifically the time period.

17   Probably it was in December.

18        Q.    **Did your conversations -- were they about**

19   **this case?**

20        A.    Other than to say:  "So I hear that this

21   time you are not going to beat me up."  And we joked a

22   little bit about -- I think he made another comment

23   that I was just off the mark.

24             I don't know.  We talked about my book.

25   We talked about Charlie -- allowed me to use some of

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    his materials for my book.  We talked about that,

2    which reminds me, I've got to send him a copy.

3         Q.     Did you speak with any other defense

4    experts?

5         A.     No.  Well, not that I know of.  I didn't

6    ask him.  Actually, Charlie's name came up in a

7    conversation and that's when I learned that he was in

8    this case, as did someone else's name but I didn't ask

9    him.  I don't know who their experts are on your side.

10   I only know the ones I've seen some reports on and I

11   know some of these people.

12        Q.     Have you spoken with any of them about

13   this case?

14        A.     I've spoken with them, even seen one

15   recently but not had any conversations about this

16   case, and I don't know that they know I'm an expert on

17   this side.

18        Q.     Okay.  Have you spoken with anyone at the

19   Seminole County Sheriff's Office?

20        A.     I have not.  Only counsel.

21        Q.     Have you spoken with any of the defendants

22   in this case?

23        A.     Like Deputy Morris?

24        Q.     Yes.

25        A.     No.

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1        Q.      Have you spoken with Mr. Gailey?

 2        A.      Recently?  About this case?

 3        Q.      Yes.

 4        A.      No.

 5        Q.      Ever?

 6        A.      Yes.

 7        Q.      Oh.  I didn't know that you knew him.  How

 8   do you know him?

 9        A.      I don't know that he'd remember me, but I

10   remember him.  In 1999 or 2000 possibly -- I'm pretty

11   sure it wasn't in 2001, that year I remember quite

12   well.  It was probably in 2000 the Sheriff of Lake

13   County, whose name has escaped me --

14        Q.      Lake County, Florida?

15        A.      Lake County, Florida, invited a group that

16   I do consulting work with occasionally to come to Lake

17   County, Florida to present a six-day training seminar.

18                Unlike some of the SWGDOG events, that

19   area has some nice restaurants.  I recall that there

20   was -- the sheriff had a day where there was a

21   barbecue that his staff prepared and he brought out

22   all of his K-9 staff.  And, you know, we met each

23   other.

24                Anyway, I believe that Mr. Gailey was

25   there and I believe that he was in a class that I
```

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1      presented, but I'm not sure.  I do remember meeting
2      him and I believe that he had some affiliation with
3      the Lake County Sheriff's Office.  It may have been as
4      a deputy or a reserve deputy, a trainer, I do not
5      recall.  But I'd heard his name in connection with
6      these handlers from Lake County.
7              Q.      Okay.
8              A.      So to say I know him is probably a strong
9      word.  But we have met.  I suppose there's an off
10     chance he would remember me.
11             Q.      Just as a speaker?
12             A.      Just as a speaker.
13             Q.      Did you speak with anyone at the Florida
14     Department of Law Enforcement?
15             A.      In connection with this case?
16             Q.      Yes.
17             A.      No.
18                     (Discussion off the record.)
19                     (Brief recess.)
20             Q.      Looking at your report, I'm going to try
21     and break it down into sections.  Charlie Mesloh gave
22     a great report -- not his opinion -- but the way he
23     broke it down.  It was very easy for me to go through
24     his report.
25             A.      Can I see it afterwards?

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1            MR. POULTON:  Sure, I'll send you a copy.

2       Q.    He would set out facts he relied upon

3  opinion, facts he relied on, opinion.  So it was very

4  easy to go through.  Not that you have a bad report

5  here.

6       A.    I'm always looking to improve.

7       Q.    I'm going to try to break this down.  Let

8  me start off on page ten, you start talking about

9  Strike's training.

10      A.    Yes.

11      Q.    Let's talk about Strike's training.  Do

12 you have an opinion as to Strike's training?

13      A.    I do.

14      Q.    What is that opinion?

15      A.    Strike's training was adequate.  It was

16 reasonable.

17      Q.    Did you ever receive a copy of -- well,

18 let me start from the beginning.  Do you know when

19 Strike was purchased by Seminole County Sheriff's

20 Office?

21      A.    I do not.  That was in the documents

22 provided to me, but I don't have an independent

23 recollection.

24      Q.    Do you know if Strike was trained prior to

25 being obtained by the Seminole County Sheriff's

KENNETH WALLENTINE                              ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
1    Office?
2         A.    My understanding is -- when you say
3    "trained", do you mean trained as a police service
4    dog?
5         Q.    No.
6         A.    Trained at all?
7         Q.    Yes.
8         A.    Yes.  I do believe that he was.
9         Q.    Do you know how he was trained?
10        A.    I believe --
11        Q.    Or what he was trained in?
12        A.    Yes, I believe that a private individual
13   had trained him in the basic disciplines of obedience,
14   apprehension, location and tracking sufficient to the
15   point that Strike was able to go through the processes
16   and be titled both as an IPO III and Schutzhund III
17   dog.
18        Q.    Do you know who his handler was at these
19   trainings?
20        A.    At the Schutzhund and IPO?
21        Q.    Yes.
22        A.    I'm sorry, I don't recall.  I believe I
23   saw that in the record but I don't recall that.
24        Q.    Do you know if it was Deputy Morris?
25        A.    I do not believe it was.
```

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1      Q.     Do you know who certified Strike in this

2  case?

3      A.     Well, when you say "certified", I know

4  that Strike was certified under the rules promulgated

5  by the Florida Department of Law Enforcement.  I don't

6  know who did that.

7              Again, I've seen it in the documents.  I

8  don't recall.  I'm generally familiar -- actually

9  fairly familiar with FDLE certification processes.  I

10  don't know who did that but I know it was done.

11              I know that there are quarterly

12  performance exams -- I don't know that I'd call them

13  certifications -- administered by a training officer

14  of the K-9 unit at the Seminole County Sheriff's

15  Office, and I know that Strike was certified to the

16  sheriff's office as being competent in the disciplines

17  that the sheriff's office was expecting him to perform

18  in by Mr. Gailey, who was the trainer.

19      Q.     Uh-huh.

20      A.     He was the trainer at least that

21  supervised with some assistance, no doubt, from other

22  people, that supervised the police service dog

23  training of Strike and Billy Morris -- Deputy Morris.

24      Q.     Did you ever receive a copy of the

25  curriculum for Mr. Gailey's ability in certification

1      of dogs?

2          A.     Yes, a short time ago, and that is

3      included either in my first or second supplemental

4      report.

5          **Q.     Do you know if you reviewed it before you**

6      **issued this report?**

7          A.     Yes, I do know; and no, I did not.

8          **Q.     Do you have any thoughts on that**

9      **curriculum, whether it was appropriate or not?**

10         A.     I did have thoughts.

11         **Q.     What were they?**

12         A.     The curriculum is appropriate in scope and

13     length of time.  It's appropriate if all of the hours

14     represented to me are presented.  And it's my

15     understanding that Mr. Gailey runs a night program.

16             It is not uncommon that he starts his

17     handlers working out at three in the afternoon --

18     excuse me -- I think he goes six to three rather than

19     three to 12.  I think he starts in the evening and

20     goes until three.

21             So he essentially works eight hours a day,

22     assuming there's a break or two in there, for ten

23     weeks, five days a week.

24             I think that that is sufficient, perhaps

25     even depending on the dog handler, more than

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    sufficient time to provide the basic skills for a

2    police service dog.

3              I think that it's been sometime since Mr.

4    Gailey put the document together and the document

5    lacks, I think, some detail and doesn't seem to -- if

6    I were doing it, I would have organized it perhaps

7    differently.

8         Q.    How so?

9         A.    I might include more detail, but I think

10   that I would have an index or a table of contents, an

11   overview that allowed me to look and say okay.

12             I'm sorry, I don't remember the document

13   as I sit here right now, but I remember seeing

14   tracking and I believe it said 100 hours under that.

15             If I were in the position that I'd been in

16   when I was at the police academy and my subordinate

17   came to me and said Chief, here's my curriculum and it

18   says tracking 100 hours, I'd say go back and give me

19   an index, break those hours down so I can see 100

20   hours doing X, Y and Z; X five hours, Y ten hours.

21        Q.    Okay.

22        A.    To be sure, ma'am, when I'm talking about

23   curriculum I'm talking about the document I reviewed,

24   one what was actually presented in the course.

25        Q.    Okay.

**Tempest Reporting, Inc.**
**(801)521-5222**

 1           A.      I'm relying on the document.

 2           **Q.      Did you have a chance to look at the**

 3   **training records that Deputy Morris kept for training**

 4   **K-9 Strike?**

 5           A.      Yes.   During what period of time?

 6           **Q.      Up through the date of the incident?**

 7           A.      Yes.

 8           **Q.      Did you have any opinions as to those**

 9   **training records?**

10           A.      I felt that he kept pretty darn good

11   training records.

12           **Q.      Why did you think they were good?**

13           A.      They recorded such things as weather

14   conditions, surface conditions, for the narcotic cases

15   he talked about distraction, talked about hides, in

16   other words, the areas where the drugs were hidden,

17   different kinds of drugs, different quantity of drugs,

18   if there were other complications to the problem, he

19   talked about tracks, he talked about surfaces, he

20   talked about the number of turns, he talked about the

21   aging of the track, he recorded the decoy names so I

22   could look and see that he was using different decoys,

23   that he wasn't always using the same decoy to lay his

24   tracks.

25                   And they were legible, in sharp contrast

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

 1    to another case that I looked at in Florida.  They
 2    were legible.
 3         Q.    Okay.
 4         A.    Which helped, I think, give them the
 5    overall impression.  They seemed to me to be uniform,
 6    to be complete, and they showed me that he was
 7    consistent in keeping records of his training, at
 8    least the formal training that he would do with police
 9    service dog Strike.
10         Q.    Do you know if he trained Strike on
11    cross-tracks?
12         A.    I believe that I saw a reference at a
13    couple of points.  I believe that there is a reference
14    in Mr. Gailey's training curriculum to cross-tracks.
15    I believe that there was a reference in some of the
16    training records although, ma'am, as I sit here today,
17    I can't tell you that that is a pre-incident
18    recollection.
19         Q.    Okay.
20         A.    Because, you see, I've also been provided
21    with post-incident training records.
22         Q.    Do you know if Strike was trained in scent
23    discrimination?
24               MR. POULTON:  Object to the form.
25         A.    Insofar as I've defined scent

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.   v. DONALD ESLINGER, ET AL.

1    discrimination earlier as the ability to distinguish

2    the odors that we want the dog to find as opposed to

3    odors we don't want the dog to find, the answer is

4    yes.

5         Q.    Do you know if Deputy Morris trained the

6    dog on walking tracks?

7         A.    Based on the training records, I believe

8    that he did.

9         Q.    Do you know if he trained the dog on

10   running tracks?

11        A.    Again, based on the training records, it

12   appears that he did.

13        Q.    Do you know if he ever -- we talked about

14   this earlier -- proofing a dog.  Do you know if he

15   ever proofed the dog off of any items?

16        A.    I don't recall seeing any records that the

17   dog was proofed off items.

18        Q.    Do you know if he laid tracks himself?

19        A.    I believe --

20             MR. POULTON:  Object to the form.  Go

21   ahead.

22        A.    I believe that he did.  In the early days

23   of tracking training that would be typical.

24        Q.    Why is that?

25        A.    Many times -- the most common method --

1    and I say this from the perspective of student

2    handler, I've never trained anybody to train a dog to

3    track -- but one of the more common methods is to use

4    Beanie Wienies or Vienna sausages or hotdogs.  One

5    will take lay a track by rubbing the hotdog or the

6    Beanie Wienie.  Some people would take it on a stick

7    and drag it at intervals that would be consistent with

8    footsteps.

9              Sometimes you can start earlier and

10    actually do a food track where you take small pieces

11    of sausages or hotdogs and lay them out.

12              There it would be appropriate and common

13    for the handler to be told by the trainer -- I mean,

14    this has happened to me and I've seen it happen in

15    other cases -- go lay up, take that hotdog and drag

16    step it.  Lay it every 34 inches, every 32 inches,

17    stride length.  Lay a hotdog track.  So I don't know

18    but I believe he probably did.

19         Q.    Do you know if he continued to lay tracks

20    that way until the date of the incident?

21         A.    Based on the records, I don't believe he

22    did.

23         Q.    Okay.  Do you know if he ever employed

24    double-blind tracks with Strike?

25         A.    What do you mean by double-blind tracks?

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1          Q.      My understanding of double-blind tracks is

2    one person -- the handler is not involved, the handler

3    does not know how the track is laid.  Someone else

4    lays the track and then someone else evaluates whether

5    -- a second person evaluates whether or not Strike

6    properly conducted the track?

7          A.      I do not know that.

8          Q.      Do you know if he employed any

9    single-blind tracks?

10         A.      I have not seen that term used but, based

11   on the records, it appears to me that he did.

12         Q.      Okay.  What do you mean you have not --

13         A.      I have not seen that term.  In other

14   words, in his records it doesn't say single-blind

15   track done.  But based on how that's laid out and our

16   understanding, I believe that the answer is yes.

17         Q.      I know you said that you saw Bob Gailey's

18   training school curriculum.  Are you familiar with his

19   training school at all other than seeing his

20   curriculum?

21         A.      I knew that it existed, and I think I know

22   where it is generally.  I think it's in Lake County,

23   Florida.  I don't know.

24         Q.      Okay.  Do you know if Strike was trained

25   in casting?

```
 1              MR. POULTON:  I object to the form.
 2       A.     Casting technique is pretty integral to
 3   tracking.  I don't recall seeing in the training
 4   records any specific entries saying that Strike on
 5   this date was trained in casting.
 6       Q.     Okay.  Do you know if the Florida
 7   Department of Law Enforcement requires K-9s to be
 8   certified in tracking?
 9       A.     I do know that and, no, they do not.
10       Q.     Okay.  Do you know if Strike was ever
11   trained with double-laid tracks?
12       A.     I think I know what you mean but tell me
13   what you mean.
14       Q.     What do you understand a double-laid track
15   to be?
16       A.     When you say double-laid track to me, I'm
17   thinking of a track where you have two different
18   decoys.  And it's coordinated with the handler.
19              They are given a path to lay the track.
20   One goes out and then one lays another track that is
21   fairly close to but somewhat divergent, and the dog is
22   started on the track of the decoy we desire to find
23   and is expected to follow that track.
24              It's essentially a track where a
25   distraction -- an intentional distraction is created
```

1    to see if the dog will perform or whether the dog will

2    get off track and go to the second decoy.

3        **Q.    Do you know if Strike was ever trained in**

4    **a double-laid track, as you've just defined it?**

5        A.    Again, I don't recall seeing that defined

6    in his records.

7        **Q.    Do you know what a running track is?**

8        A.    It's something I haven't visited since I

9    blew my ankle out in 2002.  When you say "running

10   track", I'm assuming you are not meaning a circular

11   gymnastics track?

12       **Q.    Correct.**

13       A.    That you are talking about a track where a

14   decoy is instructed to run, which does a couple of

15   things:  It significantly extends the stride and

16   somewhat or maybe even significantly reduces the

17   impact on vegetation or the surface.

18            So it's in theory and, I think, in

19   practice a harder track.  Again, based on Mr. Gailey's

20   training records, it appears to me that they did that.

21       **Q.    How important do you think training is for**

22   **tracking?**

23            MR. POULTON:  Object to the form.  Go

24   ahead.

25       A.    How important is training to a tracking

```
1    dog?
2         Q.      Uh-huh.
3         A.      I don't know that I can give you a
4    quantitative answer to that.  I can tell you that
5    different dogs have different strengths, just like
6    people and perhaps cats.
7              My dog, for example, who lived with me
8    after his retirement -- he passed away last year.  He
9    wasn't a great tracker and never really -- an urban
10   tracker.
11             I've seen other dogs that I don't care
12   what you did with that dog, I think that dog would
13   have tracked from here to eternity over all kinds of
14   surfaces, all kinds of weather conditions.
15             So for the latter dog, training becomes
16   much less important.
17        Q.      Uh-huh.
18        A.      For my dog, there were certain things that
19   if we didn't train on constantly, heeling, for
20   example.  He did not like to proper position for a
21   police service dog heeling.  The ears ought to be
22   right at your knee.
23             He didn't like that.  It bothered him
24   because he didn't like the knee brushing him.  He
25   wanted to have his rear flank at my knee.  He was real
```

1    comfortable with that.

2              If I didn't work on that almost every week

3    in training, you know, I would not pass that part of

4    our department evaluation.

5         Q.    Okay.

6         A.    I can't give you a quantitative answer.  I

7    can tell you this:  It's important to train people and

8    dogs in the tasks you want them to accomplish.

9         Q.    **Can you explain to me what a false**

10   **positive is?**

11             MR. POULTON:  Object to the form.

12        A.    I can tell you what I think a false

13   positive is and I will mention to you that one of the

14   reasons I became involved in SWGDOG and my personal

15   experience is that it's taken three years of debate

16   for SWGDOG to define "false positive".

17             I would urge you to support my Harley

18   Davidson fund by buying my new book.  In the back

19   you'll find a definition with input from lots of

20   people on false positive.

21             A false positive is when the dog gives a

22   change of behavior; in other words, alerts, indicates,

23   gives a final response indicating that the odor

24   desired to be found is found in a particular location.

25             There is then a search conducted at that

1    location, and the target is not found, and there is no

2    discernible explanation for the lack of the item

3    sought.

4        Q.    Can training cut down the number of false

5    positives that you could get with a dog?

6            MR. POULTON:  Object to the form.

7        A.    Training could have an impact, but the far

8    greater impact -- yeah, training could have an impact,

9    but that's not the most significant means to cut down

10   false positives.

11       Q.    What is?

12       A.    The most significant method to cut down

13   false positives is detailed investigation into the

14   reason that the dog has given a final response to the

15   odor sought and yet there's no target present.

16           Let me give you an example that may help

17   illustrate what I mean.  I can recall a situation in a

18   car stop where an officer made a car stop.  He called

19   for a K-9.

20           I responded with my dog.  We did a sniff

21   of the car.  My dog started -- he showed some changes

22   of behavior and moved to the center of the car where

23   there was a console compartment and engaged in what we

24   call the final response, barking, biting, scratching

25   as if he was trying -- because he is actually trying

1    to get to the source of the odor.

2            We pulled the dog out, put the dog up,

3    back in the kennel, back in the truck.  Go search.  No

4    drugs found.  No contraband found.  You stop right

5    there, that becomes a false positive.

6            On the other hand, when you go up to this

7    fellow and say, hey, I'm pretty sure my dog's not

8    fooling me, man.  What's up with that?  Because he's

9    telling me there's dope that's been in that car.  Then

10   it's okay, last night my buddy had some weed we smoked

11   and the pipe was sitting there.

12           That is no longer a false positive, you

13   see, because through investigation, the source of the

14   odor, that odor which I can't detect has now been

15   explained and that's no longer a false positive.

16           That is, by far, the more significant way

17   of reducing false positives.

18       Q.    Okay.  Do you know how Strike performed in

19   his Schutzhund training?

20       A.    I know that he performed well enough to be

21   awarded the highest title, Schutzhund III title.

22       Q.    Do you remember what his scores were?

23       A.    Numerically?

24       Q.    Yes.

25       A.    No, I don't.

1       Q.      Do you know what percentage of the time

2  from looking at Morris's training records he motivated

3  Strike with food?

4       A.      That's not a calculation that I did.  So,

5  no, I can't tell you that.

6       Q.      Other than what we've just discussed, is

7  there any other basis for your opinion that the dog

8  was properly trained?

9               MR. POULTON:  Object to the form.

10      A.      The dog performed well.

11      Q.      How do you mean?

12      A.      This dog -- in addition to the training

13  records, I was shown some deployment records and this

14  dog performed well.

15              By way of example, in my report I've

16  talked about an incident, and I'm going to have to

17  look at the report to give you the date.

18      Q.      Are you talking about the apprehension

19  reports on Strike?

20      A.      I am talking about apprehension reports.

21  I think it was -- you know, I didn't put the date in

22  here, but in paragraph i on page 12, I talk about a

23  date that I referred to as just prior to the date of

24  this incident on April 20th where there was a burglary

25  committed with, if I recall correctly, three suspects

1    that went in different directions.

2              Strike performed well in the field by

3    tracking the suspects along separately, of course --

4    thus two separate tracks -- locating the suspects at

5    the end of each track.

6              The suspects were later confirmed by

7    investigation as being the suspects involved in the

8    burglary.  And the track, based on the report that I

9    looked at, crossed multiple surfaces, went through

10   different yards.  I mean, it was not, by any stretch,

11   a simple track.

12             So to steal a phrase that proof is in the

13   pudding, just before this incident, the dog had shown

14   a pretty high level of tracking proficiency, tracking

15   in an urban environment, on multiple tracks, on the

16   same incident.  That's pretty commendable.

17        Q.    But if a dog successfully tracks once,

18   does it mean the dog is always going to successfully

19   track?

20        A.    No more than it means that any other feat

21   performed by dog or human is going to be repeated at

22   the same level of proficiency.

23        Q.    Are you aware that there are apprehension

24   reports where Strike was unsuccessful and didn't find

25   the suspect?

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1              MR. POULTON:  Object to the form.  Go
 2      ahead.
 3          A.      Sitting here I can't think of any
 4      instance, but it would surprise me that any dog would
 5      not have some sometime when a dog was deployed and
 6      doesn't find a suspect.
 7                  There's times when a suspect may run
 8      through backyards, may run over a hill, may run over a
 9      fence, and on the other side of the fence there's a
10      city bus waiting.
11          Q.      Does that mean that that dog --
12          A.      The suspect gets on that bus, and is gone
13      and there's nothing but diesel left.  Is that an
14      unsuccessful track?
15          Q.      I don't know, is it?
16          A.      I don't think so.  It's one that we may
17      not know exactly what happened, but the dog performed
18      as expected.
19                  The scent was removed by some fortuity or
20      un-fortuity, if that's even a word.  I'll look it up
21      tonight.
22          Q.      Anything else that you relied upon in
23      coming to the opinion that Strike was properly
24      trained?
25          A.      Well, other than what I think we've
```

1      covered, I don't think so.

2          Q.     Okay.  In paragraph K you state that it

3      was reasonable for Deputy Morris to start Strike on

4      the track at the location selected.  Deputy Morris was

5      reasonably relying upon Deputy Remus's indication that

6      the location was the last place that the two suspects

7      were seen.

8              The experts on our side of the case have

9      all stated that the track should have begun at the

10     vehicle where the two suspects were seen sitting in

11     the vehicle.  Do you agree with that or disagree with

12     that?

13             MR. POULTON:  Object to the form.  Go

14     ahead.

15         A.     Well, I don't know what they've all said

16     specifically.  It would have been reasonable,

17     depending upon some circumstances, to start the track

18     at the car where the two suspects had been seen.

19         Q.     It would have been?

20         A.     That's one of the reasonable alternatives

21     in this case.  I wouldn't have done it, but it would

22     have been reasonable under some circumstances.

23         Q.     Why would you have not done it?

24         A.     I think that it would be more appropriate

25     to start the track where the suspects were last seen.

1            There's some measure of urgency here.  If

2    I'm confident the dog is going to be able to track, I

3    can save some time.  I can possibly increase the

4    chances of finding the suspect by starting where the

5    -- did I say suspect?  Starting the track where the

6    suspects were last seen.

7            As I understand it, based on the pictures,

8    the photographs that I've looked at in this case, and

9    I think I've read this as well, the car sitting in a

10   parking lot.

11           So we've got some hard surface to get

12   across.  Hard surface typically is more difficult, I

13   think, for obvious reasons for a dog to track across.

14   It appeared to be a pretty darn good place to start

15   the track.

16           Deputy Remus said that's where he'd seen

17   the suspects more recently.  There's loose vegetation

18   on the ground, the sort of thing that's going to hold

19   a track fairly well.

20           It's not an area of high traffic, you

21   know, a privacy fence that -- I'm sorry I've forgotten

22   the precise time, but approximately two o'clock in the

23   morning.

24           If in fact the suspects had gone over or

25   along that fence and made more contact with the

1    vegetative and organic material there, there's going

2    to be a pretty good, strong fresh scent there.

3              So that would be my preference.  But I

4    don't discount that other people might say, you know,

5    I'd start at where I knew the suspects were sitting.

6              I also don't know what was in the car.  I

7    don't know what kind of surface -- not that it's going

8    to make a huge difference but it may make some

9    difference -- about the interior of the car.  It may

10   make some difference insofar as whether there were

11   chemicals or other distracting odors in the car.

12             So that wasn't recorded or provided to me

13   so I don't know.

14        Q.    When you were a law enforcement officer --

15        A.    I am a law enforcement officer today.

16        Q.    When you were a K-9 handler in the state

17   of Utah, did you ever train your dogs to use the

18   freshest scent in tracking?

19             MR. POULTON:  Object to the form.  Go

20   ahead.

21        A.    Yes.

22        Q.    Did you ever track suspects using the

23   freshest scent?

24        A.    Yes.

25        Q.    What is your understanding of freshest

1   **scent?   Because, again, it means something different**

2   **to everyone.**

3        A.     Yes, it does.  Well, there are some

4   divergent theories.  I don't think that I am -- I am

5   not a trainer.  I am not a theoretician on -- and I'm

6   not like Dr. Ferton or someone who lectures on the

7   chemistry of scent.

8             When you talk about the freshest scent, I

9   take that at its plain meaning, as the scent which has

10  been laid out and provided most recently, freshly, if

11  you will.

12            Other people say, well, you should go to

13  where the strongest scent is, you should make a

14  qualitative evaluation of what's most likely to hold

15  the strongest scent.

16            There's a little bit of an add mixture

17  between the two theories when you talk about tracking

18  on vegetation because you are talking -- if you are

19  saying, well, I'm looking for the freshest scent,

20  okay, but if you are talking about tracking on

21  vegetation, particularly mixed vegetation, grass and

22  dirt and leafs and so forth, kind of organic material

23  that's going to hold scent better, there's also an

24  element of strongest scent there.

25            Insofar as there's a divergent theory, I

1    think I'd lean towards the freshest scent theory.   I

2    think that's also the prevailing thought in this

3    region now.   Whether it's the prevailing thought in

4    Florida, I have no idea.

5              MR. POULTON:   Let's take five minutes

6    here.

7              (Brief recess.)

8         Q.    (By Ms. Webb) You stated in paragraph L:

9    **"I found no evidence in the materials provided to me**

10   **that Deputy Remus or any other person contaminated the**

11   **area of the track prior to Strike's deployment."   Why**

12   **do you say that?**

13        A.    Because I didn't see any evidence of it.

14        Q.    **Does that mean that it couldn't have been**

15   **contaminated?**

16        A.    No, it just means that I couldn't see

17   anything that would lead me to believe that it was

18   contaminated.

19        Q.    **Then you write:  "While Deputy Remus**

20   **initially pursued to two suspects"** --

21             MS. WEBB:   Tom, you didn't catch that

22   typo?

23             MR. POULTON:   I'm sorry.

24        Q.    **-- "two suspects fleeing on foot while**

25   **Deputy Remus was mounted on his bicycle.   It does not**

1   appear that he dismounted or walked through the areas

2   where the suspects were last seen."  Where did you get

3   that from?

4       A.    I believe that that was my understanding

5   from reading the reports and his statements.  I've

6   subsequently been told that that is, in fact, the

7   situation.

8       Q.    In your opinion, if Deputy Remus just rode

9   his bike through the area where the suspects were last

10  seen, that couldn't contaminate the area?

11          MR. POULTON:  Object to the form.  Go

12  ahead.

13      A.    That would depend on factors such as

14  whether he was right over the area where they were

15  seen.  I mean, through the area is pretty broad.

16          I would not say that it couldn't.  I can't

17  give you an answer with a hundred percent exclusion.

18  It's pretty unlikely, particularly when he's on a

19  bicycle and his body is not making contact with the

20  ground.

21          At any one point on a bicycle the surface

22  area actually touching the ground, number one, it's

23  rubber; two, it's tiny.

24          For example, a Harley Davidson

25  Electroglide at any one moment is riding on two pieces

KENNETH WALLENTINE

ROBERT G. SWOFFORD, JR.   v. DONALD ESLINGER, ET AL.

```
 1     of rubber that are smaller than the average credit
 2     card.  I love Harleys.
 3                MR. POULTON:  We guessed that.
 4                THE WITNESS:  So possible?  I suppose in
 5     the abstract.  Likely?  Very unlikely.
 6          Q.     Some of our experts have talked about the
 7     fact that human beings regularly -- their skin cells
 8     slough off naturally.
 9          A.     That's true.
10          Q.     Could Deputy Remus while riding his bike
11     through that area, could his skin cells have sloughed
12     off into that area?
13                MR. POULTON:  I most certainly object to
14     the form.  Go ahead.
15          A.     That's certainly a possibility.  Would
16     they have sloughed off in great volume?  Probably not.
17                Skin cells do slough off.  Most of the
18     dust in your household, disgustingly, is human skin or
19     other forms of human tissue.  If a person were to --
20     well, a fence is a great example.  This is a wooden
21     fence, right?
22          Q.     Uh-huh.
23          A.     If a person were to touch the wooden fence
24     or climb over the wooden fence, a great deal of skin
25     cells -- they're called rafts because it's not usually
```

**Tempest Reporting, Inc.**
**(801)521-5222**

```
 1      just a cell, it's usually just a microscopic flake.

 2              I have a habit of stroking my chin.  As

 3      such, that activity is -- my DNA is here.  I can prove

 4      that I've been here.  But just walking through the

 5      room does not typically release much.

 6         Q.      How do you know that?

 7         A.      Studies that I've read, lectures that I

 8      have attended, having had discussions with research

 9      chemists who specialize in the chemistry of scent in

10      general and particularly human scent.

11              MR. POULTON:  I guess I would probably

12      stipulate he's not an expert in cell sloughing off if

13      you would also stipulate that none of your folks are.

14              MS. WEBB:  I don't know that I can.

15              THE WITNESS:  There are such people.

16              MR. POULTON:  I withdraw the offer.

17         Q.      (By Ms. Webb) You say Strike made a

18      transition from tracking behavior to handler

19      protection behavior when he detected Mr. Swofford

20      moving rapidly towards his handler.  How do you know

21      that?

22         A.      Do you mind if I ask where you are

23      reading?

24         Q.      I'm sorry, paragraph M on page 14.

25         A.      M?
```

1      Q.      M as in Mary.

2      A.      That's my conclusion based on the

3   description of all of the persons telling me -- or all

4   of the persons who gave statements talking about

5   Strike's behavior.

6      Q.      What is that based on?

7      A.      The fact that he's gone from showing

8   tracking behaviors as described by Deputy Morris,

9   particularly having nose to the ground, typically the

10  ears -- and I believe Deputy Morris says this

11  somewhere -- ears erect and tail is rigid.

12          Typically the tail will be up when

13  tracking to head up, body posture forward, haunches

14  moving forward.

15          It's very unusual for a dog that is

16  tracking to bark.  A common misperception.  People see

17  movies like Oh brother Where Art Thou.  I've never

18  seen the entire movie, but I have been shown the parts

19  of the bloodhounds where dogs are barking and they

20  think the dogs are on the track.

21          In fact, it's quite counterintuitive,

22  isn't it, because how is the dog taking in large

23  volume of air?

24          So the fact that the dog has transitioned

25  to an erect upright, haunches forward, head up, ears

1    are -- I don't know if I would describe the ears at

2    that moment.  So I can't say.

3              But the barking and the pulling forward,

4    all of that indicates to me that the dog has made the

5    transition to a protective mode.

6              MR. POULTON:  Could we take a break real

7    quick?

8              (Brief recess.)

9         Q.   (By Ms. Webb) You state here that:  "Even

10   if a police service dog had not been present to track,

11   any reasonable police officer would have entered onto

12   the Swofford property to search for the fleeing

13   suspects.  Deputy Remus saw the suspects fleeing in

14   the direction of the Swofford property and last saw

15   them near the fence bordering the Swofford property."

16             Why do you state that any reasonable

17   police officer would have entered the Swofford

18   property to find the fleeing suspects?

19        A.    I say that from a couple of different

20   angles.  First, the officer has a duty to apprehend

21   these burglars.  A crime has been committed.  Property

22   crime, to be sure.  But a serious property crime.

23             The officer has the opportunity to

24   apprehend and should apprehend these persons.  I know

25   I'm not here to talk about property rights, but I

1    think that that's sufficient reason to enter onto this

2    private property in pursuit -- urgent pursuit of these

3    two suspects.

4            But there's another component here,

5    another angle from which I view this.  It's informed

6    by knowing that there had been burglaries in the area.

7            I'm not sure that that's a critical point,

8    but here are a couple of burglars who apparently have

9    possibly of a cohort, a co-conspirator.  There's one

10   person who apparently is with them.  I know that that

11   never was resolved.

12       Q.    Are you talking about Bernie Landavol?

13       A.    Mr. Landovol, who drives away and he's

14   arrested for loitering -- what I think in Utah we

15   called possession of burglary tools or something along

16   those lines.

17           We don't know what kind of communication

18   they're in.  Even if they're not in communication,

19   there are two burglars.  There are two criminals now

20   that are entering onto other people's property.

21           We don't know what their mindset is.  We

22   don't know what they would do if they encountered Mr.

23   Swofford or some kids having a sleep-out in a backyard

24   tent or -- it's Florida -- maybe not even in a tent --

25   or what dangers they may pose to other people.

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1              So there is a duty not only to apprehend
 2    them from the crime, but to stop them from committing
 3    further crimes.
 4         Q.    Do you know whether or not Mr. Swofford's
 5    property had been broken into prior to this incident
 6    in April 2006?
 7         A.    I don't know whether it had been broken
 8    into.  I do know from the reports that I saw that Mr.
 9    Swofford had been harassed by criminals.
10              He had had people come onto his property
11    and, from what I understand, he restores vehicles and
12    he has his vehicles out there.
13              Also, I know that he was getting a
14    security system put in because of the concern for
15    these cars.  I wonder if he has a 1964 and a half
16    Mustang but. . .
17         Q.    That's what I want.
18         A.    There you go.  I had read in the documents
19    that he had called the sheriff's office and had had
20    troubles.
21         Q.    Are you aware that Mr. Swofford had a
22    permit for a gun?
23         A.    I believe that he did.  I can't cite
24    chapter and verse as we sit here, but I believe that I
25    read that he had a permit, that he had been through
```

1    that process.

2         Q.    Do you think that Remus and Morris before

3    entering into Swofford's property should have notified

4    him that they were coming onto his property?

5              MR. POULTON:  Object to the form.  Go

6    ahead.

7         A.    Under the circumstances, I don't.

8         Q.    Why is that?

9         A.    Well, the time lapse, the track, the

10   character of the property.  They're in fairly hot

11   pursuit of a couple of burglary suspects.  It appears

12   to Deputy Morris that police service dog Strike is on

13   the track of the suspects.

14             As they looked through the fence, it

15   appears that this is a large open field.  Granted, it

16   may be something that someone describes as a backyard

17   or a yard, but it appears to be -- as I recall from

18   the photographs, it almost looked like it was a

19   greenhouse operation.  I think there was some

20   sprinkler pipe in black -- I don't know if it was

21   plastic or landscaping fabric laid out.

22             So, to me, it didn't appear from the

23   photograph and the description and the diagrams as an

24   area that was right close to a home where there are

25   rapid entry to follow burglars that may be trespassing

1    on this man's property would cause them any alarm.

2         Q.    Do you know whether or not this area where

3    the apartment complex was located and Mr. Swofford's

4    property was a regular route for Deputy Remus?

5              MR. POULTON:  Object to the form.  Go

6    ahead.

7         A.    As in his regular patrol area?

8         Q.    Right.

9         A.    Sector?

10        Q.    Right.

11        A.    I don't know how they do their patrol

12   staffing.  I don't.

13        Q.    Okay.

14        A.    So I don't know that.

15        Q.    Would your opinion change if I told you

16   that Deputy Remus regularly patrolled that area?

17             MR. POULTON:  I object to the form and I'm

18   going to -- well, that's all.  I'll just object to

19   form for right now.

20        A.    Just based on that, no, it wouldn't.

21             MR. POULTON:  There was a reason for my

22   wanting to get into that but we can hold off on

23   that -- or I can explain it to you off the record, if

24   you'd like.

25             MS. WEBB:  What do you --

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1            MR. POULTON:  That's all right, just keep

2    going.  If it needs to be cleared up, I'll clear it

3    up.  Go ahead.  Let's just say because you've been on

4    the road for the last five days, I know things that

5    you don't know.

6            MS. WEBB:  Oh, okay.

7            MR. POULTON:  I'm just trying to be fair,

8    but go ahead.  Right now it's not relevant.

9            THE WITNESS:  I have something I want to

10   clear up at this juncture.  I don't know why but it

11   just dawned on me -- I do know why -- I didn't know

12   that you were going to be provided this document dated

13   October 2008, disclosure information.

14        Q.      Uh-huh.

15        A.      I didn't expect that that would be

16   disclosed to you.  But, in any event, it lists a

17   four-year litigation history that is inaccurate.

18            The reason it is inaccurate is because

19   between October when I provided this to Mr. Poulton,

20   and December 7th when I completed this report, I did

21   another deposition.

22            My report itself contains a very accurate

23   -- one hundred percent accurate four-year litigation

24   history.  My disclosure statement does not.

25        Q.      Actually I'm confused because I thought I

1    checked off --

2        A.    I did a deposition in Becker.

3        Q.    Okay.

4        A.    That is not listed in my disclosure

5    statement.  The reason it's not listed is because it

6    was done after I produced this document.

7        Q.    Alright.

8              MR. POULTON:  That's that whole things

9    falling off after four year deal, right?

10             THE WITNESS:  I added one, though.  I'm

11   saying I added one in my report.

12             MR. POULTON:  Oh, I see.  Okay.

13             THE WITNESS:  I just don't want her to get

14   back to her office and say, wait a minute, these don't

15   match up.  Anyway, sorry about that.

16       Q.    (By Ms. Webb) You state in paragraph O:

17   "Mr. Swofford's decision to go into his field armed

18   with a handgun was unreasonable and negligent."  Why

19   do you say that?

20       A.    Well, I go on to explain that.  It is an

21   overarching principle in teaching firearms classes to

22   teach people -- in the context of teaching anyone but

23   particularly in the context of teaching persons

24   qualifying for a concealed weapons permit that drugs

25   and alcohol don't mix.

```
 1              I'll give you an example that I shared

 2    with Mr. Poulton.  Yesterday I had some meetings to

 3    attend to.  I was in quite a bit of misery until I was

 4    able to talk to my cousin.

 5              I'm the black sheep in the family, five

 6    doctors and a lawyer and a cop.

 7              MR. POULTON:   Cowboy.

 8       A.     I get the prescription for the Prednisone

 9    that cautions, you know, that when you take the first

10    dose, it's huge, it's massive.  It says use caution in

11    operating heavy machinery.  It doesn't say you can't

12    drive.

13              Well, I'm toast if I get in a crash under

14    the influence of medication -- prescription or not --

15    in a state police car.  That's one thing.  Plus I

16    don't want to take the risk.  So I had someone drive

17    me to one of my meetings.

18              The same mindset is applicable to guns.  I

19    didn't carry a gun yesterday, which for me is very

20    unusual.  I'm supposed to.  At least until later in

21    the day, after I'm hurting worse and the stuff had

22    worn off.

23              It's such a fundamental principle that if

24    you've been drinking or taking drugs, you shouldn't be

25    anywhere near guns.
```

**Tempest Reporting, Inc.**
**(801)521-5222**

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1        Q.      No matter how much you've had?

2        A.      I'm not a drinker.  I understand that we

3   allow people in this state to operate a motor vehicle

4   lawfully and don't impose the presumption of

5   impairment up until a .08, which could be a couple of

6   beers.

7            I impose on my staff a no alcohol/no gun

8   rule.  If they have any alcohol in their system at

9   all, they are not allowed to drive a state police car

10  or carry a gun.  Period.

11           Now, you couple that with -- I think your

12  question was broad enough that you want me to go on.

13  You couple that with the fact that he has taken some

14  drugs.

15           Now, I'm not a chemist, I'm not a

16  pharmacist, I understand that.  But I have taken at

17  least one of the drugs that he had taken in the past.

18  The 800 milligrams of Skolaxin.

19           I'll never take that again.  At least for

20  me, it knocked me for a loop.  I mean, it just really

21  made me quite -- I didn't like it.  I don't like that

22  feeling of being out of control.

23           So I went back to my doctor and said:  "I

24  really need the muscle relaxer, but something much

25  milder."

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1              But then you couple the alcohol and the
 2    drugs together and you cut down judgment, you cut down
 3    the motor skills necessary to properly manipulate a
 4    firearm.  That probably drives my point home.
 5         Q.    Do you know how impaired Mr. Swofford was
 6    on the night in question?
 7         A.    I don't know how impaired he was on a
 8    quantitative scale such as blood alcohol level or
 9    whether there were any medical tests administered with
10    respect to how impaired he was because of his taking
11    the injectable narcotic or the Skolaxin or the Ambien.
12    I am not able to say that.
13         Q.    Do you know what the law is in the state
14    of Florida with respect to protecting one's property?
15              MR. POULTON:  I object to the form.  You
16    mean the criminal law or the civil law?
17              MS. WEBB:  The civil law.
18              THE WITNESS:  I do not.
19              (Discussion off the record.)
20              (Brief recess.)
21         Q.    (By Ms. Webb) Do you think Strike tracked
22    Swofford or do you think he ran into Mr. Swofford on
23    his track?
24              MR. POULTON:  Object to the form.  Go
25    ahead.
```

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1        A.     I believe that he ran into Mr. Swofford on

 2   his track.

 3        Q.     Do you have an opinion in this case as to

 4   whether or not Deputy Morris should have allowed

 5   Strike to go under the hole in the fence that he was

 6   tracking?

 7        A.     I do.

 8             MR. POULTON:  Object to the form.  Go

 9   ahead.

10        Q.     What's your opinion?

11        A.     He should not have gone through the hole.

12   I'm sorry.  I may have misunderstood.  If the question

13   was:  Do you have an opinion as to whether Deputy

14   Morris should have gone through the hole, the answer

15   is yes.  My opinion is that, no, the deputy should not

16   go through the hole.

17        Q.     Should the deputy have allowed the dog to

18   go through the hole on his own?

19        A.     I don't have any heartache with that.  I

20   don't see that as being unreasonable.

21        Q.     My understanding of the facts in this case

22   is that Morris -- that when the dog tried to go under

23   the hole he pulled the dog back, and then they went to

24   another part of the fence that they could easily have

25   gotten through or more easily have gotten through, and
```

KENNETH WALLENTINE                        ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    **they went through the hole -- they kicked down some**

2    **boards and went through a hole at that point in the**

3    **fence; is that your understanding of the facts of this**

4    **case?**

5              MR. POULTON:  Object to the form.  Go

6    ahead.

7         A.    He either pulled or got the dog back.

8    They went to where I think there had been a

9    pre-existing hole that somebody had repaired

10   temporarily.

11             They either kicked in or moved aside some

12   kind of wood, got through, and then went back to the

13   other side, having traversed the fence, where Strike

14   had initially gone through the smaller aperture that

15   Deputy Morris couldn't get through and shouldn't have

16   tried.

17        **Q.    Do you know if Deputy Morris queued the**

18   **dog to go back to the hole on the other side of the**

19   **fence that he was originally trying to go through?**

20             MR. POULTON:  I object to the form.

21        A.    I'm sorry, I don't recall whether he

22   walked with the dog back to there to restart the track

23   or not.  I believe that's the case but I don't recall

24   with perfect clarity as I sit here today.

25        **Q.    You state in paragraph R:  "Based on the**

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    circumstances presented to Deputy Morris and Deputy

2    Remus at the time that Mr. Swofford advanced towards

3    them, his gun held in a two-handed firing grip and

4    raising the gun towards the deputies, it was

5    reasonable for Deputy Morris and Deputy Remus to fire

6    their guns upon Mr. Swofford."  Why do you state that?

7              MR. POULTON:  Object to the form.  Go

8    ahead.

9         A.    He reasonably believed that he presented a

10   threat of imminently using deadly force.  They had

11   provided identification to him.  They had provided

12   warnings to him.  They told him to drop the gun.

13             He did not do so.  He continued to advance

14   towards them and continued to raise his gun up.

15        Q.    If Mr. Swofford hadn't raised his gun but

16   had kept it pointing down to the ground, would it have

17   been reasonable for the officers to fire upon him?

18   (Demonstrating.)

19             MR. POULTON:  Object to the form.

20        A.    As the question has just been posed to me

21   I would say no.  And I would note that you are

22   pointing your hand directly at the ground so that the

23   gun is not raised at all in that direction.

24             Given those facts, I do not believe that a

25   reasonable police officer would have fired upon him.

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1          Q.     Okay.  You state in paragraph S:

2   "Assuming as accurate the position and stance of Mr.

3   Swofford posited by Richard Ernest, as illustrated in

4   Mr. Ernest's image seven attached to his report, a

5   reasonable officer would perceive this to be an

6   aggressive movement that would immediately proceed

7   offensive gunfire by the person illustrate in image

8   seven."  Image seven shows someone with their

9   two-handed grip, I guess you'd call it?

10         A.     It appears to me to be a two-handed grip.

11         Q.     Pointed down towards the ground, is that

12   an aggressive substance?

13                MR. POULTON:  Object to the form.  Go

14   ahead.

15         A.     Before I answer that, did you hear 11 or

16   seven both times?

17                (Discussion off the record.)

18         A.     If I accept image seven as being accurate

19   by Mr. Ernest, I would say yes, that is an aggressive

20   stance.

21                It's a stance from which one could fire

22   but also which is generally a stance that immediately

23   precedes an even more aggressive position of being

24   what we call on target.

25         Q.     What does that mean?

1      A.      Being on target means that the muzzle of

2   the weapon is aimed directly at where it's intended to

3   hit -- the bullets are intended to impact.

4      **Q.      You state in paragraph U:  "It would have**

5   **been an unreasonable decision for Deputy Morris to**

6   **deploy Strike, to apprehend Mr. Morris" -- I'm**

7   **sorry -- "Mr. Swofford as Mr. Swofford moved towards**

8   **the deputies with the gun in hand."**

9          **Why was it unreasonable for them to deploy**

10  **Strike in that circumstance?**

11     A.      At that distance, it would have been

12  unreasonable to deploy any dog unless there were a

13  reasonable likelihood that the dog could disarm or

14  disable Mr. Swofford.  I don't believe that to be the

15  case.

16          Moreover, given the positioning, relying

17  on Mr. Swofford's statements and Deputy Morris's

18  statements, Deputy Remus's statements, the diagram

19  presented to me by the Florida Department of Law

20  Enforcement report, it appeared to me that Mr.

21  Swofford and Deputy Morris were directly facing one

22  another at a relatively short distance.

23          I don't know how quickly Strike could

24  cover the 25 or so, give or take, feet, between Deputy

25  Morris and Mr. Swofford.

1           I do believe that it would have been a

2    natural reaction and one could reasonably expect that

3    as Strike approached Mr. Swofford as he ran to bite

4    him, that Mr. Swofford would have raised the gun up

5    and would have fired at Strike.

6           I think I may have used the term here -- I

7    don't remember -- he would have drawn fire -- Strike

8    would have drawn fire.

9           Had that been the case, Deputy Morris is

10   right in the direct line of fire and the outcome, I

11   think, would have been that Deputy Morris would have

12   responded by firing.

13          That, of course, is speculation.  But it's

14   a conclusion based on the evidence as I've seen it.

15   It does not appear to me that -- there are times, I

16   think I said earlier in my deposition -- there are

17   times that a dog can and should indeed be sent to

18   apprehend a person with a firearm or other weapon.

19   This was not one of those times.

20      Q.    **Why was it not one of those times?**

21      A.    Again, the Deputy is right in the line of

22   fire with the hammer.  There's no cover position.

23   Ideally, if there were multiple officers and the dog

24   could come in perpendicular to the person with the

25   weapon, that's the best of a horrible situation.

1            If you could have deputies or officers off

2    to the other side perpendicular to the suspect that

3    could engage in some kind of a distraction, shouts, a

4    noise flash distraction device, commonly called a

5    flash bang or a noise grenade, a light grenade -- so

6    that the person's attention -- the suspect's attention

7    is momentarily drawn, then the dog can come in

8    perpendicularly and grab the hand.

9            I will tell you that from my own personal

10   experience of being a decoy and being bitten countless

11   times by dogs, sometimes without a sleeve, and from

12   seeing other people fight dogs, it is possible that

13   even with a dog hanging off one arm -- I saw a man

14   once fighting with two dogs, one biting on either arm

15   and lifting one dog up -- my dog up off the ground.

16   It's possible that you'd still have fire.  What I'm

17   saying is there are situations when it can be done.

18   It's never a great tactic.

19           Whenever the dog and the handler are

20   directly facing the person with the weapon, it's

21   almost universally a recipe for disaster.

22        Q.    **What is your opinion based upon?**

23        A.    That it's a recipe for disaster?

24        Q.    **Yes.**

25        A.    The very fact that these two people with

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1   weapons, they both have guns and they're lined right
 2   up at one another.
 3              It's reasonable to expect that when the
 4   dog comes at the person with the gun, the person who
 5   has not responded to verbal commands, the person who
 6   has already started to raise the gun up, any
 7   reasonable officer, I think, would expect that that
 8   person is going to fire at the dog.
 9              When he fires at the dog, he's firing at
10   the deputy because they're right in line.
11        Q.    Could Strike still have been a distraction
12   if they had released him to apprehend Swofford?
13              MR. POULTON:  Object to the form.
14        A.    He could have been a distraction.  Would
15   that have prevented any shooting?  I don't know but I
16   don't think so.
17        Q.    But it could have, couldn't it?
18              MR. POULTON:  Object to the form.
19        A.    I think it is within the realm of
20   possibilities.  That's the best I can do.
21        Q.    Okay.  Did you ever review Seminole County
22   Sheriff's Office K-9 policies or guidelines in this
23   case?
24        A.    I did.
25        Q.    Do you know if they have a policy or
```

 1      guideline that provides that an officer can release a

 2      dog in this type of a circumstance?

 3                   MR. POULTON:  Object to the form.

 4           A.      I don't recall the policy with absolute

 5      clarity as I sit here, but I don't believe that the

 6      circumstance of a person standing with a gun -- a

 7      person standing with a gun is not typically a

 8      circumstance that would be described in a police

 9      service dog policy.  I don't believe that it's

10      described in the Seminole County Sheriff's Office

11      policy, but I may be mistaken.

12           Q.      You write here that Deputy Morris -- this

13      is the rest of paragraph U -- "that Deputy Morris was

14      holding both his flashlight and Strike's leash in his

15      left hand as one would expect a typical police service

16      dog to be in the situation.  To send Strike would have

17      required Deputy Morris to drop or move his flashlight

18      to his belt or other hand, release the leash and send

19      Strike."

20                   Is that how your officers in Utah are

21      trained?  Are they holding a flashlight as well as a

22      lead and then they also have to do something in order

23      to grab their gun and shoot the weapon?

24                   MR. POULTON:  Object to the form.

25           A.      That depends.  Since this incident --

KENNETH WALLENTINE                              ROBERT G. SWOFFORD, JR.   v. DONALD ESLINGER, ET AL.

1     well, this happened in 2006.  Even before 2006, but

2     certainly far more commonly after 2006, many

3     departments allow K-9 handlers and other specialized

4     assignment officers to use what you will find referred

5     to in your documents as WML weapons, referring to

6     weapon mounted light weapons.  You will see a

7     reference in some of the documents to WML gun or

8     gun/WML.

9               I think -- I don't know, but I think that

10    that transition has been made at Seminole County

11    Sheriff's Office.

12              In Utah, we had a number of people switch

13    to weapon mounted lights.  There were some early

14    problems with the Glock model 22 pistols

15    malfunctioning with weapon mounted lights.

16              It took some time for Glock to find out

17    what the problem was.  They resolved it.  It was an

18    easy fix.  And after that -- and I don't recall the

19    exact time -- I will tell you that today in 2009, for

20    a K-9 officer, a weapon mounted light is far more

21    common than it was in times before.

22              So I think that most K-9 officers in this

23    area have transitioned to weapon-mounted lights.  They

24    may still search -- in fact, probably do still search

25    -- with a separate flashlight because office a weapon

1    mounted light is going to be much smaller, much less

2    capable than a flashlight.

3            Also, there's other reasons that one

4    doesn't search with -- I mean, every time you point

5    the light someplace you are pointing the gun and

6    that's not always appropriate.

7            So to say that that's how it's done in

8    Utah, I would say today, no.  Back then, more so.

9        Q.    **When you describe this situation where**

10   **Deputy Morris has a lead in one hand, he has the**

11   **flashlight and then he would need time to drop and**

12   **move the flashlight to his belt or other hand and**

13   **release the leash and send to Strike, are you saying**

14   **that it would have been impossible for him to release**

15   **Strike because his hands were holding so many objects**

16   **at the same time?**

17           MR. POULTON:  Object to the form.  Go

18   ahead.

19       A.    I am not.  I am saying that it adds time

20   in an equation where time is already short, where

21   we're talking here in this situation actions that

22   unfold not in seconds, but in fractions of seconds.

23       Q.    **Couldn't he have just dropped both the**

24   **lead and the flashlight and drawn his weapon?**

25           MR. POULTON:  Object to the form.  Go

1    ahead.

2        A.     That's a possibility.  Dropping one's

3    flashlight generally not a good idea but it's a

4    possibility.

5        **Q.     Do you know if Deputy Remus had his**

6    **flashlight on that evening?**

7        A.     I'm sorry, I don't recall.

8        **Q.     Okay.  If Deputy Remus did have his**

9    **flashlight on illuminating Mr. Swofford, was it a**

10   **possibility that Officer Morris could have dropped the**

11   **leash and the flashlight and drawn fire on Mr.**

12   **Swofford?**

13               MR. POULTON:  Object to the form.

14       A.     He could.  Again, not optimal.  Not a good

15   idea for the officer to drop his flashlight because

16   then the officer then has to bend down and pick it up

17   which is not a good thing in the heat of battle, but

18   if the officer moves in front of the flashlight, a

19   typical police flashlight is pretty powerful.  The

20   officer becomes silhouetted.

21               If you've not been working with them at

22   all, a few minutes, and the bulbs have heated up, when

23   you drop them they're more likely to go out of

24   service, to break potentially.

25               There are other reasons, but we generally

KENNETH WALLENTINE                              ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    do not encourage officers to drop a flashlight.

2         Q.    Did you have any opinions in this case on

3    the policies, procedures or guidelines of the Florida

4    Department of Law Enforcement with respect to K-9s?

5         A.    No.

6         Q.    Did you have any opinion as to FDLE's

7    policies, procedures or guidelines with respect to use

8    of force?

9              MR. POULTON:  I'm going to object to the

10   form.  Go ahead.

11        A.    No.

12        Q.    Did you have any opinions as to the

13   policies, procedures or guidelines of the Seminole

14   County Sheriff's Office with respect to K-9s?

15             MR. POULTON:  Can you repeat the question?

16             THE WITNESS:  I got the question.

17             MR. POULTON:  But I didn't.

18        Q.    Do you have any opinions with regard to

19   the policies, procedures or guidelines of the Seminole

20   County Sheriff's Department with respect to K-9s?

21             MR. POULTON:  I'll object to the form.  Go

22   ahead.

23        A.    As I review -- and I was not asked to

24   review the policy and opine on its adequacy -- but as

25   I looked at the policy, it seemed to me to be a pretty

1    well constructed, up-to-date, reasonable policy that

2    covered what I think a good policy should.

3         Q.    And what do you base your opinion on?

4         A.    I base it on first having looked at that

5    policy, having written policy, K-9 deployment

6    policies, for a major sheriff's office in this state,

7    having participated in drafting policies for other

8    municipal and county law enforcement agencies, having

9    participated in drafting a policy for a very large law

10   enforcement agency, our Utah Department of Public

11   Safety, that has a pretty good size -- certainly much

12   larger than this department's K-9 unit.

13             My experience in participating in drafting

14   model policies for all departments in the state of

15   Utah and having reviewed many other people's policies

16   and having had many discussions with other

17   practitioners and lawyers, K-9 handlers, K-9 trainers.

18        Q.    When you say other people's policies, are

19   you talking about other states?

20        A.    Yes.

21        Q.    What other states have you reviewed?

22        A.    I don't think I could give you an

23   exhaustive list.  There are many times when I've gone

24   to other states and participated in a seminar where a

25   handler comes up and says:  "Can we sit down and look

1    at my policy?"  And I say:  "If you are willing to pay

2    my fee", which if I'm on the road is usually a good

3    hamburger or, you know, a steak, and I will sit down

4    over a meal and talk about a policy.

5            Occasionally I'll point something out and

6    say, you know, I think this is really great, I'm going

7    to copy this.  Or the reverse, converse, you know, I

8    think you are missing this.

9         Q.    **Have you ever been formally retained to**

10   **review another states' policies or procedures with**

11   **respect to K-9s?**

12        A.    I have been retained to review other

13   agencies' policies, some of which have been out of

14   state, but not -- only in one case have I been

15   retained to have a discussion about a state's policy

16   -- a state agency's policy outside of Utah.

17        Q.    **And what state was that?**

18        A.    Iowa.

19        Q.    **In forming your opinions in this report**

20   **and drafting this report, did you specifically look to**

21   **other states or even Utah's policies to come to your**

22   **conclusions in this report?**

23            MR. POULTON:  Object to the form.

24        A.    I didn't do a fresh review of any other

25   states' or other entities' policies.  I certainly took

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    into account the background that I've had in looking

2    at other entities' policies.

3              I have just barely completed a year

4    and-a-half project with other people where I led a

5    group doing model policies.

6         Q.    Was that for the state of Utah?

7         A.    Yes.  And so some of these issues are

8    pretty fresh.

9         Q.    Is there any literature, anything

10   published on K-9 policies?

11        A.    Surely you gest.

12             MR. POULTON:  Tell you what, if he's going

13   to take about two minutes to answer that question,

14   which I suspect he would take at least that, I'm going

15   to run to the restroom, just to save time.

16        A.    I am aware of a few publications.

17        Q.    Any other than your own?

18        A.    What's wrong with mine?  I'm actually a

19   little disappointed you don't have any of my books

20   here today.

21        Q.    We may not have them here.

22        A.    You are a rich law firm.  Yes, there are.

23   Look, this is not a hot topic in publications, okay?

24        Q.    I didn't expect that it was.

25        A.    But there are a couple principal K-9

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

 1    magazines.  Probably the leading K-9 publication is

 2    Police K-9.  That's the name of the magazine.

 3    Occasionally there are policy discussions in that

 4    magazine.

 5               The Tactical Officer, which is the

 6    publication of the National Tactical Officers

 7    Association, of which I am a member, has a K-9

 8    section.  Occasionally there are articles there

 9    discussing policy.

10               There are really just a handful -- truly a

11    handful of books out there dealing with police K-9

12    legal topics.

13               Bob Eden has written one.  Sandy Bryson

14    has written one.  Those books have very slender

15    discussions.  There's another which one I've forgotten

16    the author that deals with human detector dogs.

17               Then there are a couple of national policy

18    services and one of which I am very familiar with and

19    another one I am only loosely familiar with.  There's

20    an organization that drafts policy that has quite a

21    large machine behind it, lawyers and administrators

22    and practitioners that publish, not for public, but

23    they sell, essentially, their services in drafting

24    policies.

25               So yes.  A small number but, yes, there

1    are publications other than my own.  My own are the

2    best.  You know what?  I'm sorry, do you mind if I

3    strike that?  That's terribly egocentric.

4           Q.    **It's not up to me.  I don't care.  You can**

5    **strike "wimp" too.**

6           A.    There really aren't people -- well, there

7    are, but, you know, I'm only really aware of three or

8    four lawyers in the country that have any interest in

9    this very narrow field of police K-9 law.  There's

10   just not a lot of publications.

11                (Discussion off the record.)

12                (Brief recess.)

13          Q.    **(By Ms. Webb) At the time of the shooting,**

14   **do you believe that Deputy Morris had Strike under**

15   **control?**

16                MR. POULTON:  Object to the form.  Go

17   ahead.

18          A.    I do.

19          Q.    **Why do you say that?**

20          A.    I don't see any signs that he wasn't under

21   control.  I recognize that the dog was barking and the

22   dog was pulling toward Mr. Swofford.  I would expect

23   that from any dog.

24          Q.    **Why would you say that that's under**

25   **control then?**

KENNETH WALLENTINE                           ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1        A.      The dog is doing the behavior that's
 2   expected.
 3        Q.      Is there a command he could have called to
 4   stop the dog from lunging forward and pulling him and
 5   barking?
 6        A.      I don't know that he tried that command,
 7   but I have seen in the records that the dog was
 8   trained to platz.
 9        Q.      What does that mean?
10        A.      Down.  Down on all haunches in a ready
11   position to jump up but down.  There are usually
12   commands given to silence a dog.  I don't think those
13   commands were used in this case.
14        Q.      Were you aware of where Mr. Swofford was
15   shot?
16              MR. POULTON:  Object to the form.  You
17   mean the location or on him?
18              MS. WEBB:  On him.
19              MR. POULTON:  Where he was hit?
20              MS. WEBB:  I would hope you would know
21   where he was shot, location-wise.
22              MR. POULTON:  We do.  Does he?  I'm just
23   kidding.  Sorry.  I can't help it.  After six hours I
24   can't help but make a snide remark here and there,
25   c'mon, please.
```

KENNETH WALLENTINE                           ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1              THE WITNESS:  My wife, the nurse, could do
 2    a better job of telling you the right terms.  The arm,
 3    the knee and in the torso a couple of times.
 4         Q.    Would that indicate to you that Deputy
 5    Remus was in control or out of control of the dog?
 6              MR. POULTON:  You mean Deputy Morris?
 7         Q.    Yes, Deputy Morris, I'm sorry.
 8              MR. POULTON:  Object to the form.  Go
 9    ahead.
10         A.    That doesn't impact my opinion on whether
11    the dog was under control or not.
12         Q.    Why is that?
13         A.    I just don't see any evidence that the
14    dog's behavior influenced where the rounds fired by
15    Deputy Morris impacted.
16         Q.    Well, I was thinking the fact that he was
17    shot in his extremities as well as his torso may be an
18    indication that the dog was pulling him off balance
19    and that's why the shots were not directed at his
20    torso?
21              MR. POULTON:  Object to the form.  Go
22    ahead.
23         A.    When you say he was shot in his
24    extremities, you see, I acknowledge that there were
25    bullet holes in his extremities.  I don't know that
```

1    that means that his extremities were extended.

2        Q.    **I'm sorry, his extremities were what?**

3        A.    Extended.

4        Q.    **Okay.**

5        A.    I remember a shooting one evening with a

6    great clarity, which one round was fired, a man came

7    up out of a bedroom, he had a rifle, he raised up the

8    rival, one round was fired, and he went down.

9            The bullet went through his wrists --

10   actually there's a little humor to this story.  He

11   lived and went to prison.

12           But the bullet went through his wrist and

13   struck his wristwatch.  The bullet then entered his

14   throat and carried portions of his wristwatch band

15   into his throat.

16           He was trying to kill police officers,

17   ma'am.  I mean, I feel sorry for the man but I feel

18   much happier for me.

19           He was shot in his extremities but what

20   happened was he was only shot once, you see, but the

21   bullet passed through and it made several holes in

22   him.  Two from the bullet and a few holes from the

23   wristband.

24           I know you are dying to ask a followup and

25   yes, it was a Timex and, yes, it took a licking and

KENNETH WALLENTINE                              ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    kept on ticking.

2              So I don't know, I'm not a ballistics

3    expert, but I don't know that the fact that he was

4    shot in the extremities necessarily means -- in fact,

5    to me, I don't think it does.

6              I don't see any evidence that his

7    extremities were extended, so I don't see any evidence

8    from the ballistic material provided to me primarily

9    by your client's expert, that Deputy Morris was pulled

10   off balance or his rounds went astray.

11        Q.    Clarify this for me because I don't know

12   why you keep saying his extremities were extended.

13   What does that have to do -- I don't understand what

14   you mean by that?

15        A.    I guess I understood from your question

16   that you thought that the rounds went into a wide

17   pattern as if the deputy was thrown off balance by the

18   dog.

19        Q.    No.  I was thinking that if he was thrown

20   off balance he couldn't aim for the torso, that his

21   bullets were just shooting anywhere and he happened to

22   hit him in the extremities.

23              MR. POULTON:  I object to the form.  Go

24   ahead.

25        A.    I think the extremities were in front of

**Tempest Reporting, Inc.**
**(801)521-5222**

KENNETH WALLENTINE                              ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
1    his torso when the bullets impacted the extremities.
2    That's my lay opinion on a subject on which I was not
3    asked to really study and opine.
4              MR. POULTON:  Off the record.
5              (Discussion off the record.)
6              (Brief recess.)
7         Q.    (By Ms. Webb) Who is paying your fees in
8    this case?
9         A.    You are today.
10        Q.    Well, not at the deposition, but for your
11   report and everything else that you've done?
12        A.    Actually, I haven't been paid.
13             MR. POULTON:  What?
14             THE WITNESS:  I haven't been paid.
15        Q.    You haven't been paid at all?
16        A.    No, but I'm assuming that Mr. Poulton's
17   firm will take care of that.
18             MR. POULTON:  Well, what about your
19   retainer?  Did you have one?  You didn't have one.
20             THE WITNESS:  I don't require one.
21        A.    I'm assuming it will be Mr. Poulton's
22   firm.  I don't know if there's -- sometimes I do
23   things for public entities and I get a check from an
24   insurance company.  I don't know.  I don't worry about
25   it.  I'll be paid or I won't.
```

1      Q.      Have you submitted another invoice other

2  than this one dated December 7, 2008?

3      A.      I have not.

4      Q.      Have you ever been retained by the

5  Seminole County Sheriff's Office?

6      A.      No.

7      Q.      I just want to enter this -- this is your

8  supplemental report.

9      A.      This appears to be my supplement to my

10 report in this case dated December 23, 2008.

11     Q.      And I just had one question on this:  You

12 say that you consulted and relied upon guidelines for

13 international working dog trials of the federation --

14 and I won't pronounce this in French --

15             (Discussion off the record.)

16     Q.      All of these writings that you've listed

17 here say translated from the original into English.

18 Did you translate them or read the English versions?

19     A.      I did not.  In my family, we have strong

20 language abilities at the dinner table that

21 represented Latin, Portuguese, Spanish, Chinese,

22 English, a bit of Hebrew.  No French.

23             You can purchase translations that, I

24 guess, have been done by qualified people because

25 they're published in book form and you pay a bunch.

```
 1     That's what I used.
 2                 (Discussion off the record.)
 3          Q.     (By Ms. Webb) I know that you talked
 4     earlier about a second supplemental report that you've
 5     given your attorneys.
 6          A.     Yes.
 7          Q.     Do you plan on issuing any other reports
 8     beyond that second supplemental report?
 9          A.     Yes.
10          Q.     You do?
11          A.     Yes.
12          Q.     Okay.  What was that report on?
13          A.     It will be shorter than this.  I looked at
14     some --
15          Q.     Shorter than which?
16          A.     It will be maybe two sentences.
17          Q.     Okay.
18          A.     I don't even know if Mr. Poulton is aware.
19     He's probably sitting here thinking what is he talking
20     about?  Andrea sent me the training curriculum, lesson
21     plans for firearms training.
22                 I looked at that last night.  I wasn't
23     going to get to it so I didn't include it here but I
24     couldn't sleep last night so I went through it last
25     night.  So I'll do that next week.
```

KENNETH WALLENTINE                           ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1        Q.        That will just be listing out --

2        A.        It just lists one or document.

3        Q.        Do you have anymore work to do on this

4    matter?

5        A.        I don't believe so.

6        Q.        Okay.

7        A.        At this point, I haven't been asked to do

8    anything more.  Mr. Poulton may be so disappointed

9    that he missed his early flight that I'm fired.

10                 (Discussion off the record.)

11       Q.        (By Ms. Webb) Do you hold any other

12   opinions other than what we've discussed today

13   concerning this case?  Not life in general.

14       A.        About this case?  I have not been asked to

15   form any other opinions and I have not given

16   consideration to forming any other opinions.

17       Q.        Okay.  Did you have any conversations with

18   counsel before your deposition today?

19       A.        Yes.

20       Q.        Who did you speak with?

21       A.        Mr. Poulton.  We had breakfast together.

22       Q.        What did you discuss?

23       A.        This case.

24       Q.        What about this case?

25       A.        We talked about how long the deposition

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    might go, we talked about areas that you might ask
2    questions about, we talked about whether I had seen
3    anything in the documents that his assistant or Mr.
4    DeBevouise's secretary had sent me, whether that had
5    an impact.  May I tell her what you told me?
6              MR. POULTON:  You might as well.
7              THE WITNESS:  He told me some things that
8    he had learned in another deposition.
9              MR. POULTON:  This was what I was going to
10   tell you.  Remus said he didn't ride his bike up on
11   the ground.  Because it had come up in Knockermeier's
12   deposition.  He was just getting deposed.
13             But he had just gone on the blacktop.  I
14   let him know that because Myers was sort of curious
15   about that.
16             THE WITNESS:  He told me that they had
17   been grinding away almost nonstop in depositions.
18             We talked about my childhood and my
19   acquaintance with the old owners of Lamb's and
20   Governor Rampton and maybe a few other things, but
21   that's about it.
22        Q.    Did he share with you any opinion about
23   the subject of your testimony today?
24        A.    No.
25        Q.    Did he tell you how he wanted you to

KENNETH WALLENTINE                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1       testify today?

2            A.      He did not.

3            Q.      **Did you go through your opinions with him**

4       **today?**

5            A.      I didn't.  We didn't go through the

6       report.

7            Q.      **Okay.  Was your conversation with him**

8       **today the only time that you have spoken with him**

9       **concerning your deposition?**

10           A.      No.

11           Q.      **When else did you speak with him?**

12           A.      I have spoken with him several times.

13      Most of those conversations involved whether you would

14      come here or I would go there and then when it

15      appeared that I was going to go to this meeting and,

16      two, to a social engagement in southern California, I

17      did call him back and make an offer to fly directly

18      from Los Angeles to Orlando or somewhere -- Winter

19      Park, I believe.

20              But the scheduling didn't work out because

21      of you folks were being somewhere else yesterday.  I'm

22      very sorry for you that you are here, but I am much

23      relieved.  I do not like to travel.

24              We talked earlier this week for maybe 15

25      minutes.  And we talked, I believe, yesterday -- I

1    think I spoke with him yesterday for ten, maybe 15

2    minutes while I was at lunch.

3              It might have been yesterday when he told

4    me about having done Larry Myer's deposition.  And

5    just a general report on what -- I should say Dr.

6    Myer's.  I know Larry -- what Dr. Myer's had had to

7    say.  That's about it.

8         Q.    Other than what Dr. Myer's may have said

9    or Remus not riding his bicycle through the area when

10   they started the track, has he told you about any

11   other new facts in this case?

12        A.    He hasn't told me about any other new

13   facts, no.

14        Q.    Because you've just told us that you've

15   had several conversations with him prior to this

16   deposition.  Has he ever told you how you should

17   testify in this case?

18        A.    Never.

19        Q.    Has he ever told you any of his opinions

20   about the subject of your testimony?

21        A.    He's not.

22        Q.    Okay.

23        A.    In fact, he didn't even give me the

24   standard don't say more than -- you know -- I didn't

25   get any of the traditional preparation stuff.

1          MR. POULTON:  I've been too busy.

2     Q.     **You mentioned at the beginning of the**

3  **deposition that you reviewed the course curriculum for**

4  **perimeter training for the Seminole County Sheriff's**

5  **Office?**

6     A.     Yes.

7     Q.     **Who provided that to you?**

8     A.     Andrea Rizzo.  She provided that to me.

9     Q.     **When did you get that?**

10    A.     I don't know, but it's been very recently.

11    Q.     **Within the last week?**

12    A.     I believe it's been within the last week.

13 It may have been within the last ten days.  But pretty

14 recently.

15          (Discussion off the record.)

16          MS. WEBB:  I don't have anymore questions.

17          MR. POULTON:  I've got some.

18                    EXAMINATION

19 BY MR. POULTON:

20    Q.     **Mr. Wallentine, the opinions expressed in**

21 **Exhibit Number 1, your report, are those opinions that**

22 **you expect to provide at trial and under oath?**

23    A.     I do.

24    Q.     **Now, let's talk a little bit about the**

25 **Trammell case.  As a precursor to that, is there a**

1      **difference between a track and an area search?**

2          A.      Yes.

3          **Q.      What's the difference?**

4          A.      In a track situation, the dog is expected

5      to follow an scent to an unknown location to find a

6      person -- what the hope is, the objective is -- to

7      find a person at the end of the track, whether it be a

8      suspect who has fled and is hiding or be it an

9      Alzheimer's patient who has unfortunately wandered off

10     and may be in peril or a child.

11              An area search, on the other hand, is when

12     there is a belief that a suspect is contained within a

13     particular area but there's no track defined.  An

14     example perhaps would be, that in my neighborhood, we

15     have a facility for Alzheimer's patients.

16              Occasionally, one of those nice people

17     will slip out the door and they may wander through the

18     neighborhood.  My neighbors, one would hope, would

19     call the facility or the police.

20              But sometimes they get lost.  So the

21     police department in my community, which has a

22     bloodhound, would come and would go from where that

23     person was known to be and ask the dog to track,

24     follow the scent as laid down on the ground to find

25     that person, as opposed to, say, a burglary alarm goes

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1     off at a lumber yard.  The lumber yard may be a acre
 2     or two.  It has a fence around it.
 3              Officers get there fairly quickly, quickly
 4     enough that they believe that the burglar or burglars
 5     are still in the lumber yard or the home improvement
 6     center.  They then are going to conduct an area
 7     search.
 8              They believe the suspects are contained in
 9     the area and they are going to send the dog to use its
10     locating ability, primarily through scent again, to
11     find persons hiding in a confined area.
12         Q.    Okay.  Can a track lead to an area search?
13         A.    A track can lead to an area search.
14         Q.    Counsel was asking you questions about the
15     fact that you thought the track part of that
16     deployment of the K-9 was okay in Trammell, but then
17     they got to an area search; do I understand that
18     correctly?
19         A.    Yes.
20              MS. WEBB:  Are you speaking about the
21     Trammell case or Swofford?
22         Q.    Let me clarify.  It's just been a long
23     day, I'm sorry.
24              In Trammell was there an area search, in
25     your opinion?
```

KENNETH WALLENTINE                              ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

```
 1          A.     There was a brief area search, yes.

 2          Q.     Was that when they got to Mr. Trammell's

 3   backyard?

 4          A.     Yes.

 5          Q.     In this case, do you think that there was

 6   an area search?

 7          A.     No.

 8          Q.     When you gave the opinion that in Trammell

 9   there should have been a warning given when they were

10   at the fence to Mr. Trammell's backyard, was that a

11   function of a being an area search?

12          A.     Yes, it's generally advisable with some

13   exceptions.  It's generally advisable to give a

14   warning prior to sending or releasing a dog into an

15   area to conduct an area search.

16          Q.     In the Trammell case, you thought that the

17   deputy or the law enforcement officer had not done

18   that?

19                 MS. WEBB:  Objection.

20          Q.     Or did you have an opinion on that one way

21   or the other?

22          A.     I believed that he had given a warning.  I

23   didn't agree with that individual officer's statement

24   about when he gave the warning.

25                 Well, to be accurate, I didn't agree about
```

KENNETH WALLENTINE                                    ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    the statements made by other people because, again,

2    that individual officer, he didn't give a deposition

3    at least that ever was made available because he had

4    other issues that caused him to leave the state and

5    they couldn't locate him to serve process or any other

6    thing.

7         Q.    Under the circumstances of this case, was

8    Billy Morris obligated to give a verbal warning before

9    beginning the track?

10        A.    No.

11        Q.    Did you see photographs of the Trammell

12   backyard or did you go there?

13        A.    I didn't go there.  I saw an overhead

14   video image taken from a helicopter.

15        Q.    How large was that Trammell backyard

16   relative to the Swofford property?

17        A.    Oh, I'm sorry.  I'm sorry.

18        Q.    Did I confuse you?

19        A.    No.  I allowed myself to err.  Did you ask

20   me whether I had seen the Trammell backyard, whether I

21   had gone there?

22        Q.    Right.

23        A.    I didn't go there.  I saw photographs and

24   diagrams.

25        Q.    Okay.  Can you compare for us the size of

1    **the Trammell backyard to the Swofford property?**

2         A.      Many, many, many Trammell backyards would

3    have fit into the Swofford property.  The Trammell

4    backyard was -- it was a very small backyard in a

5    series of small homes and small backyards that they

6    were parallel to a waterway.  So you had just a string

7    of small homes that kind of seemed to be a lower

8    income neighborhood.

9         **Q.      Were there any other differences between**

10   **the Trammell case and the Swofford case that affect**

11   **the difference in when one should give a verbal**

12   **warning that a K-9 is about to be deployed versus not**

13   **give that warning besides the size of the properties?**

14        A.      Well, in the Trammell case, one very

15   distinct fact is that the suspect -- I apologize, I

16   cannot not remember his name.  I'm trying to think

17   about that.

18             The suspect knew the police were pursuing

19   him right then because an officer had seen him.  He

20   had seen the officer.  They'd made eye contact.

21             The officer actually saw him and

22   recognized him and yelled his name and he looked right

23   at the officer as he ran down towards what ultimately

24   turned out to be Mr. Trammell -- where Mr. Trammell

25   was at.  I actually don't think it was his home.  He

```
 1    was just staying there.

 2              Anyway, so there was a fresher pursuit, if

 3    you will, and a more active -- a different kind of

 4    more active, aggressive pursuit because the officers

 5    not only -- they knew that that's where the suspect

 6    had run.

 7              When they got to the fence, outside the

 8    fence, the dog transitions from tracking behavior into

 9    an apprehension mode.

10              The dog starts indicating that the suspect

11    is on the other side of the fence.  They believed

12    before they ever breached the fence -- the officers

13    believed before they ever breached the fence -- again,

14    we're somewhat limited by the fact that the handler

15    involved wasn't deposed.  They believed the suspect is

16    right on the other side of the fence.

17              The dog in that case -- they had a small

18    confined area and I don't know, again, the perfect

19    detail the perimeter they had.

20              They knew generally where the suspect was

21    at.  They had a pretty good sense that that suspect

22    was right in that perimeter.  It was locked down

23    pretty good.

24              So they had the opportunity to do a sneak

25    and peek and actually look and see if they could find
```

KENNETH WALLENTINE                              ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1    the suspect or see if they could see the suspect and

2    give the suspect commands to show his hands and come

3    out.

4          Q.    Well, would a sneak and peek type of

5    exercise have been effective in this type of a case,

6    meaning the Swofford case?

7          A.    No.  No.  Different situation.

8          Q.    Is that both the size of the property on

9    the other side of the fence being so much larger and

10   also the length of time that had elapsed from the time

11   the suspects were last seen and the track was done?

12         A.    Those are two things.  But you have a

13   small yard that it's not much bigger than this room.

14         Q.    You are speaking of Trammell?

15         A.    The Trammell yard.  I'm pretty darn sure

16   the suspect was somewhere in that immediate area.

17   They had three officers right there.  They had the

18   opportunity to take a quick look through.

19               Sneak and peek refers to a technique of

20   looking through -- hitting the flashlight quickly.

21         Q.    Before I forget you were asked questions

22   about perimeter.  Under the circumstances of this

23   case, meaning the Swofford case, is Billy Morris a

24   part of the perimeter?

25         A.    No.  No.

KENNETH WALLENTINE                                      ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1          Q.     Isn't it true that perimeter units
2     generally stay with their vehicles?
3          A.     They should.
4          Q.     They had their overhead lights on?
5          A.     They should every light on a car on.
6          Q.     But Billy Morris, as the person going into
7     the search, he's not part of the perimeter, right?
8          A.     No.
9          Q.     Am I asking the question in a confusing
10    way?
11         A.     No, I'm just not sure where you are going
12    with it.
13         Q.     If he's not part of the perimeter, he
14    doesn't have to have his overhead lights on, does he?
15              MS. WEBB:  Objection.
16         A.     No.  If I were the handler, getting my dog
17    out and going in to do it, I wouldn't have of my
18    lights on.
19         Q.     You were asked a question by plaintiffs'
20    counsel about the reasonableness of firing on someone
21    who has a gun pointed down at the ground.  For the
22    record, she was demonstrating a firearm in one arm,
23    one hand pointed down by the side directly to the
24    ground, right?
25         A.     Yes.

 1          Q.     And you indicated that that would not be

 2    reasonable, correct?

 3          A.     I think I said that if that's the case,

 4    and if that is the true fact, a reasonable officer

 5    would not fire at that moment.

 6          Q.     Okay.  Well, and that's actually going to

 7    be part of my question to you.  Wouldn't that depend

 8    on all of the circumstances both just generically, the

 9    environment, and also what the person was doing

10    besides just holding a gun down to their side?

11          A.     Yes.

12          Q.     For example, if the person had the gun

13    down to their side but they were advancing towards the

14    deputies what their view was a threatening manner,

15    might that affect your opinion on whether that person

16    could be fired upon?

17          A.     It would.  In fact, if the person were

18    advancing at all when they were told not to would

19    affect my opinion.

20          Q.     What about if the firearm moved in any

21    perceptible way from the deputy's view, would that

22    affect whether it would be reasonable to fire on that

23    person?

24          A.     If the firearm moves up at all from the

25    position that you've demonstrated here just now, and

KENNETH WALLENTINE                          ROBERT G. SWOFFORD, JR.  v. DONALD ESLINGER, ET AL.

1        your position again, sir, was pointed directly at the
2        ground.   A firearm moved up toward the deputies at
3        all, that would substantially change my opinion.
4             Q.      **Generally speaking, do law enforcement**
5        **officers facing a deadly threat have a duty and a**
6        **right to defend themselves?**
7             A.      Yes.
8             Q.      **And, in that situation, are they obliged**
9        **to send a K-9 to try to distract that person if they**
10       **don't think it's practical to do so?**
11            A.      No.
12            Q.      **In the scenario presented in the Swofford**
13       **case, isn't it true that the deputies would have had**
14       **only just a few moments to make those determinations?**
15            A.      I tried to be very precise with
16       plaintiffs' counsel's terminology, Mr. Poulton, and
17       I'll be the same with you.
18            Q.      **I'll clarify.**
19            A.      "Few moments" does not work for me.
20            Q.      **No, I understand.**
21            A.      Because I don't know what you mean by
22       that.
23            Q.      **I'll clarify.**
24                    **Well, actually, I think that's the**
25       **question.   Isn't it the case that the amount of time**

1    that the deputies believe that they have to react will

2    have an effect on their ability to decide whether

3    releasing the K-9 is a practical alternative?

4         A.    Yes.

5              MR. POULTON:  That is all I have.  Do you

6    have any followup?

7              MS. WEBB:  No.

8              MR. POULTON:  He will read.  I assume

9    that's okay to read.

10              (Discussion off the record.)

11              (Deposition concluded at 5:12 p.m.)

12                        -O-

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>Deponent's Certificate.</u>

2

3          I, KENNETH WALLENTINE, deponent herein, do

4    hereby certify and declare the within and foregoing

5    transcription to be my deposition in said action taken

6    on January 16, 2009; that I have read, corrected, and

7    do hereby affix my signature to said deposition.

8

9          DATED this _11_ day of _February_____,

10   2009.

11

12                                    _____

13                                    Deponent

14   STATE OF UTAH          )   ss.
                             )

15

16          SUBSCRIBED AND SWORN to before me this

17   _11_ day of _February_____, 2009.

18

19

20                    _____

21          Notary Public residing in

22          _____

23   My Commission Expires:

24   _____

25

SCHEREE E. WILCOX
5272 S. College Dr. Suite 200
Murray, UT 84123
My Commission Expires
July 10, 2010
State of Utah

1                    Reporter's Certificate

2    State of Utah        )
     County of Salt Lake )

3

4

5                    I, Denise Kirk, Certified

6    Shorthand Reporter and Registered Professional

7    Reporter for the State of Utah, do hereby certify:

8              THAT the foregoing proceedings were taken

9    before me at the time and place set forth herein; that

10   the witness was duly sworn to tell the truth, the

11   whole truth, and nothing but the truth; and that the

12   proceedings were taken down by me in shorthand and

13   thereafter transcribed into typewriting under my

14   direction and supervision;

15             THAT the foregoing pages contain a true

16   and correct transcription of my said shorthand notes

17   so taken.

18             IN WITNESS WHEREOF, I have subscribed my

19   name this 27TH day of January_____, 2009.

20

21             _____

22                  Denise Kirk, CSR/RPR

23

24

25

# Tempest
### REPORTING
### SM

YOU HAVE 30 DAYS IN WHICH TO RETURN THIS TRANSCRIPT TO US.

## CORRECTION SHEET

Please read your deposition and indicate any corrections to be made by specifying the page and line number, the correction to be made, and the reason. Then sign the deposition before a notary public.

PLEASE DO NOT MAKE ANY MARKS ON THE ORIGINAL TRANSCRIPT WITH THE EXCEPTION OF THE DEPONENT'S CERTIFICATE.

### MAKE THE CORRECTIONS ON THIS CORRECTION SHEET

| PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|
| 11 | 3 | replace "was" with a comma | transcription error |
| 26 | 3 | replace "Ferton" with "Furton" | Spelling |
| 40 | 16 | replace "a.m." with "am" | " |
| 48 | 8 | " "class" with "glass" | " |
| 51 | 22 | " "preferable" with "present" | transcription error |
| 75 | 16 | " "gauage" with "gauge" | Spelling |
| 84 | 23 | " "mezo" with "Mosloh" | " |
| 100 | 3 | " "Forerunner" with "Four Runner" | " |
| 107 | 9 | add closing parentheses | transcription error |
| 108 | 2 | Replace "bond" with "bomb" | " " |
| 110 | 24 | " "nasturbind" with "nasoturbinate" | " " |
| 118 | 9 | ditto | |
| 131 | 4, 6 | Replace "wienies" w/ "weinies" | Spelling |
| 145 | 6 | ditto | |
| 145 | 16 | Replace "add mixture" with "admixture" | " |
| 147 | 25 | " "Electraglide" with "Electra Glide" | " |
| 159/160 | 18/11 | " "Skolexin" with "Skelaxin" | " |

_____ Date
Signature

**Tempest Reporting, Inc.**
801-521-5222 / Fax 801-521-5244
Post Office Box 3474 / Salt Lake City, UT 84110

CASE NAME: Robert G. Swofford, Jr. -v- Donald Eslinger, et al.
CASE NO 6:08-CV-00066MSS-DAB
DATE: January 16, 2009
DEPONENT: Kenneth Wallentine
REPORTER: Denise Kirk