**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ROBERT G. SWOFFORD JR., an individual,**
**and his wife, SHARON R. SWOFFORD, an**
**individual,**

      **Plaintiffs,**

**v.**                                      **Case No.: 6:08-cv-00066-Orl-35DAB**

**DONALD ESLINGER, in his official capacity**
**as the Sheriff of Seminole County, Florida;**
**WILLIAM MORRIS JR., in his individual**
**capacity; and DONALD REMUS, in his**
**individual capacity,**

      **Defendants.**

_____/

## ORDER

      **THIS CAUSE** comes before the Court for consideration of the Motion for Summary

Judgment, filed by Defendants William Morris Jr. and Donald Remus on March 27, 2009 (Doc.

No. 173), and Plaintiffs' Memorandum in Opposition, filed on April 27, 2009 (Doc. No. 188).

Defendants Morris and Remus move the Court to declare as a matter of law that Defendants

are entitled to immunity from suit on all claims brought by Plaintiffs, pursuant to the doctrine of

qualified immunity and Florida Statute § 768.28(9)(a).  Upon consideration of all relevant

filings and case law and being otherwise fully advised, the Court finds that Defendants' Motion

for Summary Judgment (Doc. No. 173) should be **GRANTED in part** and **DENIED in part**.


**I.**      **Background**

## A. Case History

This case arises from the shooting of Plaintiff Robert Swofford by Defendants William Morris, Jr. and/or Ronald Remus ("Defendants") during the early morning hours of April 20, 2006. Morris and Remus, Deputies for Seminole County Sheriff's Office ("SCSO"), were pursuing two felony car burglary suspects when Defendants encountered an armed Mr. Swofford on Swofford's property and fired upon him. Donald Eslinger is a third defendant in this case, being sued in his official capacity as the Sheriff of Seminole County, State of Florida. The Amended Complaint, filed by Mr. Swofford and his wife, Sharon Swofford, on May 16, 2008, alleges claims against all Defendants, pursuant to 42 U.S.C. § 1983, for the use of excessive force and unlawful entry onto Swofford's property, in violation of his Fourth Amendment rights, and seeks compensatory and punitive damages, plus interest, costs and attorneys' fees, pursuant to 42 U.S.C. § 1988. The Amended Complaint also alleges, on behalf of Mr. Swofford, state law claims of battery, gross negligence, simple negligence, and negligent training and supervision and, on behalf of Mrs. Swofford, a claim for loss of consortium. (Doc. No. 34.)

On March 27, 2009,[1] Defendants Morris and Remus filed the Motion presently before the Court, contending that they are entitled to immunity from suit on all claims brought by Plaintiffs, pursuant to the doctrine of qualified immunity and Florida Statute § 768.28(9)(a).[2]

---

[1] On March 2, 2009, Defendants Morris and Remus each filed separate motions for summary judgment. (Doc. Nos. 76, 77.) The motions were written such that Defendant Morris's motion focused primarily on the use of force issues, while Defendant Remus's motion focused on the entry onto property issues. However, the two Motions cross-referenced each other so as to incorporate the legal arguments of each with respect to both Defendants Morris and Remus. The Court ordered the motions be stricken, finding that the motions amounted to an impermissible attempt to circumvent the twenty-five page limitation for each party's motion, pursuant to Local Rule 3.01(a), and permitted Defendants Morris and Remus to re-file a joint memorandum in support of their Motions, not to exceed thirty total pages. (Doc. No. 157.)

[2] On November 11, 2008, Plaintiffs filed a motion, seeking sanctions against all Defendants for bad faith spoliation of multiple pieces of evidence. (Doc. No. 44.) The Court granted Plaintiffs' Motion, finding that Defendants had purposely

(Doc. No. 173.)  Accordingly, Defendants Morris and Remus request the Court to enter summary judgment in their favor on Mr. Swofford's federal claims because neither Morris's nor Remus's conduct violated Mr. Swofford's constitutional rights.  Alternatively, even if a constitutional violation occurred, Mr. Swofford's rights were not clearly established at the time of the alleged violation.  Additionally, Defendants claim they are entitled to summary judgment on Plaintiffs' state law claims because their actions on April 20, 2006, were reasonable.  Upon consideration of the disputed and undisputed facts in this case, the Court finds that there are outstanding factual disputes which, at this time, preclude summary judgment in either Morris's or Remus's favor.

**B.  Facts of Record**

Upon consideration of the many disputed facts in this record, most of which are relevant to the dispositive issues underlying the Motion, the Court is unable to decide as a matter of law that Defendants are entitled to qualified immunity.  For the sake of clarity in the Court's recitation of the facts and explanation of its decision, the Court recounts separately the undisputed and disputed facts pertinent to the Court's analysis.

**1.    Undisputed Facts**

The following facts are undisputed in this case:  During the early morning hours of April 20, 2006, Defendant Remus was on bicycle patrol in the Barrington at Mirror Lake Apartments, located in Seminole County, Florida.  (Doc. No. 173 at 3.)  The Barrington is located adjacent to Mr. Swofford's residential property, with a six-foot tall wooden privacy

---

destroyed or permitted the destruction of evidence requested by the Plaintiffs.  (Doc. Nos. 233, 273.)  The Court does not consider the sanctions in its disposition of the Motion for Summary Judgment. The Court notes, however, that viewed through the lens of the inferences and presumptions the jury will be permitted to engage, granting summary judgment is even more inappropriate.

fence separating the two properties.  (Doc. No. 188 at 2.)  Mr. Swofford's property is approximately six to seven acres in size and has three addresses associated with it: 400, 410, and 420 Forest Lake Drive.  Mr. Swofford initially lived on one of the parcels of land. After winning the Florida Lottery in 2004 (R. Swofford Dep. 110:13-19, Jan. 9, 2009), Mr. Swofford purchased the lots adjacent to his home to make them one property with one address, 400 Forest Lake Drive.  Id. at 136:2-137:2.  On April 20, 2006, Mr. Swofford's property contained Swofford's main residential home, a second residential home where an individual sometimes stayed for security purposes,[3] a garage area and an open nursery with a black plastic tarp. (Doc. No. 173 at 12.)  Swofford's property also contained a tractor-trailer and an unknown number of cars on which Swofford worked.  (Doc. No. 188 at 10.)

At approximately 2:28 a.m., Remus observed a car backed into a parking space at the apartment complex with its engine running and its lights off.  Id.  At the same time, Remus saw two Hispanic males attempting to "hotwire" a second car in the apartment complex parking lot.  Id. at 4.  When the two Hispanic men (the "Suspects") saw Remus, they ran toward the fence line separating the apartment complex and Swofford's property and then north along the fence.  Remus chased the two men on his bicycle, but eventually lost sight of them.  Remus assumes the two men jumped the fence, but he could not confirm that they did.  "[He] heard the fence rattle and then didn't see them there anymore." (Remus Dep. 223:4-16, Jan. 13, 2009.)

At approximately the same time, 2:25 a.m., Mr. Swofford awoke to his dog barking at the back door.  (Doc. No. 188 at 2.)  After listening at the back door and not hearing

---

3 The facts indicate that the home was unoccupied at the time of the shooting.  (Doc. No. 173 at 12.)

anything, Mr. Swofford took his gun, locked the house, and went outside to inspect his property. Swofford did not put his gun into battery (i.e. load a cartridge into the gun's chamber). After leaving the house, Mr. Swofford went to his garage to check the doors and windows. Next, he walked past the vintage cars he was restoring to a bush where he knelt down to observe his property.

Meanwhile, after losing site of the Suspects, Remus peddled back to the point where he had noted the first car with the engine running. Remus then followed the car as it pulled onto S.R. 436. Remus followed the car for about one mile until another officer was able to follow the car in a police vehicle. Once the second officer began following the car, Remus turned off of S.R. 436 and headed south on Forest Lake Drive to see if he could find the Suspects. Not finding them, Remus returned back to the apartment complex.

Defendant Morris was on duty with his K-9, "Strike," near the intersection of 17-92 and Maitland Boulevard when he heard radio traffic regarding Remus's pursuit of the Suspects. (Doc. No. 173 at 5.) At least eleven minutes elapsed between the time Remus lost sight of the Suspects, and Morris arrived at the apartment complex. (Doc. No. 188 at 3.) Morris parked his car on the street, close to the fence, and removed Strike from the vehicle. Morris was not in a hurry and did not know where the two Suspects were. Id. When Remus was asked whether he believed the two Suspects were in the "fenced-in property," Remus responded, "I don't know. The fenced-in area? I wouldn't say that. I would say they were in the area." (Remus Dep. 159:3-7, Jan. 13, 2009.)

Remus gave Morris a description of the two Hispanic, male Suspects (Morris Dep. 82:24-83:3, Dec. 15, 2008), but Remus did not tell Morris that he had patrolled Mr.

5

Swofford's property previously or that Mr. Swofford's property contained a residence. (Id. at 111:16-112:2; Remus Dep. 121:1-23, Jan. 13, 2009.). Per Mr. Swofford's prior request that SCSO patrol his property indefinitely, due to prior criminal activity, Remus had patrolled the property eleven times prior to the events on April 20, 2006, including one patrol that occurred less than three hours before the shooting of Mr. Swofford. (Doc. No. 173 at 7; Doc. No. 188 at 11.) Mr. Swofford had also told the SCSO that he and his property caretakers routinely patrol the property armed. (Doc. No. 188 at 11.)

At the same time that Morris arrived and was assessing the state of the "investigation" with Remus, other deputies began to arrive to set-up a perimeter to contain the Suspects. (Doc. No. 173 at 5.) A perimeter is used to "bed down" or surround suspects, so that they cannot escape the relevant area. (Remus Dep. 163:22-25, Jan. 13, 2009.) Remus asked for a perimeter, but neither Remus nor Morris determined for certain that a perimeter was set before they commenced their search.[4] (Doc. No. 173 at 5; Doc. No. 188 at 3.) Additionally, the police helicopter, "Alert," radioed that it was four minutes away from the scene. (Doc. No. 188 at 3.) Alert had both full spectrum and infrared capabilities to search area. Id. at 14. Morris and Remus decided not to await the arrival of the helicopter unit before continuing their "search." (Doc. No. 184, Exh. 2 at 5:75.)

After more than eleven minutes had passed since Remus lost sight of the two Suspects (Doc. No. 184, Exh. 2 at 1:8, 5:81),[5] Morris and Remus began to search for them. (Doc. No. 173 at 6.) Remus directed Morris toward the area along the fence where Remus

---

4 Six deputies responded to various locations to set-up the perimeter (Doc. No. 83), but Morris saw only one deputy on perimeter duty with his patrol-car lights flashing. (Morris Dep. 119:18-23, Dec. 15, 2008.)
5 SCSO's Basic Perimeter Training Materials state that a suspect can run 1 3/8 miles in ten minutes. (Doc. No. 184-4.)

had last seen the Suspects.  Id.  Strike sniffed along the fence and came to a point in the fence where there was a hole.[6]  Strike went through the hole.  Morris then looked through the hole and saw, by Morris's account, what appeared to be "a business, maybe a nursery or something of that sort."  (Doc. No. 173 at 6; Doc. No. 188 at 4.)  Morris could see a tractor-trailer and an SUV on the property on the opposite side of the fence.  Morris could also see a building in the distance.  Morris pulled Strike back through the fence to find a place where Morris could breach the security of the fence.  Finding a spot where there appeared to be two or three slats of the fence missing, Morris knocked out a few more slats and went through the opening in the fence to continue "tracking" with Strike.  Remus followed, acting as the "cover deputy."  Neither officer announced his entry or otherwise identified himself as each entered the property.  (Doc. No. 188 at 4.)

Mr. Swofford, after kneeling down in a bush to observe his property for a few minutes, heard someone on the other side of his fence say, "This looks like a good place we can get in," and then he heard the "squealing [of] somebody trying to pry something apart."  (Doc. No. 92, Exh. A at 19:10-11.)  Next, he heard a thump and then saw two bodies coming along the fence.  (Doc. No. 173 at 13.)  According to Mr. Swofford, the "tall or bigger guy in the front [was in] a full, looked like, dark uniform. . . ."  (Doc. 92, Exh. 2 at 19:18-21.)  Mr. Swofford "couldn't see anything on it other than it was full-sleeved."  Mr. Swofford testified that he could not see any insignia on the two men's clothing.  (R. Swofford Dep. 214:20-215:9; 219:-4, Jan. 6, 2009.) The second person was wearing a vest with a white T-shirt and black shorts.  Mr. Swofford watched the two men scamper along

---

6 Morris testified that he did not know whether the two Suspects jumped over or ran under the fence.

the fence, with flashlights carried in an overhand or overhead position. At that time, Mr. Swofford did not realize that the two men were police officers, and he did not see a dog.

Once Morris, Strike, and Remus came through the fence, Strike started back on the "track" from the point at which he originally went under the fence. Strike led Morris around the tractor-trailer and between it and the SUV. As they got near the tractor-trailer, Remus was positioned off of Morris's left shoulder. Strike then raised his head, indicating that he had focused on something. (Doc. No. 173 at 8.) Morris looked up at that time and saw a white male. Morris testified that it occurred to him at the moment that he saw the man that the man could be the home owner. (Morris Dep. 154:25-155:11, Dec. 15, 2008.) Remus testified that he knew, at the instant he saw the man, that he was not one of the two Hispanic males that the officers were pursuing. (Remus Dep. 174:23-25, Jan. 13, 2009.)

Mr. Swofford, crouched down with his gun in a two-handed grip, observed the flashlights as two men got closer to the trailer. When they got near the trailer, Mr. Swofford saw the flashlights start to split off, at which time Mr. Swofford shouted at the two men.[7] Thereafter, Mr. Swofford was shot multiple times. Mr. Swofford never fired a shot and never chambered a round in his gun. After Mr. Swofford was shot and lying on the ground, neither officer touched or otherwise rendered first aid to Mr. Swofford. (Remus Dep. 225:13-18, Jan. 13, 2009.) Alert arrived above the scene at the time of the shooting. The remaining facts pertinent to the shooting are in dispute and, thus, are discussed below.

### 2.    Disputed Facts

---

[7] According to Mr. Swofford, he shouted "Halt!". Defendant Morris testified that he could hear Mr. Swofford shout something, but he could not determine what he said.

The Record in this case is well-developed and filled with a myriad of expert reports. The factual disputes in this case are far too numerous to recount each one for the purpose of the Motion. In light of the following factual disputes, however, the Court finds that summary judgment in Defendants' favor is unwarranted at this stage in the litigation and, therefore, that this case should proceed to trial.

The parties dispute facts material to whether Morris and Remus unlawfully entered Mr. Swofford's property, specifically in regard to the appearance of the Swoffords' property as Morris and Remus entered onto it through the fence. Remus asserts that the property on the opposite side of the fence appeared to Remus him to be abandoned, even though he had, pursuant to Mr. Swofford's request of the SCSO, patrolled it three hours before the shooting occurred. According to Remus, "[t]here's junk on it, there was a used trailer that just sat there with weeds growing." (Remus Dep. 169:11-12, Jan 16, 2009.) However, according to Mrs. Swofford, the grass was mowed regularly, and Mrs. Swofford "would pull weeds and trim bushes to maintain a neat appearance. Since [the Swoffords] purchased the property, it has never been abandoned or neglected." (Doc. No. 188, Exh. 6, ¶ 6.)

The bulk of the disputed facts in this case surround the events that occurred immediately before, during, and just after the shooting of Mr. Swofford. Mr. Swofford testified that he does not recall moving toward the Defendants as he was crouched down, watching from the bush. (R. Swofford Dep. 233:16-21, Jan. 6, 2009.) He recalls yelling "Halt!", having a light shined in his eyes, and then he felt pain in his abdomen. Further, he recalls hearing a few shots, hearing someone yell "Seminole County Sheriff's Office," and then hearing a few more shots. Id. at 19-23. Mr. Swofford could not give a quantifiable

distance between himself and Defendants at the time he was shot. (Doc. 92, Exh. 2 at 25:12-14.) Mr. Swofford contends that he never heard a warning or Defendants identify themselves prior the first shots being fired. The "SCSO . . . radio-dispatch recording from the approximate time of the shooting [contains] no recorded evidence of Remus or Morris identifying themselves to Mr. Swofford." (Doc. No. 184, Exh. 2 at 6.) Swofford further testified that he never raised his gun above his stomach. Id. at 234:4-5; see also Earnest Aff., Doc. No. 184, ¶¶5-7. According to Richard Earnest, an expert witness for the Plaintiffs, the physical evidence shows that, "at the time the Deputies fired their guns, Mr. Swofford's hands were together in a two handed grip on his firearm, his hands were in front of his waist and the firearm was pointed down towards the ground and not towards the Deputies." Mr. Swofford does not know the precise number of shots fired upon him, but stated that he has seven wounds from the incident and two "near misses" where the bullets "creased" him. (Doc. No. 92, Exh. 2 at 22:9-23:6.) Dr. Ronald K. Wright, Plaintiffs' expert witness, opines that Mr. Swofford suffered five gunshot wounds caused by three bullets. (Doc. No. 184, Exh. 7, ¶ 6.)

According to Defendants, however, Mr. Swofford was walking in their direction. Each Defendant contends that he gave at least three warnings to Mr. Swofford, each identifying himself as the "Sherriff's Office" and directing Mr. Swofford to put his gun down. According to Morris, at the moment Strike looked up from his track, Swofford appeared as a silhouette walking towards him, holding a gun in his left hand, pointed to the ground. (Doc. No. 173 at 8.) Morris estimates that Mr. Swofford was forty to fifty feet away from him at that moment. (Morris Dep. 144:7-9, Dec. 15, 2009.) Morris asserts that he called out his

first warning, and Mr. Swofford continued to walk toward them.  Morris estimates that Mr. Swofford had advanced another five to ten feet when Morris called out his second warning.  Id. at 145:6-10.)   When Mr. Swofford did not drop the gun, Morris called out his third warning and began to pull his gun out of his holster.  Morris asserts that Mr. Swofford then began to raise his gun, reaching an area between Mr. Swofford's chest and stomach.  At that time, Morris shot Mr. Swofford five times.  Morris initially believed that he shot Mr. Swofford four times.  (Doc. No. 173 at 9.)  Morris estimates that he was approximately twenty-five to thirty feet away from Mr. Swofford at the time he shot him.  Id. at 151:14-16.

Remus recounts that, from the moment the flashlight hit Mr. Swofford, Remus could see Mr. Swofford with the gun in his left hand, pointed directly at the Officers, rather than at the ground.  (Remus Dep. 193:17-194:6, Jan. 13, 2009.)  Remus testified that he gave three to five verbal warnings to Swofford and then fired at Mr. Swofford two times.  Id. at 194:20-23; 217:5-6.  Though Richard Ernest proffers that neither one of Remus's shots could have hit Mr. Swofford (Earnest Dep. 29:20-24 Jan. 14, 2009), Remus believes that at least one bullet fired by him struck Mr. Swofford.  (Remus Dep. 210:4-7, Jan. 13, 2009.)

## II.      Standards of Review

### A.      Summary Judgment

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009)(citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)).  Which facts are material depends on the

substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356). A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001)(citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. Porter v. Ray, 461 F.3d 1315, 1321 (11th Cir. 2006)(citation omitted). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985)("conclusory allegations without specific supporting facts have no probative value"). In the qualified immunity context, the Court must resolve all issues of material fact in Plaintiffs' favor and then answer the legal question of whether Defendants are entitled to qualified immunity under that version of the facts. Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009)(citing West v. Tillman, 496 F.3d 1321, 1326 (11th Cir. 2007)).

### B. Qualified Immunity

Qualified immunity shields law enforcement officers from suit in their individual capacities concerning alleged federal constitutional violations that may arise while the

officer is performing his discretionary functions, so long as the officer's conduct does not violate a clearly established statutory or constitutional right of which a reasonable officer would have known. <u>Case</u>, 555 F.3d at 1325. The qualified immunity analysis consists of three prongs. First, the officer must prove that he was acting within the scope of his discretionary authority when the alleged unconstitutional act took place. <u>Id.</u> After the officer satisfies the first prong, the burden shifts to the plaintiff to prove, second, that the officer violated the plaintiff's constitutional rights and, third, that the right was clearly established "in light of the specific context of the case, not as a broad general proposition." <u>Id.</u> "The relevant query is whether it 'would be *clear* to a reasonable officer that his conduct was unlawful in the situation he confronted.'" <u>Maiorano v. Santiago</u>, No. 6:05-cv-107-Orl-19KRS, 2005 WL 1200882, at *7 (M.D. Fla. May 19, 2005)(quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2002)). Further, the plaintiff must demonstrate that the right was clearly established by pointing to decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the highest court of the pertinent state, in this case, the Supreme Court of Florida, that provide clear notice of the violation. <u>Priester v. City of Riviera Beach, Fla.</u>, 208 F.3d 919, 926 (11th Cir. 2000); <u>McClish v. Nugent</u>, 483 F.3d 1231, 1237 (11th Cir. 2007).

Once the officer satisfies the first prong, the court has discretion to determine which prong of the qualified immunity analysis should be addressed next in light of the circumstances of the particular case at hand. <u>Case</u>, 555 F.3d at 1325. The plaintiff must prove both the second and third prong, or the officer is entitled to qualified immunity and, thus, summary judgment as a matter of law. <u>Id.</u> at 1327.

13

## III. Discussion

The first prong of qualified immunity analysis—whether the officer was acting in the scope of his discretionary authority when the alleged unconstitutional act took place—is not in dispute with regard to any of Mr. Swofford's constitutional claims. The parties agree that Defendants Morris and Remus were acting within the scope of their discretionary authority when the events on April 20, 2006, took place, and thus, the burden shifts to Mr. Swofford to prove that qualified immunity is not appropriate in this case. The Court, therefore, next considers whether: (1) the officers violated Mr. Swofford's constitutional rights, specifically his Fourth Amendment rights to be free from unlawful entry onto property and excessive force, and (2) whether those rights were clearly established.

### A. Unlawful Entry

#### 1. Legal Standards

The Fourth Amendment protects individuals from unreasonable governmental intrusion into their "persons, houses, papers, and effects." <u>McLaughlin v. Elsberry, Inc.</u>, 868 F.2d 1525, 1529 (11th Cir. 1988). The focus of Fourth Amendment analysis is whether society is prepared to recognize an expectation of privacy as reasonable. <u>McClish</u>, 483 F.3d at 1241. In addition to protecting the privacy within the house itself, the Fourth Amendment also protects the curtilage of the house, that is, the area immediately surrounding a dwelling house. <u>United States v. Dunn</u>, 480 U.S. 294, 300 (1987); <u>see</u> <u>also</u> <u>United States v. Taylor</u>, 458 F.3d 1201, 1206 (11th Cir. 2006)("[C]urtilage is the area to

which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life' . . . ." (citation omitted)).  Though, "[w]hat a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection."  Id. (citing Katz v. United States, 389 U.S. 347, 351 (1967)).  In that regard, "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home."  Oliver v. United States, 466 U.S. 170, 178 (1984).  "[O]pen fields surrounding a house are not protected under the fourth amendment[,] and [] a search of them need not be accompanied by a warrant issued upon probable cause."  United States v. Williams, 581 F.2d 451, 453 (5th Cir. 1978).[8] Further, "[a] perimeter fence around the property does not create a constitutionally protected interest in all open fields on the property."  Taylor, 458 F.3d  at 1208; McClish 483 F.3d at 1237.  To distinguish whether property is curtilage versus an open field, the court must consider four factors:  "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."  Dunn, 480 U.S. at 301; see also Oliver, 466 U.S. at 180 n.11 ("An open field need by neither 'open' nor a 'field' as those terms are used in common speech.").

Warrantless entry into the home or curtilage is unreasonable and, therefore, in violation of the Fourth Amendment, subject to only two exceptions:  consent or "exigent circumstances."  McClish, 483 F.3d  at 1240-41; see also Welsh v. Wisconsin, 466 U.S.

---

8 Cases decided by the Fifth Circuit before October 1, 1981, are binding precedent in the Eleventh Circuit today. Bonner v. Pritchard, 661 F.2d 1206 (11th Cir. 1981)(en banc).

740, 749 (1984)("[E]xceptions to the warrant requirement are 'few in number and carefully delineated,' and the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches and arrests." (citation omitted)).  Consent is not implicated in this case.  Defendants proffer the exigent circumstances exception, which "recognizes a 'warrantless entry by criminal law enforcement officials may be legal where there is compelling need for official action and no time to secure a warrant.'" United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002)(citing Michigan v. Tyler, 436 U.S. 499, 509 (1978)).  Exigent circumstances which might justify warrantless searches include hot pursuit, protecting the safety of the police officers, and likelihood that the suspect will imminently flee.  Georgia v. Randolph, 547 U.S. 103, 117 n.6 (2006)(citations omitted).

### 2.    Analysis

Defendants contend that their warrantless entry onto Mr. Swofford's property was constitutional because the property was an open field.  Alternatively, Defendants contend that exigent circumstances existed because Defendants were in hot pursuit of the two Suspects at the time of their entry.  (Doc. No. 173 at 19.)   The Court considers each contention in turn.

To determine whether Defendant Morris's and Defendant Remus's entry onto Mr. Swofford's property was lawful, the Court must decipher whether the property was curtilage or an open field.  Considering the four factors enumerated in Dunn, the Court finds that, when the facts are viewed in the light most favorable to the Plaintiffs, a reasonable jury could find that the portion of Mr. Swofford's property entered upon by Defendants Morris and Remus was curtilage and, thus, protected from warrantless entry.  First, Defendants

contend that the "distance between the east side of the property where the home is located and the fence where the deputies entered[] is over 600 feet." (Doc. No. 173 at 21.) However, Plaintiffs suggest that Mr. Swofford was 140 yards from the residence when Defendant Morris first encountered him, a distance of only 420 feet. (Doc. No. 188 at 10.) Therefore, even if the point of entry was not curtilage, the point of contact with Mr. Swofford very well may have been. Additionally, Defendants contend that the property appeared abandoned and overgrown with weeds. According to Plaintiffs, however, the grass was mowed regularly, and the property had never been abandoned or neglected since the Swoffords purchased it. With regard to the steps taken by the Swoffords to protect their property from observation, Defendants contend that the fence surrounding the Swofford's property "is not consistently wood and at one point is easily seen through as chain link." (Doc. No. 173 at 23.) However, Plaintiffs allege that "the Fence was repaired as needed . . . . [T]he Swoffords' property was enclosed with a 6-foot tall wooden privacy fence and some chain link fencing like a traditional backyard. . . , protect[ing] their backyard from observation." (Doc. No. 188 at 10.) Considering these facts and viewing them in the light most favorable to the Plaintiff, a reasonable jury could find that Plaintiffs manifested a reasonable expectation of privacy in the area of the Swoffords' property upon which Defendants entered, and the property would therefore be protected against warrantless search.

Even if the area upon which Defendants entered and encountered Mr. Swofford is curtilage, Defendants are nonetheless entitled to qualified immunity if it would not be clear to a reasonable officer that the property entered upon was curtilage. "The standard of

objective reasonableness which is used to assess an officer's entitlement to qualified immunity 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law." <u>Priester</u>, 208 F.3d 919, 925 (11th Cir. 2000)(quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)). Thus, should an officer be reasonably mistaken as to the exact constitutional propriety of entering land, he or she should not face personal liability in such instances. <u>Maughon v. Bibb County</u>, 160 F.3d 658, 661 (11th Cir. 1998). There is evidence in this case from which a jury could infer that both Defendant Morris and Defendant Remus knew, in fact, or reasonably should have known, that the property they entered upon was residential. As discussed below, that evidence is relevant to the Court's assessment of whether Defendants' use of deadly force against Mr. Swofford was reasonable. The fact that the property was residential, however, does not automatically render it cartilage, protected from warrantless entry. Mr. Swofford's property is over six acres in size, and by Plaintiff's own admission, "the proximity of the area where Morris encountered Swofford was approximately 140 yards from the residence." (Doc. 188 at 10.) "In <u>Dunn</u>, the Supreme Court held that a barn, used for storing chemicals, located some sixty yards from the house was not located within its curtilage for Fourth Amendment purposes." <u>Taylor</u>, 458 F.3d at 1207 (citing <u>Dunn</u>, 480 U.S. at 302). Therefore, even if a reasonable jury could find that Defendants violated Mr. Swofford's Fourth Amendment right against unlawful entry, the Court cannot say that it would be clear to all reasonable officers that entry onto Mr. Swofford's property, both at the fence and to the point at which the Defendants encountered Mr. Swofford, was unlawful. Because the Court cannot find that the property entered onto by Defendants was clearly defined as protected curtilage, the

Court must **GRANT** summary judgment in favor of Defendants Morris and Remus on Mr. Swofford's unlawful entry claim.

In the alternative, Defendants also contend that their warrantless entry onto the Swoffords' property should be excused due to the exigent circumstance of hot pursuit. Upon review of the undisputed facts in this case, the Court finds as a matter of law that Defendants were not in hot pursuit of the two Suspects when Defendants entered onto the Swoffords' property. The United States Supreme Court has repeatedly found that hot pursuit requires a chase. Hatchcock v. Cohen, 547 F. Supp. 2d 1271, 1276 (S.D. Fla. 2008)(citing United States v. Santana, 427 U.S. 38 (1976) and Welsh v. Wisconsin, 466 U.S. 740 (1984)). When Defendants Morris and Remus began to search with Strike, more than eleven minutes had passed from the time that Defendant Remus lost sight of the two Suspects. During those eleven minutes, Defendant Remus left the apartment complex on his bicycle, followed a car for about a mile, and then returned to the apartment complex and began briefing Deputy Morris. Further, Defendant Morris admits that he was not in a hurry when he arrived at the apartment complex and met Defendant Remus. Additionally, Defendant Morris did not know where the two Suspects were when Defendants began to search the perimeter of Mr. Swofford's property, and Defendant Remus conceded that he did not know whether the two Suspects were within the fenced-in area. Lastly, Defendants have made no contention that the Suspects were armed or otherwise dangerous. Hathcock v. Cohen, 547 F. Supp. 2d 1271, 1277 (S.D. Fla. 2008)(The fact that the suspect was not armed during the commission of the offense weighed against a finding of hot pursuit). Considering these undisputed facts, the Court finds that neither Defendant was in

19

hot pursuit when they entered onto Mr. Swofford's property.  Nevertheless, Defendants'

Motion for Summary Judgment as to Defendants' entitlement to qualified immunity on the

unlawful entry claim is **GRANTED** because Mr. Swofford's right against unlawful entry

under the circumstances was not clearly established.

### B.    Excessive Force

#### 1.    Legal Standard

Mr. Swofford's excessive force claim derives from the Fourth Amendment, which

protects individuals from "unreasonable" seizures.[9]  A police officer's use of force violates

the Fourth Amendment if it is objectively unreasonable in light of the circumstances.

Graham v. Connor, 490 U.S. 386, 395-97 (1989).   The reasonableness of the use of force

is evaluated with reference to the perspective of the deputy on scene at the time of the

incident, not with the benefit of 20/20 hindsight.  Long v. Slaton, 508 F.3d 576, 579-580

(11th Cir. 2007).  "[T]he question is whether the officers' actions are 'objectively reasonable'

in light of the facts and circumstances confronting them, without regard to their underlying

intent or motivation."  Graham, 490 U.S. at 397.   Deadly force is "reasonable" for the

purposes of the Fourth Amendment when an officer "'(1) has probable cause to believe that

the suspect poses a threat of serious physical harm, either to the officer or to the others' or

'that he has committed a crime involving the infliction or threatened infliction of serious

physical harm;' (2) reasonably believes that the use of deadly force was necessary to

prevent escape; ***and*** (3) has given some warning about the possible use of deadly force, ***if***

---

9 "It is clear that the [intentional] 'apprehension by the use of deadly force is a seizure.'"  Vaughan v. Cox, 343 F.3d
1323, 1328 (11th Cir. 2003)(citing Garner, 471 U.S. at 7); Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1166-67

*feasible*." <u>Vaughan v. Cox</u>, 343 F.3d 1323, 1329-30 (11th Cir. 2003)(quoting <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985)(emphasis added)).  When the individual against whom the force was used is not a suspect, that factor weighs against a finding that the force used was reasonable.  <u>See</u> <u>Hamilton v. City of Jackson, Alabama</u>, 261 Fed. Appx. 182, 186 (11th Cir. 2008).

### 2. Analysis

Preliminarily, the Court addresses issues tangential to Mr. Swofford's excessive force claim raised by Defendants on summary judgment.  First, Defendants contend that "the Court uses Plaintiff's *best* case to decide qualified immunity and thereby avoid deciding collateral issues presented based on conflicts of fact." (Doc. No. 173 at 26 (citing <u>Robinson v. Arrugueta</u>, 415 F.3d 1252 (11th Cir. 2005)).  Defendants continue, "if Swofford's best case is illustrated via, or at a minimum limited by, the physical evidence and the experts, Swofford should not be able to pose an alternative fact scenario that is inconsistent with his own experts and the physical evidence, just to avoid summary judgment." <u>Id.</u> at 26.  While the Court agrees that Mr. Swofford's case on summary judgment must rest on more than just that which is metaphysically possible, Mr. Swofford's case can be based on evidence and facts proffered by either party.  Mr. Swofford's best case is derived from the Court's viewing all facts of record in the light most favorable to him.  <u>Robinson</u>, 415 F.3d at 1257.  Therefore, with regard to the facts pertinent to Mr. Swofford's excessive force claim, the Court will consider all facts and evidence offered on the Motion by each party to determine whether Defendants' Motion should be granted as to qualified immunity on the excessive force claim against each Defendant Officer.

---

(11th Cir. 2005).  The parties do not dispute that Mr. Swofford was subject to a seizure by Defendants.

### a. Whether Mr. Swofford Can Establish that a Violation of Mr. Swofford's Fourth Amendment Right to be Free of Excessive Force Occurred

#### i. Officer Morris

Viewing the facts in the light most favorable to Mr. Swofford, the Court finds that a reasonable jury could find that Defendant Morris's actions were objectively unreasonable in light of the facts and circumstances on April 20, 2006.

"A]n excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest." Bashir v. Rockdale County, Ga., 445 F.3d 1323, 1332 (11th Cir. 2006). While the unlawful entry and the excessive force claims should be analyzed separately, on the excessive force claim, the Court must consider the events leading up to the use of force to decipher whether the force used against Mr. Swofford was objectively unreasonable. Significantly, "[d]efendants cannot claim the protection of qualified immunity when their own objectively unreasonable actions created the very risk that generated the eventual use of deadly force." Bletz v. Gribble, Case No. 1:08-cv-533, 2009 WL 2132729, at *7 (W.D. Mich. July 10, 2009)(citing Yates, 941 F.2d at 447, and Kirby v. Duva, 530 F.3d 475, 482 (6th Cir. 2008)("Where a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive.")); see also Estate of Starks v. Enyart, 5 F.3d 230, 233-234 (7th Cir. 1993). Therefore, regardless of whether Morris's entry onto the Swoffords' property was unlawful, his decision to enter and search the property under such circumstances is relevant to whether his ultimate decision to use deadly force against Mr. Swofford was objectively unreasonable and, therefore, unlawful.

At the time Defendant Morris arrived at the apartment complex to meet Defendant Remus (approximately 2:46 a.m.), at least eleven minutes had passed since Remus last saw the Suspects, and Alert was four minutes away from the premises. Rather than contact the SCSO to obtain information regarding the nature of the property, confirm that a police perimeter was secured, or wait for Alert to arrive to help search for the Suspects, Defendant Morris ripped away protective fencing and entered onto what he knew to be enclosed, private property to begin searching for the two Suspects, without first attempting to contact the property owner. Further, it is undisputed that both Morris and Remus entered the property without announcing their entry or illuminating the lights on Morris's police car to indicate their presence. In light of these facts, a reasonable jury could conclude that Morris's entry onto Mr. Swofford's property under such circumstances was objectively unreasonable. See Yates v. City of Cleveland, 941 F.2d 444, 447 (6th Cir. 1991)("It was not 'objectively reasonable' for [defendant officer] to enter the dark hallway at 2:45 a.m. without identifying himself as a police officer, without shining a flashlight, and without wearing a hat."); Miller v. United States, 357 U.S. 301, 314 n.12 (1958)("Compliance [with knock and announce] is also a safeguard for police themselves who might be mistaken for prowlers and be shot down by a fearful householder."). Considering Yates, the Court finds that the mere presence of a flashlight in the instant case does not render Defendants' entry onto Mr. Swofford's property reasonable.

Once Morris and Remus entered the property, they followed Strike's lead in and around Mr. Swofford's property, ultimately leading them to their encounter with Mr. Swofford. According to Morris's own testimony, at the moment that Strike raised his head

and Morris first saw Mr. Swofford, Morris believed that Mr. Swofford was likely the homeowner. By Mr. Swofford's account, at that moment, Mr. Swofford was crouched down by a bush, and his firearm was initially pointed at the ground.[10] Mr. Swofford was lawfully armed and legally entitled to protect his property. FLA. STAT. §§ 776.012, 776.013 (West 2005); (Remus Dep. 212:15-25, Jan. 13,2009.). Accepting Mr. Swofford's account, at that instant, Mr. Swofford shouted "Halt!", and then Defendant Morris, without identifying himself or offering a warning to Mr. Swofford, shot Mr. Swofford twice. Next, Mr. Swofford recalls hearing, "Seminole County Sheriff's Office," and then being shot a few more times.

Viewing the facts in the light most favorable to Mr. Swofford, a reasonable jury could find that Defendant Morris unlawfully and unreasonably entered upon Mr. Swofford's property, and then, without warning and with knowledge that Mr. Swofford was not one of the two Suspects for whom they were searching, unreasonably used deadly force upon Mr. Swofford. Defendant Morris contends to the contrary, arguing that, in light of the reasonableness factors set forth in Garner, his use of deadly force against Mr. Swofford was reasonable. Morris contends that the first Garner factor, that Morris had "probable cause to believe that the suspect posed a threat of serious physical harm," weighs in his favor. Certainly, the sight of an individual holding a gun in a dark yard during the middle of the night may invoke the fear of serious physical harm. However, Defendants admittedly were aware that Mr. Swofford was not one of their suspects and that he was likely the property owner who was lawfully entitled to possess a firearm to protect his residence from intruders. By entering the property without announcing or otherwise informing the property

---

10 Viewing the facts in the light most favorable to Mr. Swofford, Mr. Swofford's gun never came above his stomach and, thus, allegedly never reached the fire position.

24

owner of their entry, a reasonable jury could find that Defendants' own actions created this precarious position.  See Hamilton, 261 Fed.Appx. at 186; Bletz, 2009 WL 2132729, at *7. Further, by shining a flashlight in Mr. Swofford's eyes and failing to warn Mr. Swofford to put the gun down or to identify themselves, as contended by Mr. Swofford, a reasonable jury could infer that Defendant Morris's decision to resort to deadly force at that instant was unreasonable.   See Bletz, 2009 WL 2132729 at *7("This argument [unsuccessfully] attempts to justify Defendants' entire course of unreasonable conduct by reference to one split-second decision during which Defendants may legitimately have feared for their lives.").

The second Garner factor, concerning use of force to prevent escape, weighs against a finding of reasonableness because Defendants knew that Mr. Swofford was not a suspect, and there are no facts of record to suggest that Mr. Swofford ever attempted to flee.  As to the third factor, whether a warning was given, Defendants contend on the one hand that they provided warnings to Mr. Swofford before shooting him (Doc. No. 173 at 9-10), but on the other hand, suggest that providing a warning before shooting Mr. Swofford was not feasible, in light of Mr. Swofford's version of the facts.  Id. at 28.  If Mr. Swofford's version of events is believed, a reasonable jury could find that it was feasible for Defendants to give a warning and that no warning was given.   Therefore, upon consideration of the foregoing, the Court cannot say as a matter of law that Defendant Morris's decision to use of deadly force was objectively reasonable.

### ii.      Officer Remus

The analysis of the second prong of qualified immunity as it pertains to Defendant

Remus is similar to that for Defendant Morris.  However, concerning the analysis for Defendant Remus, there is a factual dispute as to whether any of the shots fired by Defendant Remus ever struck Mr. Swofford. Specifically, Defendant Remus contends he "is independently entitled to summary judgment on all use of force and battery claims because Plaintiffs' expert has testified that Remus' shots missed."  (Doc. No. 173 at 28.)  The Court finds this contention unavailing.  Defendant Remus testified at his deposition that he believes at least one bullet fired by him on April 20, 2006, struck Mr. Swofford.  Defendants note, however, that Richard Ernest, the Swoffords' expert witness, proffers that neither one of Remus's shots could have hit Mr. Swofford.  (Doc. No. 173 at 28.)  Viewing the facts in the light most favorable to Mr. Swofford, a reasonable jury would be free to reject the opinion of Plaintiffs' expert, whose opinions Defendants will undoubtedly assail.  The jury could, in that event, credit Defendant Remus's own admission that at least one of the bullets fired by Defendant Remus struck Mr. Swofford.

Further, even if these facts were insufficient to support a jury finding that one of Remus's bullets hit Mr. Swofford, Defendant Remus would not automatically be entitled to summary judgment on Mr. Swofford's excessive force claim.  It is well settled in the Eleventh Circuit that "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." Fundiller v. City of Cooper City, 777 F.2d 1436, 1442 (11th Cir.1995); Trammell v. Thomason, No. 08-13801, 2009 WL 1706591, at *7 (11th Cir. June 18, 2009); see also Grandstaff v. City of Borger, Tex., 767 F.2d 161, 168 (5th Cir. 1985)(finding that, because the use of force was a joint operation, each participant could be

liable despite the inability to decipher which defendant fired the shot that killed the plaintiff). Defendants argue to the contrary, citing Troupe v. Sarasota County, Fla., a § 1983 case in which the Court found that a defendant officer's single-missed shot was not the proximate cause of any injury to the plaintiff. 419 F.3d 1160, 1165 (11th Cir. 2005). However, Troupe is distinguishable from the instant case because the Court in Troupe found that *none* of the three defendant officers involved in the case was the "proximate cause" of the Plaintiff's injuries. In this case, however, the parties agree that at least one of the Defendants involved in the shooting of Mr. Swofford on the night of April 20, 2006, proximately caused Mr. Swofford's injuries. Therefore, even if a jury finds that none of the rounds discharged by Defendant Remus struck Mr. Swofford, Defendant Remus could still be liable if the jury finds that he failed to take feasible steps to protect Mr. Swofford from Defendant Morris's use of force, assuming Morris's use of force is found to be unlawful.

As with Defendant Morris, considering the events leading up to Defendant Remus's entry on to Mr. Swofford's property, a reasonable jury could infer that Defendant Remus's actions created or contributed to the risk that ultimately resulted in the use of deadly force against Mr. Swofford. In this regard, the facts of record are even more compelling against Remus. Remus had patrolled the property eleven times prior to the events on April 20, 2006, including one patrol that occurred less than three hours before the shooting. Remus knew that the property comprised of 400, 410, and 420 Forest Lake Drive—Mr. Swofford's property—was residential property, and he knew where the residence was located. Based on Remus's knowledge of the prior criminal activity targeting the property, Mr. Swofford's requests that the property be patrolled, and Remus's knowledge that the property was

residential, it was reasonably foreseeable to Remus that the officers might encounter a homeowner on the property. Yet, as Defendant Remus admits, he never informed Morris about Mr. Swofford's patrol requests, his knowledge of the property, or that the property was residential. Nevertheless, Remus's knowledge can be imputed to Morris because Remus and Morris were working in close concert with each other. <u>Stassi v. United States</u>, 410 F.2d 946, 952 n.7 (5th Cir. 1969)(citing <u>United States v. Romero</u>, 249 F.2d 371, 374 (2d Cir. 1957). Further, Remus never took any action to ensure that the property owner was notified regarding the two Suspects or Defendants' intended entry onto the property. Viewing these facts and those previously discussed herein concerning Officer Morris in the light most favorable to the Plaintiff, a reasonable jury could conclude that Remus's entry onto Mr. Swofford's property under such circumstances was objectively unreasonable and created a foreseeable risk of injury to the property owner.

Thus, even if a reasonable jury finds that Defendant Remus did not shoot Mr. Swofford, the jury could still find that Defendant Remus violated Mr. Swofford's Fourth Amendment Right to be free from excessive force by failing to take feasible steps to protect Mr. Swofford from Defendant Morris's excessive use of force. Remus knew at the moment that he encountered Mr. Swofford that Mr. Swofford was not one of the two Suspects for whom they were searching. Thus, not only did Defendant Remus fail to inform Defendant Morris about the nature of the property, but also, when viewing the facts in the light most favorable to Mr. Swofford, Remus took no action to protect Mr. Swofford from Defendant Morris's use of deadly force. Remus did not announce himself to Mr. Swofford or warn Mr. Swofford to drop his firearm. Considering these facts, a reasonable jury could conclude

that Remus failed to take steps that were feasible to protect Mr. Swofford from Defendant Morris's use of deadly force and, therefore, violated Mr. Swofford's Fourth Amendment right. <u>See</u> <u>Grandstaff</u>, 767 F.2d at 168 ("The firestorm that killed [the plaintiff] was in all respects a joint operation: the same recklessness, the same circumstances, and the same object. Each participant was as much at fault as the others, and all are liable for the foreseeable consequences.").

> **b.** **Whether Mr. Swofford's Fourth Amendment Right to be Free of Excessive Force was Well Established Under the Circumstances**

The Defendants contend that, even if they used excessive force in this circumstance, Mr. Swofford's constitutional right to be free from excessive force in the context of this case was not clearly established at the time Defendants acted to infringe those rights. Considering <u>Garner</u>, however, and viewing the facts in the light most favorable to Mr. Swofford, the Court finds that, indeed, Mr. Swofford's rights were clearly established. 471 U.S. 1 (1985). Mr. Swofford was not a suspect, he was not attempting to escape, and it was feasible for Defendants to voice a warning to him before they fired shots.

It is simply not normal for law enforcement officers to tear down privacy fencing in a non-exigent search for suspects, enter unannounced onto a homeowner's property, and shoot him, unprovoked in his own backyard, knowing full well that he was not one of the suspects. Viewed in the light most favorable to Mr. Swofford, this is what the evidence would prove occurred. If constitutional protection against that risk is not bedrock, it is hard to envision what is.

Even if this right was not clearly established, which the Court finds that it was, in excessive force cases, the Eleventh Circuit has "recognized a narrow exception to the rule requiring particularized case law." Hamilton, 261 Fed.Appx. at 187. To overcome a qualified immunity defense, a plaintiff can demonstrate, alternatively, "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." Priester, 208 F.3d at 926-27.

The Court recognizes that the exception to the particularized case law requirement is narrow. Id. When viewing the facts in the light most favorable to Mr. Swofford, though, the Court finds that every reasonable officer in the position in which Defendants put themselves on the night of April 20, 2006, would conclude that the use of deadly force against Mr. Swofford was unlawful. The use of deadly force is clearly unlawful when an officer enters upon private property without indicating his or her presence, searches the property, encounters the property owner whom the officer knows is likely lawfully armed on his own property and not a suspect, and then fails to give a warning or to identify himself to the property owner before shooting him.

Therefore, Defendants' Motion for Summary Judgment as to Defendants' entitlement to qualified immunity against Mr. Swofford's excessive force claim is **DENIED.** However, Defendants Morris and Remus "are not foreclosed from asserting a qualified immunity defense at trial." Vaughan, 343 F.3d at 1333 (citations omitted). Should the jury choose to reject Plaintiffs' version of the facts, or the facts not be presented at trial as alleged on summary judgment, the qualified immunity analysis will inevitably change. In

this regard, Defendants may seek special interrogatories to the jury to resolve factual disputes going to the qualified immunity defense.  <u>Id.</u>

**C.      Mr. Swofford's Claim for Punitive Damages**

Defendants Morris and Remus contend that they are entitled to dismissal of all claims for punitive damages.  Punitive damages may be awarded against an officer under § 1983 when a defendant's conduct was "motivated by evil motive or intent, or when it involves a reckless or callous indifference to the federally protected rights of others."  <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983).  The Court finds Defendants are not entitled to summary judgment on Plaintiffs' claim for punitive damages.  If the jury accepts Plaintiffs' version of the facts, a jury could reasonably conclude that Defendants Morris and Remus were, at the very least, callously indifferent to Mr. Swofford's federally protected rights.  Therefore, summary judgment in Defendants' favor with respect to Mr. Swofford's claims for punitive damages is **DENIED**.

**D.      State Law Claims**

**i.      Mr. Swofford's State Law Claims**

Defendants Morris and Remus suggest that they are entitled to summary judgment on all state law claims because they are immune from suit pursuant to § 768.28(9)(a), Florida Statutes.  According to § 768.28(9)(a):

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer,

employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Defendants contend that there is no evidence that they acted in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights safety, or property. (Doc. No. 173 at 2.) Defendants further contend that they are entitled to summary judgment on Mr. Swofford's state law claims for excessive force or battery and for negligence because their use of deadly force was reasonable, necessary, justified, and privileged. Aside from identifying § 768.28(9)(a), Defendants provide no legal or factual support for their contentions on each of the state law claims

In light of the Court's analysis concerning qualified immunity and considering the many factual disputes in this case, the Court finds that the issue of whether Defendants' use of deadly force was reasonable, necessary, justified, and/or privileged ought to be put to the jury. See Prieto v. Malgor, 361 F.3d 1313, 1320 (11th Cir. 2004)(quoting McGhee v. Volusia County, 679 So. 2d 729, 733 (Fla. 1996)). The Court cannot say as a matter of law that Defendants did not act with wanton and willful disregard of human rights, safety, or property or that Defendants acted reasonably if Mr. Swofford's version of the facts is accepted. Therefore, summary judgment in Defendants' favor on all of Mr. Swofford's state law claims is **DENIED**.

### ii. Mrs. Swofford's Claim for Loss of Consortium

Defendants Morris and Remus contend that they are entitled to summary judgment on Mrs. Swofford's claim for loss of consortium because "it is a derivative claim which fails

when judgment is due on the state law claims brought by Mr. Swofford." (Doc. No. 173 at 2.) Because the Court did not grant summary judgment in Defendants' favor concerning Mr. Swofford's claims, the Court must also deny summary judgment in Defendants' favor on Mrs. Swofford's claim for loss of consortium.

## IV.     Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment as to all of Plaintiffs' claims (Doc. No. 173) is **GRANTED in part** and **DENIED in part**. Defendants' Motion is **GRANTED** as to Mr. Swofford's claim of unlawful entry, pursuant to the doctrine of qualified immunity. Defendants' Motion is **DENIED** as to all other claims.

**DONE** and **ORDERED** in Orlando, Florida, this 30th day of November 2009.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record