UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**ROBERT G. SWOFFORD JR.**, an individual, and his wife, **SHARON R. SWOFFORD**, an individual,

 **Plaintiffs,**

v.              Case No.: 6:08-cv-00066-Orl-35DAB

**DONALD ESLINGER**, in his official capacity as the Sheriff of Seminole County, Florida; **WILLIAM MORRIS JR.**, in his individual capacity; and **DONALD REMUS**, in his individual capacity,

 **Defendants.**
_____/

## ORDER

**THIS CAUSE** comes before the Court for consideration of the Motion for Summary Judgment (Doc. No. 78), filed by Defendant Donald Eslinger, in his official capacity as Sheriff of Seminole County, Florida, and Plaintiff's Memorandum in Opposition, filed in response thereto (Doc. No. 184). Defendant Eslinger moves the Court to declare as a matter of law that he is entitled to summary judgment on all claims brought by Plaintiffs. Upon consideration of all relevant filings and case law and being otherwise fully advised, the Court finds that Defendant's Motion for Summary Judgment (Doc. No. 78) should be **DENIED**.

1

## I. BACKGROUND

This case arises from the shooting of Plaintiff Robert Swofford by Defendants William Morris, Jr. and/or Ronald Remus (the "Officers") during the early morning hours of April 20, 2006. Morris and Remus, Deputies for Seminole County Sheriff's Office ("SCSO"), were pursuing two felony car burglary suspects when they encountered an armed Mr. Swofford on Swofford's property and fired upon him. The Amended Complaint, filed by Mr. Swofford and his wife, Sharon Swofford, on May 16, 2008, alleges claims against Defendant Eslinger (the "County"), pursuant to 42 U.S.C. § 1983, for the use of excessive force and unlawful entry onto Swofford's property, in violation of Mr. Swofford's Fourth Amendment rights, and seeks compensatory and punitive damages, plus interest, costs, and attorneys' fees, pursuant to 42 U.S.C. § 1988. The Amended Complaint also alleges on behalf of Mr. Swofford state law claims of battery, gross negligence, simple negligence, and negligent training and supervision and, on behalf of Mrs. Swofford, a claim for loss of consortium. (Doc. No. 34.)

On March 2, 2009, Defendant Eslinger filed the Motion presently before the Court.[1] The County moves for summary judgment, contending that it is not liable to Mr. Swofford as a matter of law because Mr. Swofford cannot establish that: 1) the County had a policy or custom that was the moving force behind the alleged violation of Mr. Swofford's constitutional rights, or 2) the County's failure to train Defendants Morris and Remus

---

[1] On November 11, 2008, Plaintiffs filed a motion, seeking sanctions against all Defendants for bad faith spoliation of multiple pieces of evidence. (Doc. No. 44.) The Court granted Plaintiffs' Motion, finding that Defendants had purposely destroyed or permitted the destruction of evidence requested by the Plaintiffs. (Doc. Nos. 233, 273.) The Court does not consider the sanctions in its disposition of the Motion for Summary Judgment. The Court notes, however, that viewed through the lens of the inferences and presumptions the jury will be permitted to engage, granting summary judgment is even more inappropriate.

reflected a deliberate indifference to Mr. Swofford's constitutional rights.  Further, the County contends that it is entitled to summary judgment on Mr. Swofford's state law claims and Mrs. Swofford's claim for loss of consortium because Defendant Morris's and Remus's actions on April 20, 2006, were reasonable.

The Officers also moved for summary judgment in their favor on all claims against them (Doc. No. 173), which the Court granted in part and denied in part.  (Doc. No. 317.) The Court granted summary judgment on the unlawful entry claim, concluding that, while a reasonable jury could find that Defendants Morris and Remus violated Mr. Swofford's Fourth Amendment right to be free of unlawful entry onto his property, given the factual nuances surrounding the property on which the Officers' conduct occurred, Mr. Swofford's rights were not clearly established.  Therefore, the Court found that Defendants Morris and Remus were entitled to qualified immunity on Mr. Swofford's unlawful entry claim.  The Court, however, denied summary judgment on Mr. Swofford's excessive force, state law, and punitive damages claims.  Central to the Court's determination was that, when considering the many factual disputes in the record and when viewing the evidence in the light most favorable to Mr. Swofford, the Court could not say as a matter of law that the Officers did not act with wanton and willful disregard of human rights, safety, or property or that they acted reasonably if they, in fact, shot Mr. Swofford in his own backyard without warning, knowing he was not one of the two suspects for whom they were searching.  The Court incorporates in this Order its recitation of the facts and its analysis contained in its prior Order on the Officers' Motion for Summary Judgment.  (Doc. No. 317.)

Upon consideration of the disputed and undisputed facts relevant to the County's Motion, the Court finds that there are outstanding factual disputes which, at this time, preclude summary judgment in Defendant Eslinger's favor.

## II.  LEGAL STANDARDS

### A.  Standard of Review for Summary Judgment

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, No. 08-12553, 2009 WL 485187, at *3 (11th Cir. Feb. 27, 2009)(citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)). Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 2009 WL 485187, at *3 (citing Welding Servs., Inc., 509 F.3d at 1356). A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001)(citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. Porter v. Ray, 461 F.3d 1315, 1321 (11th Cir. 2006)(citation

omitted). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985)("conclusory allegations without specific supporting facts have no probative value"). If material issues of fact exist that would not allow the Court to resolve an issue as a matter of law, the Court must not decide them, but rather, must deny the motion and proceed to trial. Herzog v. Castle Rock Entertainment, 193 F.3d 1241, 1246 (11th Cir. 1999). In the § 1983 context, however, the Court must resolve all issues of material fact in Plaintiffs' favor and then answer the legal question of whether Defendant is entitled to immunity from suit under that version of the facts. See Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009) (citing West v. Tillman, 496 F.3d 1321, 1326 (11th Cir. 2007)).

### B. Municipal Liability Standard

In Monell v. Department of Social Services, 436 U.S. 658 (1978), the Supreme Court held that a municipality's liability under § 1983 "must be predicated upon more than a theory of respondeat superior." Fundiller v. City of Cooper City, 777 F.2d 1436, 1442 (1985). For the Court to find that the municipality may be held liable for the plaintiff's claims, the plaintiff must establish that a violation of his or her constitutional rights occurred. Case, 555 F.3d at 1328 (stating that no Supreme Court decision "authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the officer inflicted no constitutional harm") (quoting City of Los Angeles v. Heller, 475 U.S. 769, 799 (1986)). Additionally, the Plaintiff must demonstrate that "it is [the] execution of a government's policy or custom, whether made by its lawmakers or by those whose

edicts or acts may fairly be said to represent official policy, [that] inflicts the [claimed] injury [in order for] the government as an entity [to be] responsible under § 1983." Monell, 436 U.S. at 694. The Court further clarified the difference between a policy and a custom:

> Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels.

Id. at 690. Finally, "[r]egardless of whether the basis of the claim is an officially promulgated policy or an unofficially adopted custom, it must be the 'moving force behind the constitutional deprivation before liability may attach.'" Fundiller, 777 F.2d at 1442 (quoting City of Oklahoma City v. Tuttle, 471 U.S. 808 (1985)). Thus, the municipality must be at fault for establishing a policy or custom and a causal link must exist between the custom or policy and the violation of constitutional rights. Id.

## III. DISCUSSION

### A. Federal Claims

On November 30, 2009, the Court entered its Order, granting in part and denying in part summary judgment in favor of Defendants Morris and Remus. (Doc. No. 317.) As part of its analysis, the Court determined that, when viewing the facts in the light most favorable to Mr. Swofford, a reasonable jury could find that Defendants Morris and Remus violated Mr. Swofford's Fourth Amendment Rights against excessive force and unlawful entry. The issue that remains for consideration on this motion, then, is whether the alleged violation of

Mr. Swofford's constitutional rights occurred as a direct result of a policy or custom of the County or as a result of the County's deliberate indifference to the rights of its citizens as reflected in either its failure to adequately train or supervise its officers.

The parties have addressed three separate theories under which the County may be held liable under § 1983 on the excessive force and unlawful entry claims: (1) failure to train; (2) inadequate supervision and discipline; and (3) failure to investigate. The Court finds that, when viewing the facts of record in the light most favorable to the Plaintiff, there is evidence from which a reasonable jury could conclude that the County's failure to train its officers was the moving force behind the violations of Mr. Swofford's Fourth Amendment rights to be free of excessive force and unlawful entry onto property. Thus, because the Court can dispose of the Motion as to the excessive force and unlawful entry claims on the failure to train basis, the Court need not address the other potential theories of Monell liability.

In City of Canton, Ohio v. Harris, the Supreme Court held that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." 489 U.S. 378, 386 (1989). "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. at 388. However, "[b]efore it may be said that a municipality has made a deliberate choice among alternative courses of action, its policy makers must have had 'actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens.'" Young v. City of Augusta, Ga. Through DeVaney, 59 F.3d 1160, 1172

(11th Cir. 1995)(citing Canton, 489 U.S. at 396).  Further, a district court must consider whether the training program is adequate to address the tasks that an officer must perform and must determine whether any deficiencies in the training program are closely related to the violation of constitutional rights.  Canton, 489 U.S. at 390-91.  The district court can find that § 1983 liability attaches if the municipality was deliberately indifferent to the potential violations of constitutional rights hazarded by its deficient training program.  Vineyard v. County of Murray, 990 F.2d 1207 (11th Cir. 1993)

The County presents two legal arguments to defeat Plaintiffs' allegations of inadequate training.  First, Defendant argues that, under Monell, the court must review the training program "as a whole" and that "while the Plaintiffs might select individual training courses [to criticize] . . . this is not sufficient to impose *Monell* liability." [2]  (Doc. No. 78 at 8.) This argument has been considered and rejected.  When, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and that inadequacy so likely to result in the violation of constitutional rights, [ ] the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." Canton, 489 U.S. at 390; see Young, 59 F.3d at 1172; see also Olson, 312 F.3d at 1319 (the jury may infer that the abject failure to offer training constitutes deliberate indifference to the resulting victims).  Concerning training on the use of deadly force specifically, the Supreme Court has warned, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." Canton,

---

2 Defendant's reliance on Canton for this proposition is misplaced, and Defendant does not identify any additional legal authority in support of this contention.

489 U.S. at 390 n.10. Therefore, even if the County requires its officers to undergo significant training in other general disciplines, the County may still be liable where it ignores an obvious need in a specific area of training to prevent violations of citizens' constitutional rights.

Second, Defendant contends that, absent notice to the County concerning the need for additional training stemming from a pattern of similar conduct to that in this case, Monell liability cannot be imposed. Id. This contention, too, lacks merit under the circumstances of this case. In certain cases, there need not be a pattern of similar conduct equating to notice for Monell liability to stand. "A single constitutional violation may result in municipal liability when there is 'sufficient independent proof that the moving force of the violation was a municipal policy or custom.'" Vinyard, 990 F.2d at 1212. As discussed more fully below, in this case, the municipal policy or custom is the abject failure to train in an area singled out by the Supreme Court as being fundamental to the protection of constitutional rights. See Canton, 489 U.S. at 390 (A municipality's failure to train can qualify as a "policy or custom" that is actionable under § 1983).

### 1. Unlawful Use of Deadly Force

Mr. Swofford maintains that,"[b]y failing to provide S/DS training, SCSO deprived its [officers] of necessary and requisite training needed to make proper deadly force and tactical decisions that it knew they were likely to face."[3] (Doc. No. 184 at 10.) The County

---

3 In anticipation of Mr. Swofford's arguments regarding inadequate training and Mr. Swofford's excessive force claim, the County's Motion first addresses issues concerning Defendant Remus's training. The Court notes, however, "that [the fact that] a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcoming may have resulted from factors other than a faulty training program." Canton, 489 U.S. 378, 390-

challenges the Plaintiffs' contention that it can be held liable for any excessive force used by the Officers in their encounter with Mr. Swofford, arguing that Plaintiffs have failed to identify any officially promulgated policy or an unofficially adopted custom, , that was the moving force behind the constitutional deprivation caused by any alleged excessive force inflicted by the Officers. The Court finds that there is sufficient evidence of record from which a reasonable jury could conclude that the County's failure to provide adequate S/DS training resulted in the violation of Mr. Swofford's Fourth Amendment right to be free from the use of excessive force.

In support of its contention that the County has provided adequate S/DS firearms training to its officers, Defendant Eslinger proffers evidence concerning the County's accreditation and recognition by the Commission on Accreditation of Law Enforcement Agencies and the hours of training SCSO officers receive each year. (Doc. No. 78 at 5, 7-8.) Sheriff Eslinger also offers the opinion of Mr. Lou Dekmar, Defendants' expert on training and policy issues, stating that "the Seminole County Sheriff's Office training on firearms and deadly use of force is consistent with what he has seen in reviewing and assessing hundreds of law enforcement agencies in various contexts." Id. Defendant Eslinger has identified evidence to suggest that the SCSO officers complete significant training, with a portion of that training directed toward instructing officers on *how* to use deadly force. From the undisputed fact that Mr. Swofford received multiple shots to the abdomen, the Court has little doubt that the officers were trained on accuracy. However, the pertinent issue for the Court's consideration is whether the officers were instructed on

---

91. Therefore, on this Motion, the Court does not address those issues unique to Defendant Remus, but does consider all proffered evidence relevant to whether the County's S/DS training as a whole was inadequate.

*when* to use deadly force.

In this regard, the County's experts acknowledge that firearms training ought to include an element of training on judgment as to when it is proper to discharge a weapon. (Grossi Dep. 135:24-136:6, Feb. 18, 2009; Dekmar Depo. 90:4-6, Jan. 2, 2009.) There is record evidence that, at one time, the SCSO provided Firearms Training Systems ("FATS") training and simunitions training. (O'Connor 2 Dep. 132:10-13, Jan. 13, 2009.) According to David Grossi, Defendants' expert, simunitions training and training on a FATS simulator are forms of judgmental shooting exercises. (Grossi Dep. 135:24-136:6, Feb. 18, 2009.) According to O'Connor, however, most of the SCSO officers' training was essentially target practice for accuracy, where the officer is told to fire on a target when ordered. (O'Connor 2 Dep. 91:25-93:8, Jan. 13, 2009.) The FATS machine was used to train officers once,[4] and then it malfunctioned and remained inoperable until mid-2007. Id. at 103:13-16. Consequently, Defendant Morris received training on the FATS simulator once on February 16, 2001; Defendant Remus never received training on the FATS simulator. Additionally, the record evidence suggests that the County did not regularly provide simunitions training. Morris had two simunitions training sessions in 2000 and 2001; Remus had none. (Doc. No. 184, Exhs. 13, 20.)

Aside from Mr. Dekmar's cocnlusory assertion that the SCSO training is consistent with what he has seen from other law enforcement agencies and the single training of Morris on the FATS system in 2001, the County offers **no** evidence regarding how it trains its officers on the appropriate use of deadly force. By the SCSO's own admission, "the

---

4 Presumably, the one training on the FATS machine occurred in 2001, based on when Defendant Morris received his one training on the machine. (Doc. No. 184, Exhs. 13, 20.)

decision to use the firearm is completely up to the deputy." (O'Connor 2 Dep. 18:10-6, Jan. 13, 2009.)[5] As noted in this regard, the Supreme Court has warned, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." Canton, 489 U.S. at 390 n.10.

Thus, while the Court is loathe to second-guess the decisions of officers put in harm's way by the call of duty, the Court cannot say that permitting an officer, without the benefit of *any* meaningful training, to rely solely on the officer's instincts or personal judgment as to the presence of a deadly threat and the need to resort to deadly force satisfies the Supreme Court's clear mandate. The evidence in this case, viewed in the light most favorable to the Plaintiff, illustrates this point graphically. Officers Morris and Remus entered Mr. Swofford's property without first indicating their presence. Morris and Remus, themselves forcible intruders on Mr. Swofford's property, encountered Mr. Swofford in his own yard in the middle of the night. At the mere sight of Mr. Swofford holding a gun, which was trained to the ground, not chambered or in a firing position, the Officers opened fire, shooting Mr. Swofford multiple times. They did not announce beforehand their authority as law enforcement officers or direct him to drop his weapon. And, they knew that he was not their suspect, but that he was probably the "homeowner."

Moreover, this unfortunate scenario was foreseeable. Keith Weissman, Corporal in SCSO's K-9 Division, and the 30(b)(6) witness offered by the SCSO, admitted that he has personally encountered a startled homeowner in his or her backyard "many times."

---

5 David O'Connor is a Corporal at the SCSO and serves as the Range Master and Armorer. (O'Connor 1 Dep. 7:4-7, Dec. 30, 2008.)

(Weissman Dep. 39:20-22, Jan. 7, 2009.) From Corporal Weissman's testimony, a reasonable jury could infer that SCSO officers frequently encounter homeowners in their backyards. (Weissman Dep. 39:20-22, Jan. 7, 2009.) Further, in this instance, the SCSO had been notified regarding prior criminal activity on Mr. Swofford's property and were informed that Mr. Swofford patrols his property, armed. Yet, SCSO K-9 officers are not trained to contact homeowners when they enter private property (Linnekugel Dep. 16:15-17:9 Jan. 12, 2009), nor has the SCSO identified any record evidence suggesting that officers are trained how to avoid posing danger to an innocent homeowner. Zuchel v. City and County of Denver, Colo., 997 F.2d at 730, 739 (10th Cir. 1993)(upholding trial court's finding that training was inadequate; considering expert's testimony that S/DS training "should include training on how to avoid getting into that predicament in the first place.").

Upon consideration of the foregoing, the Court finds that, viewing the facts in the light most favorable to Mr. Swofford, a reasonable jury could conclude that the County's failure to provide adequate S/DS training to its officers resulted in the violation of Mr. Swofford's Fourth Amendment right against excessive force. Assuming, in the absence of contrary evidence, that the SCSO provides no judgmental S/DS training, a reasonable jury could conclude that the County's abject failure to offer such training constitutes deliberate indifference to the innocent victims of deadly force. Assuming that FATS and simunitions training do contain a judgmental element of training, a reasonable jury could still find the County deliberately indifferent by the SCSO's failure to provide such training on a regular basis. Zuchel, 997 F.2d at 739-40.

Accordingly, the County's Motion for Summary Judgment as to the excessive force

claim is **DENIED**. However, should the County proffer additional evidence concerning officer training at trial, the Court may revisit this issue on a motion pursuant to Rule 50, Federal Rules of Civil Procedure.[6]

### 2. Unlawful Entry in Reliance on Canine Units

Mr. Swofford seeks recovery against the SCSO for the Officers' unlawful entry onto his property without a search warrant. More specifically, Mr. Swofford contends that, "but for SCSO's failure adequately to train and supervise its canine ("K-9") teams, Morris would not have unjustifiably relied on his K-9's untrained and unevaluated tracking ability as a basis for entering the Swoffords' backyard without a warrant or under a warrant exception." (Doc. No. 184 at 14.) Mr. Swofford identifies expert reports and evidence from which a jury could infer that the SCSO's K-9 teams are inadequately trained and supervised. Aside from the County's argument that absent a pattern of prior similar conduct, there can be no Monell liability, the County proffers no evidence or legal support to challenge Plaintiff's contention.

As previously noted, in its Order on the summary judgment motion filed by the Officers, the Court explained that factual issues preclude resolution of whether a warrant was required to enter onto Mr. Swofford's property. Because reasonable officers could differ on this issue, the Court found that the Officers were entitled to qualified immunity; however, the SCSO is not so immunized. Thus, if the jury concludes that the entry was unlawful and Mr. Swofford's constitutional rights were violated, the SCSO could be liable.

---

6 The Court declines to address the County's alleged failure to investigate and to discipline Morris and Remus, as the failure to train would be a sufficient basis to find the County liable for any breach of Mr. Swofford's constitutional rights.

In order for the SCSO to be liable for a violation in that circumstance, the Plaintiff must show that the violation was the result of a pattern of similar conduct that would have put the SCSO on notice of the need to train in this area or that the need to train is so obvious in light of the constitutional dilemmas SCSO officers face in recurring situations that the failure to train in this area is sufficient proof of deliberate indifference to the lives of affected citizens. See Young, 59 F.3d at 1172; see also Vinyard, 990 F.2d at 1212 ("a single constitutional violation may result in municipal liability when there is 'sufficient independent proof that the moving force of the violation was a municipal policy or custom'").

Mr. Swofford does not identify a pattern of prior conduct equating to notice to the SCSO that deficiencies in its K-9 training programs hazarded potential violations of citizens' Fourth Amendment rights against unlawful entry onto property. Therefore, Mr. Swofford must show that the need for this specific type of training was so obvious in light of the constitutional dilemmas SCSO officers face in recurring situations that the failure to train in this area is proof sufficient of deliberate indifference to the lives of affected citizens. Viewing the facts in the light most favorable to Mr. Swofford, the Court finds that a jury could so find, and therefore, the Plaintiff has carried this burden.

The SCSO has five fulltime K-9 units. (McDaniel Dep. 23:22-24:1, Dec. 30, 2008.) Corporal Weissman admitted that, as a K-9 officer, he has personally encountered a startled homeowner in his or her backyard "many times." (Weissman Dep. 39:20-22, Jan. 7, 2009.) Thus, a reasonable jury could conclude that SCSO K-9 officers are put in recurring situations in which they must determine whether to enter or continue deeper onto private property based on a perceived tracking signal of a K-9 unit.

Further, there is evidence from which a reasonable jury could determine that the County does not train its K-9 teams to "track" suspects, but to alert to *any* individual who happens to be present during the search, including homeowners and innocent by-standers. Kenneth Wallentine, Defendants' expert witness on Strike's[7] tracking ability, explained the difference between tracking and area searching:

> In a track situation, the dog is expected to follow an [sic] scent to an unknown location to find a person . . . to find a person at the end of the track, whether it be a suspect who has fled and is hiding . . . . An area search, on the other hand, is when there is a belief that a suspect is contained within a particular area but there's no track defined. . . . [A dog that is tracking would] follow the scent as laid down on the ground to find that person, as opposed to, say, a burglary alarm goes off at a lumber yard. The lumber yard may be a [sic] acre or two. It has a fence around it. Officers get there fairly quickly, quickly enough that they believe that the burglar or burglars are still in the lumber yard or the home improvement center. Then they are going to conduct an area search.

(Wallentine Dep. 190:24-192:11, Jan. 16, 2009.) In other words, a dog trained to "track" is trained to follow a specific scent of the target individual. In stark contrast, a K-9 unit deployed to conduct an area search will alert to the presence of any human scent other than its handler and this, necessarily, would include the homeowner or business owner who happens to be in the vicinity during the deployment.

While Morris and Strike were certified by the FDLE in "area searching," they were not certified in "tracking." (See Doc. 184, Exh. 24.) Tracking certification is not required for FDLE certification. (McDaniel Dep. 76:24-77:1, Dec. 30, 2008.) Additionally, SCSO requires internal quarterly training and annual recertification, during which the SCSO evaluates the overall proficiency of the K-9 teams based on FDLE standards that do not

---

7 As explained in the Order on the Officers' Motion for Summary Judgment, Strike is the K-9 assigned to Morris and used by Morris and Remus on April 20, 2006. (Doc. No. 317 at 5.)

include tracking.

Plaintiffs' expert, Paul W. Gallagher, retired K-9 instructor from the Maine State Police, opines:

> [W]ith respect to tracking, the canine team, Deputy William Morris and K-9 Strike, were not adequately trained, were not tested, were not certified, and were not proven reliable. A reasonable K-9 officer would not have relied on K-9 Strike as a tracking canine because the K-9 team was never tested and proven reliable by an evaluator. FDLE does not certify K-9's for tracking.

(Doc. 184, Exh. 21, ¶ 4.) Defendant Morris admits that he has no way to know whether Strike is tracking the wrong person or the wrong direction. (Morris Dep. 124:2-24, Dec. 15, 2008.) Yet, it was on Strike's signal that Morris decided to breach the security of Mr. Swofford's property b ripping down portions of his privacy fence to enter and traverse farther onto Mr. Swofford's property. Based on the foregoing, a reasonable jury could conclude that the SCSO's abject failure to provide training to and to continue to supervise its K-9 teams on how properly to track onto private property constitutes deliberate indifference to rights of the resulting victims. Therefore, the County's Motion as to Mr. Swofford's unlawful entry claim is **DENIED**.

### B. State Law Claims

#### 1. Mr. Swofford's Claim for Battery and Negligence

Defendant Eslinger contends that the County is entitled to summary judgment on Mr. Swofford's state law claims for battery and negligence because the actions of the Officers were not unreasonable. Defendant Eslinger is potentially liable for these claims under the doctrine of vicarious liability, provided Defendants Morris and Remus were acting within the

17

scope of their employment. Considering the many factual disputes in this case and viewing the facts in the light most favorable to Mr. Swofford, the Court has held that it cannot grant summary judgment in favor of Defendants Morris and Remus on the state law claims. Upon consideration of the Officers' Motion, the Court could not "say as a matter of law that Defendants did not act with wanton and willful disregard of human rights, safety, or property or that Defendants acted reasonably if they, in fact, shot Mr. Swofford in his own backyard without warning, knowing he was not one of the two Suspects for whom they were searching." (Doc. No. 317 at 32.) Therefore, Defendant Eslinger's Motion as to the state law claims must also be **DENIED** at this time.

### 2. Mr. Swofford's Claim for Negligent Training and Supervision

The County contends it is entitled to summary judgment on Mr. Swofford's claim for negligent training and supervision on three bases: (1) the Officers' actions on April 20, 2006, were reasonable and justified, and therefore, the Officers were not negligent; (2) the Sheriff's Office has an exemplary process of training and supervision, and thus, the County cannot be found negligent in its training and supervision of its officers; and (3) the claim is barred by the doctrine of sovereign immunity because the officer training decisions are discretionary. In light of the Court's § 1983 analyses with respect to the Officers and the County, the Court rejects the first two bases. Thus, the Court must consider whether sovereign immunity bars the negligent training and supervision claim.

Pursuant to Florida Statute § 768.28, the state of Florida, including its subdivisions, has waived sovereign immunity for tort liability. However, "a governmental agency is

18

immune from tort liability based upon actions that involve its 'discretionary' functions, such as development and planning of governmental goals and policies." Lewis v. City of St. Petersburg, 260 F.3d 1260, 1266 (11th Cir. 2001). The County is correct that "decisions as to how to train police officers are discretionary actions . . . " for which sovereign immunity has not been waived. (Doc. No. 78 at 15 (citing Lewis, 260 F.3d at 1266).) For a plaintiff to state a claim for negligent training, "he must show that [the municipality] was negligent in the implementation or operation of the training program." Mercado v. City of Florida, 407 F.3d 1152, 1162 (11th Cir. 2005).

Viewing the record in the light most favorable to Mr. Swofford, there is evidence from which a reasonable jury could conclude that the County was negligent in its implementation of the County's police training program. For example, even though the County admits that it endeavored to provide its officers FATS and simunitions training, its FATS equipment malfunctioned after one use and was not repaired or replaced for more than five years. Remus never received any such training prior to April 20, 2006, and Morris received a total of only three training sessions (two simunitions and one FATS), the latest occurring in 2001. Consequently, a reasonable jury could conclude that the County was negligent in the implementation of the training that it initially instituted in its discretionary capacity. Therefore, issues of fact preclude summary judgment in the County's favor on the basis of sovereign immunity. Accordingly, Defendant's Motion as to Mr. Swofford's claim for negligent training and supervision is **DENIED**.

### 3. Mrs. Swofford's Claim for Loss of Consortium

The County contends that it is entitled to summary judgment on Mrs. Swofford's claim for loss of consortium because "it is a derivative claim which fails when judgment is due on the state law claims brought by Mr. Swofford." (Doc. No. 78 at 15.) Because the Court cannot grant summary judgment in favor of any Defendant as to Mr. Swofford's claims, the Court must also deny summary judgment in the County's favor on Mrs. Swofford's claim for loss of consortium.

## IV. CONCLUSION

For the reasons stated above, the Motion for Summary Judgment (Doc. No. 78), filed by Defendant Donald Eslinger, in his official capacity as Sheriff of Seminole County, Florida, is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida, this 30th day of November 2009.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies to:
Counsel of Record